### EX PARTE LEON CARDENAS MARTINEZ, JR.

#### No. 1457. Decided March 27, 1912.

**1.—Habeas Corpus—Murder—Procedure.**

In this State the rule is that the writ of habeas corpus can not serve the office of an appeal; it was not designed to operate as a writ of error or certiorari and does not have their force and effect; it does not deal with errors or irregularities which render proceedings voidable merely, but such only as render them absolutely void. Following Ex parte Schwartz v. State, 2 Texas Crim. App., 74, and other cases.

**2.—Same—Special Term of District Court.**

The Act of the Twenty-Ninth Legislature, p. 116, which authorizes special terms of the District Court is constitutional. Following Ex parte Young v. State, 49 Texas Crim. Rep., 536, and other cases.

**3.—Same—Case Stated—District Court—Special Term.**

Where a special term of the District Court was ordered to be held at the county seat of the county of the prosecution to begin on a certain day and continue in session until adjourned by order of the court, and a special grand jury was ordered summoned and empaneled as provided by law, which order was duly entered upon the minutes of the court, and all other provisions of the law were complied with in convening said special term of the District Court, the same was legal and had power to try relator upon an indictment for murder found during said term, and there was no reversible error on this ground.

**4.—Same—Special Term—Writ of Habeas Corpus.**

Where, upon trial of habeas corpus, it appeared that the defendant had been convicted of murder during a special term of the District Court, and was duly sentenced and gave no notice of appeal, and that the proceedings of his trial were in all respects regular, this court has no jurisdiction to grant said writ and go into the merits of the case, and the relator must be remanded to custody. Davidson, Presiding Judge, dissenting.

**5.—Same—Certiorari—Leave of Court Necessary.**

While it is not decided that this court can issue a writ of certiorari until jurisdiction has been conferred by notice of appeal in the trial court, yet leave of the court should be requested for the filing of the petition for the granting of such writ, and the alleged errors of the trial court must be specifically set out.

**6.—Same—Habeas Corpus—Other Writs—Jurisdiction.**

Under Section 5 of Article 5 of the Constitution, the power to issue the writ of habeas corpus is conferred upon the Court of Criminal Appeals, and

that court can only issue such other writs as may be necessary to enforce its jurisdiction, and where the said court had not obtained the jurisdiction of the case, it can not issue the writ of certiorari to enforce its jurisdiction, and the jurisdiction of said court does not attach to any case until notice of appeal has been given in the trial court.

### 7.—Same—Notice of Appeal—Mandamus.

Where the trial court wilfully or inadvertently fails to enter notice of appeal or a defendant is prevented through force or fear from giving notice of appeal, this court upon proper application made in due time would issue a writ of mandamus compelling the entry of the notice of appeal, but where no such notice has been given this court has no jurisdiction. Davidson, Presiding Judge, dissenting.

### 8.—Same—Writ of Certiorari—Common Law.

The question as to whether this court, before obtaining jurisdiction of a cause, would have the right to issue a certiorari to bring a case before it for review, it is not necessary to decide as the application for the writ does not state reasons sufficient or point our errors which would authorize the issuance of such writ under the common law. Davidson, Presiding Judge, dissenting.

### 9.—Same—Case Stated—Practice on Appeal.

Where the death penalty has been assessed and the entire record is before this court, the court, after a careful review, if it felt that the writ of certiorari should be granted and there was no power under the law to issue same, the court would recommend a reprieve until proper legislation could be conferred; but where the only complaint is to the convening of a special term of court and the denial of the right of appeal neither of which are sustained by the record, the question as to whether this court has power to issue the writ of certiorari need not be decided. Davidson, Presiding Judge, dissenting.

### 10.—Same—Evidence—Confessions—Article 723, Code Criminal Procedure.

If the appeal were properly pending, the record in this case does not show any reversible error in admitting the written confessions of the defendant, or as to the ruling of the court on the testimony of his age, or the sufficiency of the evidence to sustain the conviction, or the charge of the court; especially under Article 723, Code Criminal Procedure.

### 11.—Same—Citizen of Mexico—Treaty Rights—International Law.

Every citizen of the United States is entitled to a speedy public trial before an impartial jury, and a citizen of a foreign country residing within the borders of the United States charged with crime is entitled to and should receive all rights, privileges, and benefits accorded to a citizen of the United States, and the fact that relator is a citizen of the Republic of Mexico does not entitle him to greater consideration or additional rights than are accorded to a citizen of the United States; besides, no such ground was set up in the application for writ of habeas corpus attacking the fairness of the jury, etc. Davidson, Presiding Judge, dissenting.

### 12.—Same—Case Stated—Foreign Citizen.

Where the relator did not plead in the lower court that he was a citizen of a foreign country and that he had been denied any guarantees to such citizen, and did not raise such question in his motion for new trial or in his writ of habeas corpus to this court, but only set it up in an application for a writ of certiorari which had been filed without leave of the court, this court will not take cognizance therof. Davidson, Presiding Judge, dissenting.

### 13.—Same—Danger of Lynching.

See opinion that there was no evidence upon which to base the conclusion that relator was transferred to a jail in another county only to prevent him from being lynched. Davidson, Presiding Judge, dissenting.

### 14.—Same—Conflict of Transcript.

See opinion that there is not evidence in the record to show that the dif-

ferent transcripts therein conflict with each other.  Davidson, Presiding Judge, dissenting.

**15.—Same—Rangers.**

See opinion that the judge did not order the rangers to the county of the prosecution, but that they were ordered there by the Governor.

**16.—Same—Threats of Mob Violence.**

See opinion that a certain State's witness did not testify to threats of mob violence after sentence was pronounced.  Davidson, Presiding Judge, dissenting.

**17.—Same—Impartial Trial—Prejudice.**

See opinion showing that relator could obtain a fair and impartial trial in the county of the prosecution, as appears by the testimony in the record. Davidson, Presiding Judge, dissenting.

**18.—Same—Motion for New Trial.**

There is nothing in the record to indicate that relator's counsel were not granted all the time they desired within which to file a motion for new trial. Davidson, Presiding Judge, dissenting.

**19.—Same—Mob Violence—Notice of Appeal.**

The record as a whole does not show that relator's attorneys were prevented by a mob from giving notice of appeal.  Davidson, Presiding Judge, dissenting.

**20.—Same—Notice of Appeal.**

Where, upon a writ of habeas corpus, the relator contended that after conviction of murder, he gave notice of appeal, but upon hearing of the writ, the evidence showed, outside of relator's testimony, that no notice of appeal was given and no appeal taken and no notice entered on the record, the State's contention was borne out and no such notice was given.  Davidson, Presiding Judge, dissenting.

**21.—Same—Conduct of District Judge.**

See opinion that the evidence in the record does not warrant the conclusion that the district judge understood and appreciated the mob spirit which surrounded his courthouse and prevailed in the community if any at the time the sentence was pronounced against the accused.  Davidson, Presiding Judge, dissenting.

**22.—Same—Sentence.**

Where no notice of appeal was given, the sentence of the court was not void, and the evidence in the record justifies the conclusion that no notice of appeal was given.  Davidson, Presiding Judge, dissenting.

**23.—Same—Writ of Certiorari—Other Writs.**

The Constitution does not confer upon this court any power to issue any writ other than the writ of habeas corpus, except such writs as are necessary to enforce the jurisdiction of this court, and where no notice of appeal was given in the lower court during the term of court at which the conviction was had, there is grave doubt whether an appeal by certiorari after the adjournment of the term of the court could be granted, but this issue is not in the case.  Davidson, Presiding Judge, dissenting.

**24.—Same—Writ of Habeas Corpus.**

Where all the proceedings during the trial were regular in every respect and every step was taken in accordance with the law, the same were not void and the writ of habeas corpus does not lie.

**25.—Same—Duress—Notice of Appeal.**

See opinion of the court that there was no duress preventing the giving

or entry of notice of appeal, and that, therefore, the question as to whether this court was ousted of its jurisdiction does not arise. Davidson, Presiding Judge, dissenting.

**26.—Same—Confessions.**

See opinion that the confessions of defendant were not made under duress so as to render them inadmissible or require a charge on the issue of duress. Davidson, Presiding Judge, dissenting.

**27.—Notice—Judgment.**

The question that if a man is not legally informed of the facts that there is a case pending against him in court, a judgment against him would be a nullity, has no application to the evidence in the case. Davidson, Presiding Judge, dissenting.

**28.—Same—Challenge to the Array.**

Where no reason is given why any member of the grand-jury who indicted relator was disqualified and that issue is not raised by the evidence, the question of challenge to the array is not an issue. Davidson, Presiding Judge, dissenting.

**29.—Same—Due Process of Law.**

To try a person at the same term of court at which he is indicted is proper in certain counties and is due process of law, even though the term lasts but one week. Davidson, Presiding Judge, dissenting.

**30.—Same—Indictment—Grand Jury.**

The indictment is not void because relator was not present in the county of the prosecution when indicted, there being nothing to show that the grand jury as organized could not return an indictment. Davidson, Presiding Judge, dissenting.

**31.—Same—Functions of Assistant Attorney-General.**

See opinion for a discussion of the functions of the Assistant Attorney-General in representing the State in the Court of Criminal Appeals.

**32.—Same—Right of Appeal.**

If the relator has been tried and convicted in a trial court by due process of law, he is not entitled to an appeal, as a matter of right, unless the appeal is perfected in the manner pointed out by law.

**33.—Same—Fourteenth Amendment.**

Due process of law within the meaning of the Fourteenth Constitutional Amendment is secured if the laws operate on all alike and do not subject the individual to an arbitrary exercise of the powers of judgment.

**34.—Same—State Courts.**

Errors committed in a criminal case by a State court of competent jurisdiction while proceeding under statutes that do not conflict with the Constitution of the United States can not be reached by habeas corpus.

From Taylor County.

Original habeas corpus asking relief from a judgment of murder in the first degree inflicting the death penalty, relator claiming that he was prevented from giving notice of appeal by reason of mob violence.

The opinion states the case.

*J. F. Cunningham* and *Robert P. Coon,* for relator.

*C. E. Lane,* Assistant Attorney-General, and *Shelly Grover,* for the State. Cited cases in minority opinion.

*Charles Rogan,* Special Counsel, for the State. Cited cases in majority opinion.

HARPER, JUDGE.—In this case it appears from the record on file that relator was on July 29, 1911, adjudged guilty of murder, and his punishment assessed at death, in the District Court of Reeves County, and in accordance with the verdict of the jury and the judgment of the court he was sentenced to death on Friday, the 1st day of September, 1911.

Subsequent to the date of conviction an application for a writ of habeas corpus was granted by Hon. W. L. Davidson, presiding judge of this court, which writ was made returnable on October 4, 1911. By agreement of the parties the cause was set for hearing before this court on November 3, 1911, on which date the application came on to be heard, and on which said date was filed with the papers in the case a petition for certiorari by relator. No order was made granting leave to file this petition and none requested by relator.

The petition for a habeas corpus reads as follows: "Your petitioner, Leon Cardenas Martinez, Jr., makes this his application for a writ of habeas corpus, and for that purpose shows to the court that petitioner is held in custody by Sheriff T. C. Weir on commitment or other process to this affiant unknown, charging this affiant with murder; and this affiant further shows to the court that heretofore on the ——— day of July, 1911, this affiant was tried in the District Court in the County of Reeves on a charge of murder, that the verdict of the jury assessed the punishment of death against this affiant; that this affiant was represented by counsel appointed by the court, and employed by affiant's father and friends; that the attorney appointed was Judge Parker, of Pecos, Texas, and the attorney employed was Judge Estes, of El Paso, Texas, the initials of said attorneys being unknown to affiant. That when the jury returned the verdict of guilty, assessing the death penalty, this affiant told his attorney that he wanted his case appealed to your Honorable Court, to wit: the Court of Criminal Appeals of the State of Texas. That this affiant was at once caused to be put in jail, and about two hours thereafter on the same day on which the jury returned the verdict as aforesaid, this affiant was brought back into court, was required to stand up and be sentenced; that when the judge, to wit, Judge Isaacks, pronounced the death sentence on this affiant he asked affiant in substance if he had anything to say why the sentence of the law should not be pronounced on him, and this affiant replied thereto that he desired that the case be appealed to the Court of Criminal Appeals of Texas, and instructed affiant's attorneys to give notice of appeal and perfect the same, which they promised to do; that affiant was at once carried back to jail, and thereafter on the same

day was carried by the sheriff to Midland County, and thence to Abilene, Taylor County, Texas, where he now is in custody.

"That affiant was not given an opportunity of the two days provided by law in which to file written pleadings, make a motion for a new trial, or otherwise perfect his appeal. That affiant never in any way in person waived said right, and never in any way agreed that the sentence might be at once passed upon him as was done by the court; never in person waived his right of appeal, and never consented to the waiver by his attorneys. This affiant further states that he has been informed by his father, Leon Cardenas Martinez, Sr., a creditable person, and believes the facts to be true, to wit: that said attorneys representing this affiant gave notice of appeal in open court as provided by law in said court in which this affiant was tried as aforesaid, and thereby perfected said appeal to the Court of Criminal Appeals of the State of Texas, and this affiant was further informed by his father that a crowd of angry and murderous men gathered around this affiant's said attorneys, and told them in substance that if they did not withdraw said appeal, that it would not be the Mexican who would be hung, but his two lawyers, and in this way intimidated and put said attorneys in fear of life to such an extent that they withdrew said notice of appeal, and waived the two days notice given by law in which to prepare motion for a new trial and perfect the appeal, and agreed that this affiant might be at once sentenced, which was done by said court on the same day on which the verdict of the jury was rendered.

"This affiant further states that he was on the night following the conviction hurried off by the sheriff of Reeves County to Midland County, and thence to Taylor County, to keep a mob of angry citizens in Reeves County from killing this affiant, and he never had any opportunity to appear before the District Court of Reeves County and perfect his appeal, or take an appeal in the way provided by law, further than was done by his attorneys as heretofore stated on information.

"This affiant further states to the court that he is only a little past fifteen years of age, that he is not 17 years of age, that he is not guilty of the charge preferred against him, and is not the person who committed the deed charged against this affiant in the bill of indictment on which this affiant was tried and convicted as aforesaid. That by mob violence he has been denied the right of perfecting his appeal to this court as he has been informed and believes to be. That by mob violence the appeal which his attorneys perfected for him was caused to be dismissed without this affiant's consent or knowledge; that this affiant, a young and innocent Mexican, will be executed without a hearing on appeal unless this court enforces its jurisdiction in the way and manner provided by law.

"Wherefore this affiant prays that your Honor grant him a writ of habeas corpus, commanding T. C. Weir, the sheriff of Taylor County,

Texas, who now holds this affiant in custody, to bring affiant before your honorable body, that you may hear and determine whether or not your honorable body has jurisdiction by reason of the facts aforesaid, and to further determine whether or not this affiant is lawfully held in custody and restrained of his liberty by said sheriff; that affiant is unable by reason of his confinement to present a writ for habeas corpus to Judge Isaacks, judge of the District Court of Reeves County, by reason of his confinement aforesaid, and by reason of a fear of being lynched by mob violence should he attempt so to do."

Upon a hearing of the writ of habeas corpus it was shown affirmatively that no notice of appeal was given. In fact, it was affirmatively shown that when the motion for a new trial was overruled by the court, the district judge asked applicant's counsel, Judge Parker, if he desired to give notice of appeal, when the judge was notified by the attorney that no notice of appeal would be given. Our Penal Code provides: "Article 883. An appeal is taken by giving notice thereof in open court and having same entered of record." In construing this article as early as 1859, in the case of Fairchild v. State, 23 Texas, 176, Judge Roberts held that unless this notice was given in open court and entered of record the appeal could not be entertained. This has been followed in an unbroken line of decisions from that day until this, the last case in which this matter was passed on by this court being the cases of Offield v. State, 61 Texas Crim. Rep., 340, 135 S. W. Rep., 566, and 568, in which the authorities are partially collated. In the case of Roan v. State, 65 S. W. Rep., 1068, this court says: "In death penalty cases in order to clothe this court with jurisdiction, the appeal must be taken at the term at which defendant is tried and convicted. Having failed to give notice of appeal during the term, appellant has forfeited his right of appeal to this court," citing authorities.

Appellant's counsel, the district judge, the district attorney and the sheriff of the county all concur in the statement that no notice of appeal was given by relator or his counsel, and the record in this case shows affirmatively no notice of appeal was entered of record at the term at which he was tried.

As shown above, the only grounds in the application for habeas corpus alleged for the writ were that notice of appeal had been given, and that without notice to this relator his attorneys had withdrawn the notice of appeal, and dismissed same without his consent. By the evidence adduced on the hearing in this court, this is shown not to be true. No other reason is assigned in the application why the writ should be granted, but in argument on the day of hearing relator's counsel suggested other reasons, which we will hereinafter consider.

Whatever may be the rule of procedure in other jurisdictions, in this State it has been and is the rule that the writ of habeas corpus

can not serve the office of an appeal; it was not designed to operate as a writ of error or certiorari, and does not have their force and effect. The writ of habeas corpus does not deal with errors or irregularities which render proceedings voidable merely, but such only as render them absolutely void. Such has been the established rule in this court from its inception. In the case of Ex parte Schwartz, 2 Texas Crim. App., 81, this court quotes approvingly the following from Hurd on Habeas Corpus:

"A proceeding defective for irregularity and one void for illegality may be revised upon error or certiorari; but it is the latter defect only which gives authority to discharge on habeas corpus. An irregularity is defined to be a want of adherence to some prescribed rule or mode of proceeding, and it consists either in omitting to do something that is necessary for the due and orderly conducting of a suit, or doing it in an unreasonable time or improper manner. Hurd on Habeas Corpus, 333, citing Tidd's Pr., 434, and 3 Chitty's Gen'l Pr., 509."

This court has been called upon to pass upon this question in the past year, and the rule announced in the Schwartz case is adhered to. Ex parte Cooks, 61 Texas Crim. Rep., 449, 135 S. W. Rep., 139. See also Ex parte Oliver, 3 Texas Crim. App., 345; Ex parte McGill, 6 Texas Crim. App., 498; Ex parte Boland, 11 Texas Crim. App., 159; Ex parte Dickerson, 30 Texas Crim. App., 448; Ex parte Beeler, 41 Texas Crim. Rep., 240; Ex parte White, 50 Texas Crim. Rep., 473; Ex parte Crawford, 36 Texas Crim. Rep., 180; Ex parte Keeling, 54 Texas Crim. Rep., 118; Ex parte Cassens, 57 Texas Crim. Rep., 377.

Not only has this been the unbroken rule of decision in this court from its creation until the present day, but such was the rule in the Supreme Court in this State when it had criminal jurisdiction. (Perry v. State, 41 Texas, 488; Darrah v. Westerlage, 44 Texas, 388.) In all these cases numerous authorities will be found cited sustaining the rule, including decisions of the Supreme Court of the United States.

In Ex parte Reed, 100 U. S., 13, 25 L. Ed., 538, Mr. Justice Swayne says: "The writ of habeas corpus can not be made to perform the function of a writ of error. To warrant the discharge of the prisoner, the sentence under which he is held must not be merely erroneous and voidable, but absolutely void." And in Ex parte Siebold, 100 U. S., 371, 25 L. Ed., 717, Mr. Justice Bradly says: "The only ground on which the court will give relief on habeas corpus to a prisoner under conviction and sentence of another court is the want of jurisdiction of such court over the person or the cause, or some other matter rendering the proceedings void." (See also Ex parte Kearney, 7 Wheat., 38; Ex parte Watkins, 3 Pet., 193; Ex parte Milligan, 4 Wall., 2; Stevens v. Fuller, 136 U. S., 468; In re Wo Lee, 26 Fed., 471; In re Jordan, 49 Fed., 238; Smith v. Whitney,

116 U. S., 167; In re Frederich, 149 U. S., 70; In re King, 51 Fed., 434; In re Rowe, 77 Fed., 161.)

However, it is equally well settled that the writ of habeas corpus will lie to secure a release where the proceedings are absolutely void. Ex parte Stein, 61 Texas Crim. Rep., 320, 135 S. W. Rep., 136; Ex parte Kramer, 19 Texas Crim. App., 123; James v. State, 21 Texas Crim. App., 353; Mato v. State, 19 Texas Crim. App., 112; Thompson v. State, 57 Texas Crim. Rep., 437. This rule is also the rule in the Supreme Court of the United States. Ex parte Wilson, 114 U. S., 417.

While no grounds are alleged in the application for habeas corpus that would render the proceedings void, yet the evidence disclosed that relator was convicted at a special term of the District Court of Reeves County, Texas, and relator's attorneys in their argument insist that chapter 83, page 116, of the Act of the Twenty-Ninth Legislature, which authorized special terms of the District Court to be held, is unconstitutional. In the case of Ex parte Young, 49 Texas Crim. Rep., 536, it is held by this court that this Act of the Legislature provides for the organization of a grand jury and the trial of new cases, and this being true, the district judge could call a special term as he did in this case. The constitutionality of this statute was specifically passed upon by this court in the case of Ex parte Boyd, reported in 50 Texas Crim. Rep., 309, and the statute authorizing special terms of the District Court held valid under the provisions of article 5, section 7, of the State Constitution, which reads: "The Legislature shall have power, by general or special laws, to authorize the holding of special terms of the court, or the holding of more than two terms in any county for the dispatch of business." In the latter case the relator Boyd sued out a writ of error to the Supreme Court of the United States to test the constitutionality of this Act of the Legislature, which writ was by that court dismissed for want of jurisdiction. Boyd v. United States, 209 U. S., 539, 52 L. Ed., 917, citing Leeper v. Texas, 139 U. S., 462; Duncan v. Missouri, 152 U. S., 377; Gibson v. Mississippi, 162 U. S., 565; Allen v. Georgia, 166 U. S., 138; Brown v. New Jersey, 175 U. S., 172; Layton v. Missouri, 187 U. S., 356; Rogers v. Peck, 199 U. S., 425.

The constitutionality of this Act was again assailed in the case of McIntosh v. State, 56 Texas Crim. Rep., 134, and it was again held that this Act of the Twenty-Ninth Legislature (page 116, Session Acts), providing for special terms of the District Court to be held under an order of the district judge, is constitutional and valid. The facts show that the judge of the District Court did call a special term of the District Court, organize a grand jury, indict the appellant in that case, order jurymen selected and summoned as provided by the laws of this State, and that relator was tried at said special term. Said Act provides;

"Section 1. Where it may become advisable in the opinion of the judge of the district in which any county in the State of Texas may be situated, to hold a special term or terms of the District Courts therein, such special term or terms may be held.

"Section 2. The judge of the district in which a county may be situated, in which it is deemed advisable by such judge that a special term of the courts should be held, may convene such special term of the courts at any time which may be fixed by him. The said judge may appoint jury commissioners, who may select and draw grand and petit jurors in accordance with the law; said jurors may be summoned to appear before said courts at such time as may be designated by the judge thereof; provided, that in the discretion of the judge, a grand jury need not be drawn or impaneled.

"Section 3. The grand jury selected as provided for in the preceding section shall be duly impaneled and proceed to the discharge of its duties as at a regular term of the court.

"Section 4. Any person indicted by the grand jury impaneled at a special term of the courts may be placed upon trial at said special term."

A special term of the District Court of Reeves County, Texas, was ordered to be held at the county seat of said county by Hon. S. J. Isaacks, judge thereof, beginning on the 24th day of July, 1911, and to continue in session until adjourned by order of the court; a special grand jury was ordered to be selected, summoned and impaneled as provided by law, which order was duly entered upon the minutes of the court. All necessary steps required by this Act of the Legislature, and the other provisions of the laws of this State are shown to have been complied with in convening said special term of the District Court. When court convened a jury commission was selected in a legal manner, who proceeded to select grand jurymen and petit jurymen, who were duly summoned as shown by the evidence in this case. The grand jury at this term of the court on the 25th day of July returned into open court an indictment, charging relator with the murder of Miss Emma Brown. The case was set for trial on July 28, and a special venire was ordered drawn and summoned to appear on said date. Relator was served with a copy of the indictment, and a list of the jurymen summoned within the time and in accordance with the provisions of our laws regulating such matters. When the case was called for trial no motion of any character was made by relator or his counsel bringing into question the legality of the proceedings; no motion for change of venue or other motion was filed, other than a motion for a postponement or continuance on account of the absence of his mother. It being made known to the court that his mother was in the county, and her attendance on court could be secured, the motion was overruled, and his mother appearing during the trial and testifying in the case, no exception was reserved to the action of the court

.in overruling the motion for a continuance.· A jury is shown to have been impaneled in accordance with the provisions of the laws of this State, no complaint being made or reserved to the manner of their selection, and no complaint is now made that the jury thus selected by the State and the relator or his counsel were guilty of improper conduct during the trial, or had not truthfully answered the questions propounded. The provisions of the laws of this State, and especially article 673 of the Code of Criminal Procedure, are shown to have been fully complied with in the impaneling of the jury. A verdict was rendered finding relator guilty of murder in the first degree, and his punishment assessed at death. A motion for new trial was presented, and by the court overruled. Relator's counsel notified the court that no appeal would be taken, when in accordance with the verdict of the jury and judgment of the court, relator was sentenced. All orders, judgments and decrees required by law are shown to have been entered in the minutes of the court.

We hold that the proceedings are not void, but were regular in every respect, and in accordance with the decisions hereinbefore cited we hold that no relief can be granted to relator under the writ of habeas corpus herein by him sued· out.

However, on the day the habeas corpus was set for hearing, relator filed with the clerk of this court what is termed a petition for certiorari. No leave was requested and none granted by the court authorizing or permitting relator to file same, and it was not presented to the court or either judge thereof. However, as the death penalty was inflicted in this case, we have carefully read the application. By this means it is sought to bring this case before us for review. At common law we understand a defendant had no right of appeal, as given by the Code of this State, but if upon conviction he desired to appeal his case, he presented to the Appellate Court a petition wherein he recited all things of which he complained, and pointed out specifically the matters in which he claimed the trial court erred to his prejudice. This appeal was not granted as a matter of right, but if the Appellate Court, upon viewing the petition, thought such errors were committed and the defendant probably suffered injury, or an improper verdict had been rendered, granted a writ of certiorari commanding that the entire record be sent up that it might review the case. The petition must set out the injury or error complained of or the writ would not be granted. While the writer of this opinion has grave doubts as to the jurisdiction of this court to issue a writ of certiorari until *jurisdiction has been conferred on this court by notice of appeal being given in the trial court,* yet we do not deem a decision of that question necessary in this case. Section 5 of article 5 of the Constitution only confers power on this court to issue the writ of habeas corpus, and, under such regulations as may· be prescribed by law, issue such other writs as may be *necessary to enforce its jurisdiction.* It is thus seen that by the

Constitution we are only given power to issue a writ of habeas corpus and no other writ in cases where this court has not obtained jurisdiction of the case, and it has been held by this court that unless notice of appeal is given at the term at which a conviction is had, this court has no jurisdiction of the case. Clark v. State, 3 Texas Crim. App., 338; Fairchild v. State, 23 Texas, 176; Hughes v. State, 33 Texas, 683; Solari v. State, 3 Texas Crim. App., 482; Johnson v. State, 8 Texas Crim. App., 671; Truss v. State, 38 Texas Crim. Rep., 291; Hurlock v. State, 43 S. W. Rep., 992. If this court under the Constitution and statutes of this State has no power or authority to issue any writ other than the writ of habeas corpus until the jurisdiction of this court attaches, and the jurisdiction of this court does not attach to any case until notice of appeal has been given, then it would appear that where no notice of appeal was given in the trial court, this court would not have the authority and power to review a case under the common law writ of certiorari. If a person really gave notice of appeal, and the trial court wilfully refused or inadvertently failed to enter such notice, or a person was prevented through force or fear from giving notice of appeal, we gather that jurisdiction would be sufficiently conferred upon this court that upon application made in reasonable time, this court could and would issue a writ of mandamus compelling the entry of the notice so given or prevented from being given. (Quesada v. State, 34 Texas Crim. Rep., 116.) Neither relator nor his counsel have made any such application to this court to have notice entered. As hereinbefore stated, the facts in this case show that no notice of appeal was given, and while this case may suggest reasons for conferring additional power and authority on this court to issue other writs, or for the Legislature to enact laws that will cause the jurisdiction of this court to attach in certain cases without notice of appeal in the trial court, yet this court has no power to legislate or enlarge its jurisdiction further than is conferred upon it by the Constitution or laws of the State. However, under all the authorities, it is held that a writ of certiorari can not be granted in vacation, nor in term time except upon order of the court, or by a majority of the members thereof, and no such order having been made, nor undertaken to be made, the decision of the question of whether this court, before obtaining jurisdiction of a cause, would have the right to issue a certiorari to bring a case before it for review, is not necessary in this case, the application itself not stating reasons sufficient, and does not point out errors that would authorize the issuance of the writ under the common law. But inasmuch as the death penalty has been assessed, and the entire record in the case has been filed in this court, we have carefully reviewed same, with the view that if the record presented such a case that we felt relief should be granted, we would take up and decide the question whether or not we could issue the common law writ to bring the case before us for review, and if so, if the merits

of the case demanded it upon a proper application being presented to do so. If we decided we did not have the power to issue the writ, and an injustice had been done, then in that event to recommend to the governor a reprieve until the Legislature could confer on us such power as would authorize us to act.

In the petition for certiorari relator complains of the convening of a special term of court, and the impaneling of a grand jury which indicted him, yet as hereinbefore shown, this was done in accordance with the laws of this State, and relator recites nothing which he says was done in violation of the statutes of this State. The only other allegation in the application is that he was denied the right of an appeal to this court. As hereinbefore stated, no notice of appeal was given, but on the hearing hereof his attorneys testify that they were prevented from giving notice of appeal by the action of a number of citizens who approached them after the verdict had been rendered.

To treat the case as if notice of appeal had been given, and this case was now before us on appeal, and we were passing on same, what does the record show? In his statement Judge Parker, of counsel for relator in the trial court, says:

"We made the following bills of exception in the case, and possibly some others which I do not now recall. When the State read the confession of the defendant, it read all of the confession, except that part of it where defendant said he was sixteen years old. We objected to this on the ground that all of the confession should be read by the State.

"The State proved by the official stenographer and his notes that the defendant, while a witness on the stand in a former criminal case, at Barstow, Texas, testified that he was seventeen years old. We took a bill of exceptions to the court's failure to limit this evidence as impeaching testimony.

"The father and mother of the boy both testified and after they had both testified as to where the defendant was born, the date of his birth, the number of children that had been born to them, and their respective ages, we then offered in evidence the marriage certificate of the father and mother, showing when and where they were married; we offered this certificate as corroborative of the fact that the witnesses were in fact the father and mother of the defendant, and would best know the age of the defendant, and also as corroborative of the credibility of the father and mother, and as corroborative of the defendant's statement in his confession. The court excluded this certificate, and we took a bill of exceptions to such ruling."

In regard to the question here first presented, while the State introduced only part of the confession, yet the record discloses that relator was permitted to and did introduce the remainder of the confession, so it was all before the jury, and no error is presented.

In regard to the second bill, the fact that relator had voluntarily

testified in the case of P. K. Holmes in January before this trial that he was more than seventeen years of age, was admissible as original testimony, and the court should not have limited the effect of the evidence to impeaching purposes. Statements made by a person accused with crime, prior to an arrest, in regard to an issue in the case, are always admissible in evidence, if the State desires to elicit same.

In regard to the third, the failure of the court to permit the marriage certificate to be introduced in evidence, there was no issue but what the witnesses were the father and mother of relator. This was uncontroverted, but if it were not, a marriage certificate would not prove nor tend to prove that the couple named in the certificate was the father and mother of any particular person; nor would said certificate be corroborative of the credibility of the father and mother; nor would it tend to corroborate relator's statement in his confession. Nothing is herein stated that would render such certificate admissible in evidence. If the father and mother had testified that relator was born in lawful wedlock, and the certificate had been offered to prove that it would be impossible for relator to have been born since the date of marriage and be over seventeen years of age, its materiality might appear. But no such state of facts are presented in the affidavits of relator's attorneys, in the motion for a new trial, or in the application for habeas corpus, nor for writ of certiorari, hence, we naturally conclude that the date of the certificate would have been of no service in this respect, and in no other way could it have been material. The testimony of the father and mother would not indicate that such was true, but, on the contrary, that its date was such that it would have been possible for relator to have been born in lawful wedlock and still have been more than seventeen years of age. To say the least of it, the rejection of the certificate was an immaterial matter for any of the purposes herein stated it was offered.

The only other grounds in the motion complain of the admissibility of the written confession of relator, and the insufficiency of the evidence to sustain the verdict. The evidence amply sustains the verdict, the confession of relator showing an unprovoked killing. The confession reads as follows:

"On July 22, 1911, about three miles from Saragosa, I met Miss Brown, who was riding in a buggy. I asked her to let me do what she had promised. She had promised to let me fuck her. When I asked her on the road on July 22, she said I would have to go somewhere else. I told her I just had to do something. She said, 'What do you mean, you son-of-a-bitch? I am going to have you arrested.' I told her she did not need to have me arrested, all I wanted was for her to do what she had promised to do. She said she would kill me, and put her hand to her hip. Then I commenced shooting, and shot four times with a 25-caliber automatic pistol. Her horse ran

away, and when I headed the horse she stopped and got out of the buggy. When I got off my horse the girl ran. She had a stick in her hand. I then stabbed her in the back with my knife. When she turned around she hit me with her fist and I stabbed her four or five times in the breast. She never hit me with the stick. I got on my horse and loped away to Saragosa. I did not tell anyone until I was arrested. She was standing up when I left her. After eating supper at home I went to Crenshaw's store and worked. On the morning of July 23, 1911, I met John Oates and Floyd Crenshaw in a buggy. Floyd told me that Miss Brown had been found dead; that she had been shot. I afterwards told Jim Mayfield about her being shot. Then I ate dinner and went to Old Saragosa, and from there I went to Mr. Honaker's place, where the body of Miss Brown had been brought. I looked through window, but could not see the body. I stayed at Honaker's almost an hour and then with Henry Everett I went to a watermelon patch and ate a melon. I was coming out toward Old Saragosa when the officers arrested me. I had the gun that I did the shooting with, but the knife was at home in my other pants. Miss Brown did not pull any pistol at any time. When I told the officers about having killed Miss Brown I did not tell them about her threatening to kill me, but I did tell Mr. Stuckler last night. This all happened in Reeves County, State of Texas. I was riding a dun mare, unshod—a little horse. The mare belonged to Crenshaw & Co. I killed Miss Brown about four o'clock in the afternoon. I had talked to Miss Brown at the store where I worked, on the morning of July 22, and that was when she told me I could fuck her. I am sixteen years old. Was sixteen June 10, 1911.

(Signed)  Leon  Martinez."

The testimony of District Attorney Brady shows that the confession of relator was freely and voluntarily made after being duly warned by him that any statement he might make could be used in evidence against him, and the confession was admissible over the objections urged. On direct examination and cross-examination of the sheriff by relator's counsel, it was shown that the dun mare which relator was riding made a peculiar track, her left forefoot was split square off, so it left an open space on the foot, and made a mark that one could identify the track, and the sheriff identified the tracks made by this mare as the one that was following the buggy. He took the mare to the place and compared the tracks. Relator was shown to have been riding this mare on the evening that Miss Brown was killed.

On the question of the age of the relator, his mother and father testified he was only fifteen years of age. Lester Majors testified that he was the court stenographer and that in the trial of P. K. Holmes in January, 1911, relator was a witness, and on that trial

relator swore he was seventeen years of age at that time. S. H. Crenshaw testified that in April, 1911, he received an invitation to a birthday party of relator. That the invitation was written in Spanish, and relator read it to him, and that it said it was to celebrate relator's eighteenth birthday, and on that occasion he gave relator a present. Relator was at that time working for the witness, and the invitation was in the handwriting of the father of relator. Pat Moran testified that the father of relator had informed him that relator was sixteen years of age more than a year before this tragedy.

The court in his charge submitted both murder in the first and second degrees, and instructed the jury: "A person for an offense committed before he arrived at the age of seventeen years shall in no case be punished with death, and if you find from the evidence in this case that the defendant was under the age of seventeen years at the date of the killing you will not assess his punishment at death, even though you find him guilty of murder in the first degree, as hereinbefore defined." Thus it is seen that this issue was submitted to the jury, and they found against this contention of relator, and under the evidence if the case was before us on appeal we would not feel authorized to disturb their verdict on this issue.

While the court's charge fairly and fully submits the issues made by the evidence, yet in the motion for new trial, nor in the application for the habeas corpus, nor the certiorari is there any complaint made of any paragraph of the court's charge, but if the case was before us on appeal we would not be authorized to review the charge, for by article 723 of the Code of Criminal Procedure of this State, it is provided that a judgment of conviction shall not be reversed for errors in the charge unless such errors were excepted to at the time or in the motion for a new trial, and no such exceptions were reserved.

Thus it is seen that if the case was before us on appeal this court, if it followed the law and decisions of this court, would feel impelled to affirm the judgment of the trial court, and if as relator contends he instructed his attorneys to appeal his case, and they were prevented from so doing by the conduct of certain citizens, no different result could or would have been attained.

It will be seen by reading the application for habeas corpus herein copied in full, the only ground relied on was the failure to perfect an appeal in the case, and as herein shown had an appeal been perfected, no relief under it could or would have been granted relator. In the application for writ of certiorari that no appeal was perfected is the main reliance again, yet in said application no such errors are pointed out or assigned as would authorize the issuance of the writ under the common law. However, in the application relator states that he is a citizen of Mexico, sojourning in the United States, and under the treaty existing between the two countries, and the

provisions of international law, he is entitled to a speedy trial before an impartial jury. This may be conceded. Every citizen of the United States is entitled to a speedy, public trial before an impartial jury, and a citizen of a foreign country, residing within our borders, charged with crime, is entitled to and should receive all rights, privileges and benefits accorded to one of our own citizens— no more and no less. That relator claims to be a citizen of our sister Republic, Mexico. This would entitle him to no greater consideration, or additional rights, than are accorded to our own citizens charged with crime. If relator has been tried in accordance with the laws of this State, in which he had been residing for a number of years, that are made applicable to all persons charged with crime committed within the borders of this State, he has received all that international law or the treaty entitles him to. In no paragraph of the motion for a new trial, in no line of the application for a writ of habeas corpus, in no syllable of the application for writ of certiorari, in no word of the testimony is the fairness or the impartiality of the jury that tried relator assailed. That they were qualified, competent and impartial jurors at the time they were sworn in to try said cause, is nowhere questioned. That he was indicted by a grand jury empaneled under our laws, is proven beyond question, and no complaint is made in regard to their fairness or impartiality, or that they acted improperly. Our statute provides that a person charged with crime shall be served with a copy of the indictment two days prior to being called upon to announce for trial. Relator received this notice and a copy of the indictment two days before the day set for trial. He was served with a list of the venire drawn from which the jury was selected, in accordance with our law. No motion was made to quash this venire or set it aside, and even now no complaint is made of the mode and manner of the selection of the jury, or statement made that for any reason they were not suitable, proper and competent persons to sit in judgment in his case at the time they were selected. The fairness of the trial judge, or his charge to the jury is not assailed, but everything is based on matters alleged to have occurred subsequent to the trial and which it is not alleged and could not in any manner have affected the result in the case in the trial court. The only complaint is that he was denied or prevented from perfecting an appeal to this court. We have herein shown that had an appeal been perfected, no such error or matters were assigned in the motion for a new trial as could or would have resulted in any benefit to him, and having been tried and convicted in accordance with the laws of our State applicable to all charged with crime, the fact that he was a citizen of another country, but who was and had been residing in this State for a number of years, entitles him to no privileges not accorded

to our own citizens. In the case of Barrington v. Missouri, 205 U. S., 483, the Supreme Court of the United States holds:

"The question of citizenship is immaterial as affecting the jurisdiction of this court under section 709, Revised Statutes. French v. Hopkins, 124 U. S., 524. Nor are we aware, as Chief Justice Waite said in Spies v. Illinois, 123 U. S., 131, of any treaty giving to subjects of Great Britain any different measures of justice than secured to citizens of this country. And the general rule of law is that aliens are subject to the law of the territory where the crime is committed. Wildenhus's case, 120 U. S., 1; Carlisle v. United States, 16 Wall., 147; People v. McLeod, 1 Hill (N. Y.), 377; Wharton, Conflict of Laws, sec. 819."

In the court below relator did not plead that he was a citizen of a foreign country, and that he had been denied any guarantees to such citizens; in the motion for a new trial no such question is raised, and neither is it raised in the application for writ of habeas corpus to this court. The first time that it is alleged that he is a citizen of Mexico, domiciled in the United States and in the State of Texas, is in the application for writ of certiorari filed with the clerk of this court without having obtained leave of this court to file same, and in said petition no grounds are alleged that would indicate he was not given a trial in accordance with the laws of this State applicable alike to all persons charged with crime under the laws of Texas.

We are of the opinion that there is no merit in any of the contentions of relator, and that he should be remanded to the custody of the sheriff of Reeves County, Texas.

The above opinion was prepared in December last, and when in consultation on January 3, 1912, our presiding judge indicated he would not agree thereto, he took and has had the record since that date, and, as he in his opinion delivered to us Tuesday of last week has stated conclusions wholly at variance with the facts as we gather from the record we have concluded to attach to and as a part of this opinion, the evidence adduced on the hearing. It is as follows:

Judge S. J. Isaacks testified that he was judge of the 70th Judicial District of Texas. "The instrument you show me is dated July 24. The order was made on Monday morning, and was placed on record on that day. I drew the order, that is, I dictated it to my stenographer." The order was introduced in evidence, and reads as follows:

"Reeves County,                                    In Vacation.
July 24, 1911.
"Whereas, there was on July 22, 1911, committed in Reeves County a horrible murder on the person of Miss Emma Brown, and whereas, the sheriff has apprehended one accused of having perpetrated the

crime, and whereas, public policy demands that the accused be given a speedy trial, and whereas, it is in my opinion advisable and necessary that a special term of the District Court of Reeves County be holden in said county for the purpose of impaneling a grand jury to investigate said killing and to try any person that said grand jury may present for said killing.

"It is therefore ordered by me, S. J. Isaacks, district judge, that a special term of the District Court of Reeves County be convened and holden in the courthouse of said county, at Pecos, Texas, on this the 24th day of July, A. D. 1911, beginning at 2 o'clock p. m., and to continue till duly adjourned for the purpose of impaneling a grand jury to investigate the killing of said Emma Brown, and to make such other investigations as said grand jury and the court may deem expedient and necessary, and for the purpose of trying any and all persons indicted by said grand jury, and for the purpose of transacting any other business that may legally come before the court.

"It is further ordered that this order be entered on the minutes of the District Court of Reeves County.

S. J. Isaacks, Judge,

70th Judicial District of Texas.

"State of Texas,
 County of Reeves.

"I, H. N. McKellar, clerk of the District Court in and for Reeves County, Texas, do hereby certify that the above and foregoing is a true and correct copy of the order convening the District Court in special session July 24, 1911, as the same now appears of record in the minutes of said court in volume 3, page 445, of said records.

"Witness my hand and seal of said court at office in Pecos, Texas, this the 31st day of October, A. D. 1911.

(Signed)  H. N. McKellar,

(Seal)  Clerk District Court, Reeves County, Texas."

At this juncture Mr. Cunningham, of counsel for relator, stated that they desired to place relator on the stand, as they desired to have him returned to Waco on the afternoon train.  Relator, Leon Martinez, was then placed on the stand and testified: "My name is Leon Cardenas Martinez.  I am a native of the Republic of Mexico.  I was born in Gallega, State of Durango.  My father's name is also Leon Cardenas Martinez.  I am a part of his family, and was living with him when arrested.  My father is a citizen of the Republic of Mexico.  He nor I have never taken out naturalization papers to become citizens of the United States.  I am not twenty-one years old.  I am the same person who was sentenced to be hung by Judge Isaacks on the 29th day of last July.  I remember the occasion, and can state what occurred.  The judge said I had com-

mitted a horrible crime, and the punishment of the law was that I be hung by the neck on the 1st day of September, 1911. He asked me whether or not I had anything to say why sentence should not be pronounced against me, and I told him I wanted to take my case to the Court of Criminal Appeals and my lawyers would do the rest. He made no reply to that statement. I did not see either of my attorneys after I was sentenced. I saw Judge Parker after the verdict was read, but did not see him after sentence was passed. He came to me after the verdict was read and I told him I wanted my case appealed, and he told me he was making a motion for appeal. At the time I was sentenced I talked with him before the sentence was pronounced, when I told him I wanted to take my case to the Court of Criminal Appeals, and he then told me he would not do that. That he was sorry for me. I was then taken to jail, and I have not seen Judge Isaacks since he passed sentence on me. I did not waive the right of appeal, and I did not agree that my attorneys should waive the right of appeal. I remained in jail until three o'clock that night when I was removed. I was sentenced on the same day that the jury brought in the verdict. The jury brought in the verdict about half past one or two o'clock, and I was sentenced about an hour and a half or two hours later. I did not waive any of my rights, and did not waive the right of two days in which to file written pleadings. My attorneys were Mr. Estes and Judge Parker."

Cross-examined: "I talked with Judge Parker and Mr. Estes the first time on the morning of the trial. When the court passed sentence upon me I told him I wanted to take my case to the Court of Criminal Appeals and that my lawyers would do the rest. I think the whole court was present when I made that statement. I think the district attorney, Mr. Brady, was present. Mr. Estes was not present, but Judge Parker was in the courtroom. I do not know Mr. F. W. Johnson, and do not know whether he was present or not. I do not remember whether the sheriff of Reeves County was present or not, and I do not remember whether the sheriff of Midland County was present or not. I remember some of the rangers were present, but do not remember which ones were present. I remember only one, a small man, with black hair. I was not present when my motion for new trial was presented and overruled. I do not remember to have been present in court when Judge Parker announced to the court that no appeal would be taken. I said I do not remember seeing him present the motion for a new trial." In answer to the question: "Q. And didn't he go to you after it was overruled and tell you no appeal would be taken, that you had no grounds of appeal?" The relator answered: "A. He did not say that; he said he could not appeal." "I do not remember whether or not Judge Isaacks asked my attorney, Judge Parker, if he desired to give notice of appeal."

Redirect: "Judge Parker and Mr. Estes were not permitted to talk to me alone. Before the trial I talked to them in the presence of an officer. I never talked to them when an officer was not present."

Recross: "I do not know whether or not my attorneys ever asked permission to talk to me. They never called to see me at the jail. I was arrested between four and five o'clock Sunday evening, and was carried to Pecos that night, and was then carried to Midland on Monday. I was brought back from Midland Thursday about three o'clock in the evening. I learned I was indicted Wednesday night. The sheriff of Midland County served me with a copy of the indictment." In answer to the question: "Wasn't that served on you Tuesday evening?" the relator answered: "I do not remember. My best knowledge is that it was Wednesday evening or Wednesday night. I was served with a copy of the special venire the same day. They were not served at the same time. I was served with a copy of the indictment one evening about six o'clock and was served with a copy of the venire next morning."

The attorneys for relator then stated they desired to waive the presence of the relator, when Judge Isaacks was recalled and testified:

"I have examined this instrument and it is a certified copy of the order appointing jury commissioners. It was made on July 24, and placed on record the same day. I read it on the record on that date." The order was introduced, and reads as follows:

"Be it remembered that on this the 24th day or July, A. D. 1911, there came on to be held and was held a special term of the District Court of Reeves County, Texas, which said special term was held in pursuance of an order made by the judge of the 70th Judicial District on July 24, 1911. Said term was held at the courthouse in the town of Pecos, Reeves County, Texas. While the following proceedings were had, court was duly called by the sheriff and the following officers were present, to wit:

"Present and Presiding Honorable S. J. Isaacks, district judge, Will P. Brady, district attorney, H. N. McKellar, district clerk, and C. Brown, sheriff. The court was called to order by the judge and the following, among other proceedings, were had and orders made, to wit:

"It appearing to the court that no grand jurors and petit jurors had been drawn and summoned for this special term of court, it is ordered by the court that W. W. Ruhlen, Sid Cowan and J. H. Heard be and are hereby appointed jury commissioners to draw a grand jury and petit jury for this term of court, the said W. W. Ruhlen, Sid Cowan and J. H. Heard were sworn and instructed by the court, and returned and afterwards came into open court with the envelopes containing the names drawn as grand jurors and petit jurors, and the court after administering the oath required by law to the district clerk delivered to said district clerk the envelopes con-

taining the commissioners names and of the grand jurors and petit jurors presented by said jury commissioners."

This was properly certified by the clerk of the District Court. The witness continued, "the grand jury was empaneled on the next day, July 25, by order," which order reads as follows:

"July 25, 1911. On this the 25th day of July, A. D. 1911, came on to be organized the grand jury for this special term of this court and a list of persons heretofore selected by the jury commissioners at this term of this court and summoned to serve as such grand jurors, were called and the following persons were found present and found to be qualified to serve as such grand jurors, to wit: T. H. Beauchamp, T. B. Pruett, Jno. Y. Lilley, T. Y. Casey, C. L. Heath, Chris Ritz, O. M. Henderson, Woody Browning, A. H. Phillips, R. R. Smothers, C. W. Goedeke, and E. G. Bowles.

"And it appearing that the foregoing twelve persons were selected by the jury commissioners at this term of this court and found qualified to serve as grand jurors, the said twelve persons were duly sworn and empaneled as a grand jury for this special term of court and T. H. Beauchamp was appointed foreman of the grand jury, after which the court instructed the grand jury as to its duties."

The witness continued: This seems to be the minutes of the court where the grand jury returned the indictment in cause No. 616, The State of Texas vs. Leon Martinez. It was returned on Tuesday as shown by the instrument itself, the minutes reading as follows:

"In the District Court, Reeves County, the 25th day of July, A. D. 1911.

"On this day the grand jury in a body, a quorum being present, appeared before the court in session, and through their foreman delivered, into open court, to the judge presiding, the following bill of indictment, to wit:

"No. 616.
"The State of Texas
        vs.
 Leon Martinez,
which said indictment was then and there, by the court, ordered to be filed."

This is an order made on July 25 setting down the case of The State of Texas vs. Leon Martinez, No. 616, for trial on July 28, 1911. It reads as follows:

"The State of Texas,          In the District Court, Reeves County,
        vs.            No. 616.                Texas.
 Leon Martinez.                The 25th day of July, A. D. 1911.
    "On this day the above styled and numbered cause is set for trial July 28, 1911, at nine o'clock a. m."

This is an order of the court empaneling the petit jury on the 28th day of July. They were the jurors drawn by the jury commissioners. The indictment was returned by a grand jury drawn by the jury commissioners. I remember examining all the above orders and they were entered on the days named. This is the order empaneling the petit jurors for the term. The order reads as follows:

"On this 28th day of July, A. D. 1911, came on to be organized the petit jury for the present term of this court, and a list of persons heretofore selected by jury commissioners appointed by the court, said jurors summoned to serve as jurors at the present term of this court was called, and the following named persons were found present and found to be qualified to serve as such, to wit: J. P. Meeks, Frank Burress, C. C. Caldwell, W. T. Christian, A. J. Hart, H. C. Barstow, E. W. Clayton, Albert Sisk, A. G. Taggart, Jess R. Chandler, J. F. Caroline, R. C. Clarke, C. W. Tudor, Seth Lewis, A. E. Pinkston, H. R. Anderson, B. T. Biggs, Ira Jackson, E. F. Wakefield, J. J. Pope, L. O. Brown, F. W. Wilcox, A. G. Barefield, H. A. Schrock, Alex Davis, Wylie Cole, J. A. Brady, A. W. Hosie and E. Wadley.

"And it appearing to the court that the foregoing twenty-nine persons were selected by the jury commissioners at this term of this court and found qualified to serve as petit jurors, the said twenty-nine persons were duly sworn and empaneled as petit jurors for this special term of this court."

The paper you show me is an order I made ordering summoned a special venire of thirty-six men, they having been selected in the manner provided by law. It was made on July 25. It reads:

"The State of Texas,        In the District Court of Reeves County,
          vs.          No. 616.                    Texas.
   Leon Martinez.           The 25th day of July, A. D. 1911.

"On this day, in the above entitled and numbered cause, came on to be heard the motion of the State for a writ of special venire to issue in said cause, which having been duly heard and considered by the court, the same is granted, and it is considered and ordered by the court, that the clerk of this court do forthwith issue to the sheriff of this county a writ of special venire commanding him to summon on the venire the 'thirty-six' persons whose names are set out in a list in the said writ, to appear before this court at nine o'clock, on the 28th day of July, A. D. 1911, at the courthouse of this, Reeves County, then and there to serve, if selected, as jurors in the trial of this cause; and it is further ordered by the court that said writ of special venire to be issued in obedience hereto shall be made returnable in this court on the 26th day of July, A. D. 1911, on or before 10 o'clock a. m."

This is a copy of the indictment returned in court by the grand jury empaneled:

"In the name and by the authority of the State of Texas: The grand jurors, for the county of Reeves, State aforesaid, duly organized as such at the special July 24 term, A. D. 1911, of the District Court of said county, upon their oaths present that Leon Martinez on or about the 22d day of July, A. D. one thousand nine hundred and eleven, and anterior to the presentment of this indictment, in the county of Reeves and State of Texas, did then and there unlawfully with malice aforethought kill Emma Brown by shooting the said Emma Brown with a pistol and stabbing the said Emma Brown with a knife, against the peace and dignity of the State.

T. H. Beauchamp,<br>Foreman of the Grand Jury."

Endorsed as follows:

"No. 616.   The State of Texas vs. Leon Martinez
, Indictment
Offense: Murder.
Filed 25th day of July, 1911.
H. N. McKellar, Clerk of the District Court of Reeves County, Texas."

Copies of the verdict of the jury and the judgment based thereon were introduced in evidence dated July 29, 1911. The motion of relator for a new trial was identified and offered in evidence, and reads as follows:

"The State of Texas,          In the District Court of Reeves County,
vs.          No. 616.          Texas.
Leon Martinez.          Special July Term, A. D. 1911.

"Now comes the defendant in the above entitled and numbered cause and moves the court to set aside and hold for naught the judgment rendered in said cause against this defendant on the 29th day of July, A. D. 1911, for the following reasons, to wit:

"First. Because the court erred in not charging the jury that the testimony of the stenographic notes to the effect that this defendant swore that he was seventeen years old in the trial of the Holmes case, should be considered by them as impeaching testimony only, as shown by defendant's bill of exceptions number one.

"Second. Because the court erred in permitting the said stenographic notes to be used as evidence in the trial of said cause against this defendant, as shown by defendant's bill of exceptions number two.

"Third. Because the court erred in sustaining the State's exception to the marriage certificate offered in evidence by defendant, said certificate showing a marriage between the defendant's father and mother, and the date of said marriage certificate, as set out in plaintiff's bill of exceptions number four.

"Fourth. Because the court erred in permitting the State's attorney to read a part of the written confession of defendant to the jury, and not requiring said State's attorney to read the whole of said statement, said written statement being a confession made by defendant to the State's officer, and introduced by the State against defendant as a written confession, as set out in defendant's bill of excepions number five.

"Fifth. Because the court erred in permitting the written confession of defendant to be read to the jury in the trial of said cause, as shown by defendant's bill of exceptions number six.

"Sixth. Because the verdict against this defendant is contrary to the evidence in said cause, in this: the competent testimony in said case pertaining to the age of this defendant was to the effect that he was under seventeen years of age at the time of the commission of the offense alleged in the indictment.

"Seventh. Because said verdict and judgment is contrary to the law, in that the testimony in said cause failed to show the defendant's age to be seventeen years, as required by law.

"Eighth. Because the testimony against this defendant is insufficient in law to show that this defendant is guilty of murder in the first degree.

"Ninth. Because said verdict and judgment is contrary to the law and not warranted by the evidence.

"Wherefore, premises considered, defendant prays that said verdict and judgment be set aside and this defendant be granted a new trial.

George Estes,<br>
J. W. Parker,<br>
Attorneys for Defendant."

Copies of the order overruling the motion for new trial, and sentence of the court were then introduced in evidence; and the charge of the court. The charge reads as follows:

"The State of Texas,          In the District Court of Reeves
    vs.      No. 616.          County, Texas.
Leon Martinez.

"Gentlemen of the jury:

"In this case the defendant, Leon Martinez, stands charged by indictment with the offense of the murder of Emma Brown, alleged in the indictment to have been committed by the defendant, Leon Martinez, in the county of Reeves and State of Texas, on or about the 22d day of July, A. D. 1911; to which charge the defendant has pleaded not guilty, and I give you in charge, as the law applicable to this case, the following:

"Every person of sound memory and discretion who shall unlawfully kill any reasonable creature in being, within the State, with

malice aforethought, either expressed or implied, shall be deemed guilty of murder.

"Murder is distinguishable from every other species of homicide by the absence of circumstances which reduce the offense to negligent homicide or manslaughter, or, which excuse or justify the homicide.

"Malice is a condition of the mind which shows a heart, regardless of social duty and fatally bent on mischief, the existence of which is inferred from the acts committed or words spoken.

"Malice, which is absolutely essential to constitute the offense of murder, is either express or implied.

"All murder committed with express malice is murder in the first degree.

"All murder committed with implied malice is murder in the second degree.

"The distinction between express malice and implied malice determines whether murder is of the first or second degree.

"Express malice, which is absolutely essential to constitute murder in the first degree, is where one, with sedate, deliberate mind and formed design, unlawfully kills another.

"When an unlawful killing is established, the condition of the mind of the party killing, at the time, just before and just after the killing, is an important consideration in determining the grade of the homicide; and in determining whether murder has been committed with express malice or not the important questions for you to consider are: do the facts and circumstances in the case, at the time of the killing, and before and after that time, having connection with or relation to it, furnish satisfactory evidence of a sedate and deliberate mind on the part of the person killing, at the time he does the act? and do these facts and circumstances show a formed design to take the life of the person slain, or to inflict on him some serious bodily harm, which, in its necessary and probable consequences, may result in his death? or do the facts and circumstances in the case show such general reckless disregard of human life as necessarily includes the formed design against the life of the person slain? If they do, the killing, if it amounts to murder, will be upon express malice.

"In order to warrant a verdict of murder in the first degree, malice must be shown by the evidence to have existed, that is, you must be satisfied from the evidence, beyond a reasonable doubt, that the killing was a consummation of a previously formed design to take the life of the person killed, and that the design to kill was formed deliberately, with a sedate mind, that is, when the mind of the person killing was self-possessed and capable of contemplating the consequences of the act proposed to be done. There is, however, no definite space of time necessary to intervene between the formed design to kill and the actual killing; a single moment of time may

be sufficient; all that is required is that the mind be cool and deliberate in forming its purpose, and that the design to kill is formed.

"If the evidence satisfies you, beyond a reasonable doubt, that the killing was the result of a previously formed design by the defendant to kill deceased, and that the design was formed when the mind was calm and sedate and capable of contemplating the consequences of the act proposed to be done by him, and such killing is further shown to be. unlawful and done with malice, then the homicide is murder in the first degree, and your verdict should be rendered accordingly.

"To warrant a conviction of murder in the first degree, you must be satisfied by the evidence, beyond a reasonable doubt, that the defendant, before the act, deliberately formed the design with a calm and sedate mind to kill the deceased; that he selected and used the weapon or instrument reasonably sufficient to accomplish the death by the mode and manner of its use. The act must not result from a mere sudden, rash and immediate design, springing from an inconsiderate impulse, passion or excitement, however unjustifiable and unwarrantable it may be.

"Now, if you find and believe from the evidence, beyond a reasonable doubt, that the defendant, Leon Martinez, did, as charged in the indictment, with express malice aforethought, with a pistol and knife, with a sedate and deliberate mind and formed design to kill, did unlawfully shoot and stab and thereby kill the said Emma Brown, you will find him guilty of murder in the first degree, and so state in your verdict, affixing the penalty therefor.

"The punishment for murder in the first degree shall be by death or by confinement in the State penitentiary for life, as you may determine and state in your verdict.

"The next lower grade of culpable homicide than murder in the first degree is murder in the second degree. Malice is also a necessary ingredient to murder in the second degree. The distinguishing feature, however, so far as the element of malice is concerned, is: that in murder in the first degree malice must be proved to the satisfaction of the jury, beyond a reasonable doubt, as an existing fact, while in murder in the second degree malice will·be implied from the fact of an unlawful killing.

"Implied malice is that which the law infers from or imputes to certain acts, however suddenly done; thus: when the fact of an unlawful killing is established and the facts do not establish express malice, beyond a reasonable doubt, nor tend to mitigate, excuse or justify the act, then the law implies malice, and the murder is in the second degree; and the law does not further define murder in the second degree than if the killing is shown to be unlawful, and there is nothing in evidence on the one hand showing express malice, and on the other hand there is nothing in evidence that will reduce

the killing below the grade of murder, then the law implies malice, and the homicide is murder in the second degree.

"If you find and believe from the evidence, beyond a reasonable doubt, that the defendant, with a pistol and knife, in a sudden transport of passion, aroused without adequate cause, with intent to kill, did shoot and stab and thereby kill Emma Brown, as charged in the indictment, you will find him guilty of murder in the second degree and assess his punishment at confinement in the State penitentiary for any period that you may determine and state in your verdict, provided it be for not less than five years.

"A person for an offense committed before he arrived at the age of seventeen years shall in no case be punished with death, and if you find from the evidence in this case that the defendant was under the age of seventeen years at the date of the killing you will not assess his punishment at death, even though you find him guilty of murder in the first degree, as hereinbefore defined.

"The burden of proof is on the defendant to establish the fact that he was under seventeen years of age at the date of the killing.

"The defendant can not be compelled to testify in the case. He has a right to testify in his own behalf, but if he chooses not to do so, his action in not testifying is not subject to criticism by you, and you will not discuss nor even refer to the fact that defendant did not testify in the case.

"If you find the defendant guilty of murder, but have a reasonable doubt as to the degree of murder, you will resolve the doubt in favor of the defendant and find him guilty of murder in the second degree.

"The defendant is presumed to be innocent until his guilt is established, by legal evidence, beyond a reasonable doubt, and if you have a reasonable doubt as to the defendant's guilt you will acquit him and say by your verdict not guilty.

"You are the exclusive judges of the facts proved, of the credibility of the witnesses and the weight to be given to the testimony, but you must receive the law from the court, as it is herein given you, and be governed thereby.

                                            S. J. Isaacks,
                                Judge Seventieth Judicial District.


"Endorsed as follows:


"No. 616.   The State of Texas vs. Leon Martinez.
                        CHARGE.
   "Filed in District Court this 29th day of July, A. D. 1911.
        H. N. McKellar,
              Clerk District Court Reeves County, Texas."
   Judge Isaacks, the witness, continuing, testified: "All of these orders were made and entered of record on the dates named. The charge was not copied in the minutes, but was filed by the clerk.

When the motion for new trial was presented and overruled the defendant was present. No notice of appeal was given. The defendant was present at all times when anything transpired. Judge Parker was present when the motion for new trial was overruled. He presented the motion for a new trial, and when I overruled the motion I asked him if he was going to give notice of appeal. He said: 'We are not going to give notice of appeal.' That after the trial he thought the court had committed error in one instance, but after careful consideration they had decided there was no error. That was in reference to the admission of certain testimony, and he said: 'We are convinced there was no error in the trial of the case, and we are not going to appeal it.' The defendant did not say one word about appealing the case. Before passing sentence I asked him if he had any statement to make why sentence should not be pronounced against him. He said that he had not, except as to his age; and I think he said, I am not old enough to be hanged. He never at any time mentioned the Court of Criminal Appeals. He never at any time said anything about appealing the case. If he had made any intimation whatever that he wanted to appeal the case, I should myself have entered a notice of appeal without any action on the part of him or his attorneys. When I asked Judge Parker if he wanted to give notice of appeal he went over and talked to the defendant, and then notified me that no appeal would be taken. Judge Parker is ex-district attorney of the 43d judicial district, and had been practicing law twenty or twenty-five years. The attorneys requested consultation with defendant, and it was always granted. Two requests were made in open court, and they went off in a room adjoining the courtroom and consulted with him."

The evidence adduced on the trial of the case in the District Court was introduced in evidence in this case. It is as follows:

"Be it remembered, that the following is a statement of the facts proved upon the trial of the cause before numbered and entitled:

Doctor J. H. Wolverton, a witness for the State, having been duly sworn, testified:

Direct examination: My name is J. H. Wolverton. I live at Balmorhea. I am a physician. I have been a physician six years. My experience has been, hospital and general practice, for that length of time.

I have had occasion to examine gunshot wounds and other wounds. I have had occasion to examine the general run of that; I have examined gunshot wounds and stab wounds.

I knew Miss Emma Brown. I had occasion along about July 22 or 23 to examine the body of Miss Emma Brown. Sunday morning, about eleven o'clock; I forget about what day it was; 22d or 23d, along there, of this year.

I found that Miss Brown had six stab wounds in the front part of her chest. I found one stab wound in the median line just above

the sternum, in this position here (indicating) and I found two stab wounds about half an inch apart, on the left of the median line of the sternum, three and a half inches of the breast bone, in this positon over here (indicating) about half an inch apart. Then there was two stab wounds in front on the left side just above the breast, two inches below the clavicle; that was on the left side, about this position (indicating). Then there was one stab wound on the right side, one inch from the median line of the back; that would be right about there (indicating). These wounds in front, four of them punctured the lung, and the one behind punctured the lung. Then there was one bullet wound. There were six wounds in front and one behind. From my experience as a physician, these wounds were made with some kind of a sharp instrument; I imagine a knife. There was one bullet wound, in the lumbar region, three and a half inches from the line of the back bone, ranging from the superficial structure, coming out of the abdomen on the left side, three and a half inches from the median line and five inches from the umbillicus. The ball entered about this position here (indicating), came out around here (indicating). I do not think it entered the abdomen. It followed the superficial structure, and it would not have caused death.

From my experience as a physician, the natural effect of these wounds on the body of Miss Brown was: they would have caused death. When I got to the body life had been extinct for some time; I could not say how long. I waited upon the body down where she was found, two miles east of Saragosa.

Cross-examination: Any one of the four of the six knife wounds in front would have been fatal, and the one in the back would have been fatal. The bullet wound was not fatal. That was a flesh wound. It would be problematical as to whether or not the bullet wound, if inflicted first, would impair immediately the strength of the deceased party; I believe it would, though, for a woman; it might not for a man; for the time being I think it would. It would probably impair their physical strength very materially. It is hard to say, exactly, but I have seen people come around with very little discomfort with a larger wound; but sometimes a woman faints; it depends upon the person.

I expect I have known the deceased something like five or six months. I could not tell you with any certainty about what her age was; it is mere guesswork on my part. I would say she was about anywhere between twenty-six and twenty-nine. She was a single lady. She was about five feet four or five inches in height. I would imagine, five feet two to five inches. I would think her weight to have been between 135 and 145 pounds. Yes, she had the appearance of a stout, strong, vigorous woman; she was pretty well built. She was more on the fleshy order. When I first saw the body it was about two miles east of Saragosa, on the prairie, there. When I

saw her I think it was about half past ten or eleven, on Sunday morning. I went out there with Mr. Stuckler. Yes, there were other parties there when I got there; quite a few there. I think the body was lying on the ground as it was found. They said they had not moved it. She was lying prone; lying clear on her back; head and feet all touching the ground, straight out. I remember the arms were about in this position (indicating); may have been turned a little bit, not crossed, not upon the breast, but lying down. I could not say positively whether they were by the side, but I do not think they were crossed. I know the fingers were drawn, because I had to take off her gloves. The limbs were straight out; close together. The corpse looked to me as though it might have been straightened out, but of course I do not know.

Pink Harbert, a witness for the State, having been duly sworn, testified:

Direct examination: My name is Pink Harbert. I live about two and a half miles below Saragosa. My business is farming. I am deputy sheriff. I knew Miss Emma Brown. I had occasion, about the 22d or 23d of July, to see her body.

Mr. Robbins came down and told me he had found Mrs. Copper's horse and buggy up at the gate, and asked me to go with him to look for her; so he went back to get the buggy, and I went up the road, and I found Miss Brown a little west from the road, dead. The body was lying on her back, her feet crossed. I went then and met Mr. Robbins and Mr. Baker, and told them I had found her, and came to Mr. Honaker's and phoned to a justice of the peace. She was in the same position when the doctor came there. I did not, the first time I was there, look around the body, around about the country, to see if there was anything there. I did that afterwards. I did not find anything. I did not find any such thing as a stick, or anything around there.

Cross-examination: No, that was not near the Pecos to Saragosa road. I suppose it would be called the Barillo and Saragosa road; it was east of Saragosa. I judge it was about three miles from Saragosa. I suppose it was a mile and a half from the nearest house. The body was on the left-hand side of the road, going to Saragosa. I suppose it was about eight o'clock, or eight-thirty, when I found her. The body could be seen from the road. There was no sign around the corpse on the ground that attracted my attention in connection with any struggle on the ground. The second time I went to look I found nothing on the ground. I judge it was about half an hour between the time I first went and the second time. I said the feet was crossed. The body was lying on its back. The hands, seems to me, was something like that (indicating). They were not laid upon the breast. I do not remember whether or not the body was stiff when I first found it. I left the body remaining just as I found it. I did not notice any tracks of any

person, of any character, around where she was found. The ground was dry at that place at that time. There was grass on the ground. At some places tracks would show, if made there, at others they would not. At that particular place there would be places where tracks would show and places where they would not. I did not notice for tracks the first time I was there. I noticed for tracks the second time. I did not find any the second time. I did not find any instrument of any character about the body, knife or pistol or anything of that character. Yes, I tried to track the deceased where she was, where she came from the road she went in going out there. I found that by her buggy tracks. I did not find any foot tracks. I did not find anything that would indicate how she got out there to where she was then found. I found some buggy tracks. They were all around the body. There were horse tracks around there. I suppose the corpse was lying about three feet from the buggy track. The buggy tracks was on both sides of her; all around.

I judge she was somewhere between twenty-five and thirty years old. I suppose she was five and a half feet high. I suppose she would weigh 150 or 140. She was tolerably fleshy; not so very stout. She was considered a stout woman, distinguished from a weakly one. She was a single lady. She lived over in the U pasture out there. I guess she lived about six miles from where she was at. She lived about nine or ten miles from Saragosa.

I know the defendant. I do not think I had ever seen the defendant and the deceased in company with each other at any time. I do not remember to have seen them. I believe the defendant lived in New Saragosa at that time.

Redirect examination: I examined the buggy afterwards. I found three bullet holes in it. From the buggy tracks it looked to me like the horse and buggy had been running and circling. I judge the body was about three feet from the buggy track.

Recross examination: One of those holes was in the bed of the buggy, right behind, one in the side of the buggy and one in the back of the seat. From the way the shots went in the buggy I think whoever did it was kinder behind the buggy and to one side. One shot was fired behind the buggy, and one in the side, and one in the buggy, in front. I do not mean the front end of the buggy; I mean in the side of the buggy in front of the seat. I could not tell the caliber of the pistol that was fired; it was a very small bullet. The size of the bullet hole would indicate about a 22 or 25, something like that.

In answer to questions by the court: This buggy had no top. The country was flat. There was very few, little brush; where she was there was none at all. I suppose her body was twenty-five or

C. Brown, a witness for the State, having been duly sworn, testified: thirty steps from the road. I think it was about three miles from Saragosa.

Direct examination: My name is C. Brown. I am sheriff. I was not acquainted with Miss Emma Brown. I had seen her two or three times. I have seen the defendant several times.

I had occasion to arrest the defendant, last Sunday, on the 23d. I was notified that there was a murder committed near Saragosa. I went out there and after I got there they suggested to me that he was the man that did the deed, and me and Mr. Stuckler went up and arrested him. We found him in Saragosa when we arrested him; the old town; but before that I seen him down at Honaker's place; that is, during the day of Sunday. That was where the body of Miss Brown had been taken. I could not exactly say what he was doing at Honaker's when I saw him. He was standing around, as well as I remember; there was a big crowd there, and I never paid no particular attention to him.

The body had been moved when I got there. I went out to where it had been, but they never showed me any particular place. We went out to compare horse tracks; the little dun mare they claimed he rode the day before, which he acknowledged he did; the tracks compared exactly, and the ones that was following the buggy. They just showed me in places where it was, where it was clear, where no other tracks had went over it. I would take this mare right by the side of that track, three or four different places. I took the mare and compared the tracks. I did not make any search for instruments where the party was supposed to have been killed. I took a pistol off the boy, when I found him at Old Saragosa. It was a 25 automatic pistol. I have that with me. (Witness produces pistol.) That is the pistol I taken out of his pocket.

Cross-examination: I do not know that he was riding a dun mare the day before this, of my own personal knowledge. The tracks I found corresponded with the tracks of a mare he was supposed to ride the day before; we had her on the ground there, leading her. Her left forefoot was split right square off, so it left an open space on the foot, left that mark that you could identify the track. That showed in the track. I suppose about an inch of her foot, a little gap, just split up and broke off, that did not touch the ground. Every time she put her foot down the other hoof was so much longer. I found lots of tracks, seen lots of tracks; the tracks we compared was the tracks they showed me following the buggy, and claimed they found them tracks following the buggy when they first went down there, before there was any other tracks there. I made an examination myself to see whether or not this track with this peculiarity had been following the buggy; I found it. I could not tell whether the track was in front of the buggy there or not. There was nothing but buggy tracks and horse tracks there. From what I could see they was going in all directions while they was there (the horses). Yes, if they were going in one direction and the

peculiar track had been in front of it I could tell that, but maybe they would go this way forty feet and then back that way; you couldn't tell which was in front and behind. It would be an impossibility for a man to tell whether he had ridden a horse behind the buggy, or in front of it, from the tracks. A man seeing a track could not tell whether the track was made prior to the one made by the buggy or not. Where they were dodging back and forwards so much, I never paid much attention to that. They taken me a little further back where they was running more straight; they was not runing straight very far at the time—to compare the tracks where they had not been tromped out so much.

R. L. Baker, a witness for the State, having been duly sworn, testified:

Direct examination: My name is R. L. Baker. I live at Saragosa. I have lived out there six years. I knew Miss Emma Brown. I had occasion about the 22d or 23d of July to see the body of Miss Emma Brown. She was about a quarter south of Pink Harbert's house. She was a little over three miles east, about three miles from Saragosa. I was not with Pink Harbert when he found her. I went to the body directly after Pink was there; me and Mr. Robbins went together. I stayed there where the body was until the doctor came. I made an examination around on the ground about the body. I did not find any instruments of any kind there. I followed the tracks out all the way, around from the time she quit the road until I came to the body; buggy tracks. I did not find her tracks at any place. I could find the buggy tracks, but could not find any of her tracks. I did not find any stick in that locality; no instrument of any kind.

W. P. Brady, a witness for the State, having been duly sworn, testified:

Direct examination: I want to state to the jury that on last Monday, the 24, I believe it was 24th of July, I found out that the defendant, Leon Martinez, was in jail here. I went over to the jail to see if he wanted to make a statement. He made to me a written statement, made it voluntarily. I duly warned him.

The State here introduced in evidence the written statement above mentioned by the witness W. P. Brady, said written statement being in words, letters and figures, as follows, to wit:

Pecos, Texas, July 24, 1911.

I, Leon Martinez, after having been duly warned by Will P. Brady that I do not have to make any statement at all, and that any statement which I do make may be used against me on the trial for the offense concerning which this statement is made, I voluntarily make this statement to Will P. Brady:

On July 22, 1911, about three miles from Saragosa, I met Miss Brown, who was riding in a buggy. I asked her to let me do what

she had promised. She had promised to let me fuck her. When I asked her on the road on July 22, she said· I would have to go somewhere else. I told her I just had to do something. She said, 'What do you mean, you son-of-a-bitch? I am going to have you arrested.' I told her she did not need to have me arrested, all I wanted was for her to do what she had promised to do. She said she would kill me, and put her hand on her hip. Then I commenced shooting and shot four times with a 25-caliber automatic pistol. Her horse ran away, and when I headed the horse she stopped and got out of the buggy. When I got off my horse the girl ran. She had a stick in her hand. I then stabbed her in the back with my knife. When she turned around she hit me with her fist and I stabbed her four or five times in the breast. She never hit me with the stick. I got on my horse and loped away to Saragosa. I did not tell anyone until I was arrested. She was standing up when I left her. After eating supper at home I went to Crenshaw's store and worked. On the morning of July 23, 1911, I met John Oates and Floyd Crenshaw in a buggy. Floyd told me that Miss Brown had been found dead; that she had been shot. I afterwards told Jim Mayfield about her being shot. Then I ate dinner and went to Old Saragosa, and from there I went to Mr. Honaker's place, where the body of Miss Brown had been brought. I looked through window, but could not see the body. I stayed at Honaker's almost an hour and then with Henry Everett I went to a watermelon patch and ate a melon. I was coming out toward Old Saragosa when the officers arrested me. I had the gun that I did the shooting with, but the knife was at home in my other pants. Miss Brown did not pull any pistol at any time. When I told the officers about having killed Miss Brown I did not tell them about her threatening to kill me, but I did tell Mr. Stuckler last night. This all happened in Reeves County, State of Texas. I was riding a dun mare, unshod—a little horse. The mare belonged to Crenshaw & Co. I killed Miss Brown about four o'clock in the afternoon. I had talked to Miss Brown at the store where I worked, on the morning of July 22, and that was when she told me I could fuck her.

(Signed) Leon Martinez.

Pink Harbert, a witness for the State, recalled, testified:

Direct examination: I found the body, and this occurrence I have testified about was in Reeves County, State of Texas.

*The State Rests.*

The defendant introduced in evidence the following portion of the statement testified to by the State witness W. P. Brady, as having been made to him by the defendant, said portion of said statement not being offered in evidence by the State:

I am sixteen years old, was sixteen on June 10, 1911.

L. C. Martinez, a witness for defendant, having been duly sworn, testified, through an interpreter:

Direct examination: My name is L. C. Martinez. I am thirty-nine years old. I am married. I had nine children; five are living. My wife is living. My wife is in Toyah now; she will be here this evening. I have lived in Reeves County, will be three years the 8th of October. I lived in El Paso prior to coming to Reeves County. I came to the United States the 3d of April, 1906. Before I came to the United States I lived in Durango, Mexico.

The defendant is my son. My boy was born the 10th of June, 1896. He is now fifteen years and some months. When he was born I was living in Gallege Ranch, county of Inde, Mexico. I had another son older than him; he died. This is my oldest son living. I was married to his mother the 22d of April, 1893. I have the marriage certificate with me. (Witness produces paper.) That is it. I do not know exactly the ages of all of my children, but more or less all of them. My child next to this defendant was a girl; it died. The next child died. It was a girl. The next child is living, after that. That one is twelve years old.

Cross-examination: I lived at Saragosa last week. Last Christmas I was in Pera. I was in Saragosa in February of this year, and in March and April. A part of the time I was in Toyah this month, and part of the time in Saragosa. Yes, I stated my boy was fifteen years old last month; I repeat it again. I made a supper for my boy (on his birthday), on the 11th of April, a party, because that is the saint's day, according to his name. That is San Leon's day. That is April 11. We always celebrate the saint's day, not in his birthday. He was going on fifteen years in April when we celebrated that.

I do not know Pat Moran. When I see him I might know him. I do not remember his name. I know Pat Moran that worked in the printing office; I do not know his name, but I know him personally. I did not tell him over a year ago that that boy was sixteen years of age at that time. I do not remember when this boy was baptized. I have not got any date. I have a child two and a half years old that is not baptized yet. He was very small when baptized, but I do not remember which month it was.

My boy's name, this defendant, is Leon C. Martinez. The other boy's name, next to him, was Manuel. Manuel is going on twelve years old. I said yesterday I did not know for sure. I did not testify positively yesterday that he was twelve years old. My boy's name that died was Manuel also. It is the custom in Old Mexico to register each child when it is born. They did not issue me a certificate showing that the child was born; if anybody asks for it they do. I have not got a certificate as to when this defendant was born.

Manuel Mata, a witness for the defendant, having been duly sworn, testified: .

Direct examination: My name is Manuel Mata. I live at Saragosa. I have lived at Saragosa about—over twenty years, twenty-five, something like that. I know the defendant. I have been acquainted with him over three years, close to four, I think. I first became acquainted with him at Toyah, Texas. He was real small then; I can not say just how big he was, but he was very small. He was looking to me like he had been sick and weak, and like he had not been doing much work, and seems to me then it was that he had not developed much. I do not know what his age was at that time. I can not say how old he was, because I do not know his age. A fellow can not judge a fellow's age by the looks. I do not think I could hardly answer that question.

Cross-examination: I do not remember that I told parties last week that he was eighteen years old now. I do not remember that I told parties out at Saragosa that he was eighteen years of age now, and I thought that was about how old he was. I might have done it, in talking that way, but I did not mean to say I knew his age. That might have been my impression as to what he was at the present time. I do not remember if I told parties at Saragosa that he was eighteen years old, when they asked me. He worked for me. I was postmaster at the time. He was not assistant postmaster; he was clerk for me. I did not swear him in. I do not know whether the law tells me to swear anybody in that attends to mail, but I never did swear him in; he was working in the store for me. I do not remember it if I told anybody since this man was arrested that he was eighteen years old or that I thought he was that old; I might have told a fellow at the time it was my impression he was that old; it might have been by impression. I do not remember whether I told parties that out there; I might have said he was eighteen, but it is like you would, the same way. Yes, I attended his birthday party.

E. Sidra Martinez, a witness for defendant, having been duly sworn, testified:

Direct examination: I am the wife of L. C. Martinez. I am mother of Leon Martinez. The defendant is fifteen years old, going on sixteen. He was born in 1896, the 10th of June. I have had nine children since my marriage with my husband. I have five living.

Cross-examination: I came to Pecos in yesterday's train, the last train; when it went out of Toyah it was 3:55. When I came here a little later they told me the court was closed. I did not see the time, but I came just when the train leaves there. People told me the court was closed. When they telephoned me to Toyah to come up here, and when I got down here they told me the court was closed. No, no officer of the court told me that; nobody told me. My husband did not know I was there, but when he came to me he

told me the court was closed. I was with my husband last night. My oldest child besides this one is not living; he would be sixteen years, but he is dead. The child that died, the first child, was named Manuel. My husband has been married just with me; the first time; we are married a legitimate marriage. My boy, the next one to this one, that is living, is eleven years old. He was born the 18th day of May, 1900.

Redirect examination: I never saw that man before. I do not remember if I have seen him; I do not remember. I do not remember of seeing you before.

### Defendant Rests.

S. H. Crenshaw, a witness for the State, having been duly sworn, testified:

Direct examination: My name is S. H. Crenshaw. I live at Saragosa. I know the defendant. I am in the mercantile business at Saragosa. The defendant worked for me. He was working for me in June. He has been working for me since the 8th day of February. I had an occasion since that time to receive an invitation to his birthday party. I received it in April. I know L. C. Martinez, the father of this boy. I know his handwriting; I am familiar with it. That invitation was in his handwriting. I have made a search for that invitation. I looked the house over the day before I came down here. I have not had search made for it since then. I made diligent search for it. My wife is away from home. I do not know where that invitation is now. I might have thrown it away or destroyed it, like any other letter. I was not able to find it. It was in a blue envelope. The best of my knowledge it was stated on it, eighteen years of age.

Cross-examination: I said to the best of my knowledge, and the best of my recollection. That was somewheres between the middle of April and the 1st of May of this year, 1911. To the best of my knowledge it said eighteen years old. Yes, others saw that invitation; M. C. Luckey saw it, got one; he works in our store. It was written in Spanish. I can not read Spanish. I know it was eighteen because I got Leon to read it; I believe it was Leon. He was present when I received it. Yes, I got him to read the entire invitation; I think it was him; I got someone to read it. To the best of my knowledge whoever read it read it eighteen. I am not certain that it was the defendant that read it; I could not say for sure, but I think it was, because he is right there in the store all the time, and he is the only one that could read Spanish in the store. There was several around could read it, but he was the only one in the store at present.

Redirect examination: I gave the defendant a present on that birthday, and talked to him about his birthday.

Pat Moran, a witness for the State, having been duly sworn, testified:

Direct examination: My name is Pat Moran. I live at Pecos. I lived at Toyah before I came to Pecos. I lived at Toyah about eleven years, a little over. While at Toyah my business was a little bit of everything. The last couple of years I was running a newspaper.

I know L. C. Martinez, Sr. I know this defendant. He never worked for me. He worked in my shop, but he was doing his own work. I had occasion to have a conversation with the defendant's father in regard to the defendant's age. L. C. Martinez, the father of this boy, told me that he was sixteen years of age. That was over a year ago, but I could not——

The Court: The testimony will be limited for the purpose of impeachment.

Cross-examination: I speak Spanish very little. Old man Martinez does not speak English, but that was in Spanish. I can ask how old a person is, and can understand, when he tells me. Yes, I asked how old he was; I asked him (witness here spoke in Spanish). I will state positively that that was over a year ago. I asked the old man the age of the boy because, as printers, there was a sort of mutual interest between us. I would visit their place. The boy was a bright boy, and the question came into my mind to ask the old man how old the boy was, and he stated, positively, sixteen, in Spanish.

Redirect examination: I do not understand Spanish enough to read the paper his father was running in Toyah at that time, but the name of it was the Evolucion en Sociale.

Lester C. Majors, a witness for the State, having been duly sworn, testified:

Direct examination: My name is Lester C. Majors. I am official shorthand reporter for the Seventieth Judicial District of Texas. I held the same position in 1911.

I had occasion, in January of 1911, to take the stenographic notes of a case at Barstow, the State of Texas vs. P. K. Holmes. The witness L. C. Martinez, who is now the defendant in this case, testified in that case. (Witness is handed statement of facts.) This is the statement of facts in the Holmes case. I made that statement of facts. It is correct. (Witness turned to testimony of L. C. Martinez, in said statement of facts in the Holmes case.) In that testimony he said: I am seventeen years old.

Cross-examination: The question, to which that answer was made, is not in the record, but I can give you the question with practical certainty.

In answer to questions by the court: The record is made in narrative form. It is not made in question-and-answer form.

Lee Harbert, a witness for the State, having been duly sworn, testified as follows:

Direct examination: My name is Lee Harbert. I live at Saragosa. I know Manuel Mata, a merchant at Saragosa. Yes, I had a conversation with him since this occurrence about the——he was, if he knew. He said he was between eighteen and nineteen.

Cross-examination: I asked him if he knew how old Leon was, and he said between eighteen and nineteen. I just asked him how old he was, and he said between eighteen and nineteen. He did not tell me how he knew it, and I did not ask him. He just answered my question; that is all.

The Court: Gentlemen of the jury, you will not consider the evidence of Pat Moran and Lee Harbert for any purpose other than impeaching the witnesses who had testified prior thereto.

*All Parties Close.*

The State of Texas
          vs.                              No. 616.
Leon Martinez.

I, Lester C. Majors, official shorthand reporter for the Seventieth Judicial District of Texas, hereby certify that the foregoing twenty-three (23) pages contain a full, true and correct statement of all the facts proved upon the trial of the above numbered and entitled cause.

Witness my hand at Midland, Texas, this the 23d day of August, A. D. 1911.

> Lester C. Majors,
> Official Shorthand Reporter,
> Seventieth Judicial District of Texas."

Judge Isaacks, then continuing, testified: "You asked me if in connection with the district attorney I personally examined the minutes to see that the orders were correctly entered. I will say this being a called term of the District Court, I took it upon myself to dictate the orders, and then examined the record after the clerk had recorded them to see that it was properly done, and they were all entered at the time indicated and during the term of court. In answer to the question, were there any requests or motions by the attorneys for defendant or defendant himself that do not appear of record? I will say that when the case was called for trial, the State announced ready, and Mr. Estes made a verbal statement that he wanted to have present the mother of defendant to testify as to his age. I learned that defendant's mother lived at Toyah, only twenty miles distant, and assured defendant's counsel her attendance would be secured, and she was present and testified on the trial of the case. There was no motion for continuance, or other motion

for a postponement of the case; no application for a change of venue filed, and there was no intimation made to me by either of the attorneys for the defendant, by the defendant, or any friend of the defendant, or suggestion made that defendant could not get a fair and impartial trial. There are two regular terms of the District Court held in Reeves County annually—one in April and one in November. I learned of the death of Miss Brown on Sunday night, and I went that night to Pecos, and arrived there Monday morning.

"The first order made was the order convening the special term of the District Court of Reeves County. It was made on Monday, July 24. The next order was made after court convened, appointing a jury commission. I just selected the names of three men that I knew to be competent. I dictated all the orders and did so because it was a special session of court and I wanted to see that they were properly entered. I have held the office of district judge for three years, and this is the only time I have convened a special term of court. My reason for convening a special term of the court was because a murder had been committed, and I deemed it wise to investigate and find the murderer, and have him punished. There was no suggestion made to me by anyone that unless a trial was had immediately that relator would be mobbed. The district attorney is the person who notified me that this crime had been committed. Mr. Johnson, the proprietor of the hotel at which I stopped, said the people on the creek, that is the term used expressive of the neighborhood in which the crime was committed—when they first heard of it, were wrought up and he was afraid the prisoner, whom the sheriff had in custody, was going to be violently dealt with for awhile, but that the excitement had subsided and there was no danger of mob violence. I do not remember discussing it with anyone else except Mr. Brady, the district attorney, and probably Mr. Cowan. No, I did not say several spoke to me about it. No one else spoke to me about any probable mob violence, past, present or future, except these three men, and I do not remember that Mr. Cowan did. I heard nothing of a mob on the day the trial was concluded. I left Pecos on the three o'clock train Sunday, and relator left on the same train I did. I ordered the sheriff of Reeves County to deliver him to the sheriff of Midland County because the jail at Pecos was in an unsafe condition, from the standpoint of probable escape therefrom. The new jail was not completed. No one has escaped from the Pecos jail. I absolutely had no other reason for ordering him taken to the Midland County jail. I had not the slightest idea that he might be lynched if he remained there. I might say that I considered there was a possibility of him being lynched, but the unsafety of the jail was the moving cause. I know the majority of people in Reeves County. I could not call their names, but know their faces. I have held six terms of court in Reeves County during the past three years, and with one exception

I have never seen as many men in attendance on a trial in that county. At one other trial there was a larger number of men. I do not think there were many from any section other than the community where the offense was committed. There was quite a number from that community. The balance were Pecos people, and those who happened to be there from adjoining towns. In answer to the question: 'Those places compose about nine-tenths of the population?' he says: 'I think not. Toyah is quite a little place; Balmorhea is quite a little place, and the communities up the Santa Fe Railroad. Reeves County is a large county, possibly nearly a hundred miles across one way. In addition to what I said about Judge Parker's legal ability, Mr. Estes has the reputation of being a good criminal lawyer. They made no question about the venire of jurymen, and did not exhaust all their challenges. I appointed Judge Parker to defend the relator as soon as the indictment was returned into court, and he was present when the special venire was drawn. The attorneys tested the qualifications of the jurors extensively, and there was no mob present in town or elsewhere during the trial, nor did I hear of any indication of a mob. I was around town after the trial and before the adjournment of court, and I heard no expressions of violence to the defendant or any other person. The only thing I heard was what Judge Parker said to me. After I had overruled the motion for new trial, and Judge Parker had said there was no error in the case, and 'I am not going to give notice of appeal,' he came up to the desk and had a conversation with me, and said he wanted me as his judge to understand that what those people had said to him had nothing whatever to do with his failure to give notice of appeal in the case. I asked what that was, and he said: 'Some folks met us down there on the street a short while ago and asked us not to appeal the case, and I want you to understand as my judge that fact had nothing whatever to do with my not giving notice of appeal.' He did not say any threats had been made towards him, the defendant or anyone else. The State exhausted seven or eight challenges while the defendant exhausted thirteen in the selection of the jury."

Writs of commitment were introduced authorizing the sheriff to hold the relator under the indictment and sentence herein introduced; also the proclamation of the Governor granting a reprieve until the 30th day of September, 1911, and ordering him to be delivered to the sheriff of Taylor County to be by him kept until that date.

W. M. Beverly testified that he is sheriff of Midland County, and served relator with a copy of the indictment on July 25, 1911, and served relator with a copy of the special venire drawn on July 26.

George Estes testified he was an attorney at law, and of counsel for relator in the trial of the case in Reeves County. That he was employed to defend relator on Thursday, July 27, and the trial was begun on Friday, July 28, "I went to Pecos and conferred with

Judge Parker, also counsel for defendant. We asked permission of the court to talk to defendant, and it was granted. He placed no limitations on us. We talked to the defendant. There were two rangers present. We went into the trial Friday morning, and after the jury brought in a verdict we were granted time by Judge Isaacks to prepare a motion for new trial. I can not name the length of time. Mr. Parker and I dictated the motion to a stenographer, and we went down town where we met the district attorney, Mr. Brady, and asked for Judge Isaacks. He told us the judge was getting a shave, when we informed him that as soon as the stenographer had transcribed the motion for a new trial we would be ready to present it. He said he would inform the judge, and we started back to the courthouse. When we got nearly back to the courthouse someone holloed at us, and I turned around and saw a great many people coming rapidly—perhaps as many as fifty. They came up. Parker, the sheriff and I were standing there, the sheriff back to my left. Mr. Johnson seemed to be spokesman, and he was very much excited and out of breath, and he told us we must not appeal the case; if we did they were going to hang the defendant that night, and said they could hang three as well as one, or two as easy as one. And then Mr. Hosie got up on a box and made a speech and said they would not permit any appeal. I knew Mr. F. W. Johnson, Mr. Hosie, Mr. Landrum, and Mr. Collier, but did not know any of the others. In answer to the question: 'Any of the jurors?' the witness replied: 'There might have been one.' He told Judge Parker he would not permit any appeal, because Judge Parker had said in his argument to the jury he would be satisfied with any verdict that they might render. Judge Parker attempted to argue with them, and asked them if they did not think the quesion of law as to the trial ought to be settled by the Court of Criminal Appeals, and they said no. A gentleman from the neighborhood of the homicide, a large man, said, 'I want to know and must know right now whether this case is going to be appealed or not. We have our train and wagons to go home, but we are not going to leave until we know what is going to be done,' and finally Judge Parker said, we will comply with your request, and I went to the hotel and stayed there. I was afraid to return to the courthouse. I did not give any notice of appeal. We took some bills of exception. We offered the marriage certificate of the father and mother of the defendant, which was ruled out and we excepted. The State introduced only a part of the confession of defendant, and we objected because the State did not offer all of it, but the part the State did not introduce, we offered it and were permitted to introduce it. We also objected to the stenographer being permitted to testify what the defendant testified as to his age at Barstow, but we did not write up any of the bills of exception. I did not do so because I was afraid, and left on the first train. I have lived at 'Pecos and at one time was

county attorney of that county, and later district attorney of that district. I say that I was afraid of violence and that was the reason we did not give notice of appeal, and see that it was entered of record. I stopped at the same hotel at which Judge Isaacks stopped, but I do not remember seeing him but once that night. I did not say anything to Judge Isaacks about the matter, and made no effort to see Judge Isaacks and tell him about these threats. I never made any protest to the judge or district attorney. I never spoke to either of them about desiring to appeal the case. I do not know what time court adjourned. About six o'clock I went over to the depot and saw Judge Isaacks there, but did not say anything to him. In answer to the question: 'When you came down from trying the case, did anyone make any threats against you?' he answered, 'I met A. W. Hudson, a lawyer, and he told me I had better be careful how I conducted the case or we would get the defendant hung and they would not stop at him.' There was no evidence of the people in the courthouse acting otherwise than people always act—they went up there and sat there and listened. I did not ask for any additional time to prepare the case for trial. I made a request that we postpone the trial to get the mother of defendant, and we secured her attendance on the trial. Judge Isaacks did not do or say a thing at any time during the trial when I was present that would justify me in thinking it would do no good to speak to him about any matter affecting my client. We tested the qualifications of the jury very thoroughly and did not exhaust all of our challenges. I did not see anyone with any arms besides the rangers. I did not try to change the venue. I talked to people with a view of finding out, and did not think it any use to try, besides I left that to Judge Parker, a man who ought to know. Judge Isaacks granted us all the time we requested, and I had no reason to think that Judge Isaacks would not have granted a postponement or a change of venue if we had requested it."

The following affidavit of Judge J. W. Parker was then introduced:

"State of Texas          In the District Court, Reeves County,
          vs.          No. ——.          Texas.
Leon Martinez, Jr.          April Term, A. D. 1911, October 3, 1911.

Having been requested to make an affidavit of my connection with the above entitled and numbered cause and a detailed statement of the trial of said cause, I hereby swear to the following facts, to wit:

I was appointed by the court to represent the defendant; this appointment was made some three or four days prior to the day upon which the case was set for trial. The defendant was then taken to Midland, Texas, and was brought back to Pecos on the evening before his case was to be called the next morning. As soon as the officer arrived with the defendant, I started to go to the jail to talk with him about the matter; on my way to the jail I met the sheriff and

he showed me a telegram just received by him from Judge Estes, of El Paso, making inquiry about the case. I then went back to my office thinking that counsel had been employed and that I would not be in the case. I had tried before that time to get the court to appoint someone else and also tried to get the district attorney to talk with him and get the court to excuse me. The court, however, persistently refused to do so, but as stated above, when I saw the Estes telegram, I then supposed I was out of it. Mr. Estes came down the next morning, stating that he had been employed and a fee guaranteed to pay him and local counsel; that according to 'his agreement with his clients, local counsel must be employed also, and that because of this he would not go into the case at all unless I stayed in it; when I found him persisting in this, I said if I am to be left alone in the case with a certainty of getting nothing out of it or go on with you with the prospect of a fee, I shall go ahead with you.

As soon as it was learned that I was still in the case, a number of citizens at different times, some of them in committees, before the case was called for trial, came to me and said that it would ruin me in a business way not to withdraw from the case; that the entire citizenship of the county did not want the case delayed. I simply passed all matters of this kind up, went along and tried the case as best I could, with no time for preparation; that is, Judge Estes and myself did.

We made the following bills of exception in the case, and possibly some others which I do not now recall. When the State read the confession of the defendant, it read all of the confession, except that part of it where defendant said he was sixteen years old. We objected· to this on the ground that all of the confession should be read by the State.

The State proved by the official stenographer and his notes that the defendant, while a witness on the stand of a former criminal case, at Barstow, Texas, testified that· he was seventeen years old. We took a bill of exceptions to the court's failure to limit this evidence as impeaching testimony.

The father and mother of the boy both testified, and after they had both testified as to where the defendant was born, the date of his birth, the number of children that had been born to them, and their respective ages, we then offered in evidence the marriage certificate of the father and mother, showing when and where they were married; we offered this certificate as corroborative of the fact that the witnesses were in fact the father and mother of the defendant, and would best know the age of the defendant, and also as corroborative of the credibility of the father and mother, and as corroborative of the defendant's statement in his confession. The court excluded this certificate, and we took a bill of exceptions to such ruling.

After the case was tried, and after we had dictated hurriedly a motion for a new trial, and while the stenographer was reducing it to typewritten form, some twenty-five or thirty men on the road between my office and the courthouse, and within a few feet of the courthouse door, surrounded Mr. Estes and myself, and stated that if the case was appealed the Mexican would be hung before the next morning; that they were determined, no matter what the consequences were, that he should hang before morning, that many citizens would be killed, if any resistance to such hanging was made; they then began to plead with Estes and myself not to appeal the case; also stating, at least some of them did, that they were determined on the fact that it should not be appealed; some of the parties on the outside of the crowd, not being the ones who were talking directly to Estes and myself, made remarks to the effect that there would be three to hang if the case was appealed; this was not stated, however, by anyone who talked directly to us; they would not allow us to reason with them at all; they seemed to fear that we would convince some of the crowd that they were making a mistake and that they might fail to accomplish what they wanted. I said to the crowd that I wanted them to understand that what I did would not be done because of fear of personal injury to myself; but if it was true that they intended to hang the Mexican that evening or night because of an appeal, I would see that notice of appeal was not given; but that I would not promise what might happen later on or might not happen; that I simply would not give notice of appeal; they tried to get me to say that it would not be appealed and that there would be no future action concerning the case; this I refused to do; the two or three who had done most of the talking to me, then said they were satisfied, they would take my word that no notice of appeal would be given; they then walked away.

Now the statement by me to them to the effect that I feared no personal injury to myself was not literally true; I did not fear injury to myself so much as I feared for my client; but, still, I simply did not know what they might do; I felt that if they undertook to take the Mexican from the rangers, some of them would get killed, and if they did, they, in their rage, would be liable to turn on Estes and myself, and we could not well scrap a whole county, or what looked like a whole county to us at the time.

Now of course, there were a great many threats made by these people, as I understand, and very serious ones, on their way from town to the courthouse and after they got back to town; but Estes and myself did not hear these; we simply know it from what was subsequently told us.

As illustrative of the extent to which these people were worked up, several days after the trial, they brought a petition signed by nearly everybody in the county and wanted me to sign it; this was a petition to the Governor to let the Mexican hang; also, some days after that,

in an effort to controvert the statements before the Governor to the effect that the defendant's attorneys were intimidated, some of them wanted me to sign an affidavit to the effect that there was no intimidation at all in any shape, form or fashion.

Will say further that at the time Mr. Estes and myself were surrounded by the citizens aforesaid with a demand that the case be not appealed, we had not then decided for certain that an appeal would be perfected; we had simply decided that we would make a motion for new trial, argue same, and if the motion was overruled, give notice of appeal, and then investigate the merits of our bills of exception; and in the event we should decide that material error had been committed, to go ahead with the case on appeal, properly prepare same for hearing in the Appellate Court; but in the event we should decide that our bills of exception were not well taken, and that no material error had been committed, to go no further with the appeal; this is the decision to which we had come at the time aforesaid. Will say, however, that I am now sure that but for the demonstration aforesaid, the case would have been appealed by us and carried to the Court of Criminal Appeals. This is because that after investigation and more mature consideration, our exceptions were such as we would have concluded the higher courts should pass upon it in a case where the death penalty had been inflicted.

Will say further that when the motion for new trial was overruled I stated to the court privately while he was on the bench that I did not desire to give any notice of appeal; that what errors we had saved did not seem sufficiently material to appeal on; and I understand that this statement by me has been repeated as evidence that the failure to appeal upon our part was voluntary. In reply to this will say I made this statement to the court, because I thought he seemed embarrassed, surprised and wondered why no notice of appeal was being given; I thought he possibly suspected the reason, was to an extent embarrassed over it; so as I had agreed that no notice of appeal would be given, I whispered to the court the above statement so that he would not feel any embarrassment about the matter if he had such feelings. I simply did not want to bring the court into it.

Will say further that in the above crowd of citizens there were several of the jurors who tried the case, and in their efforts to prevent an appeal, they called my attention to the fact that I said to them in my argument to the jury that a fair and impartial trial had been had; this is true. I did make the above statement, but I made the further statement in connection therewith, and to which I called the attention of said jurors at the time they were making the argument on appeal as aforesaid; this further statement by me was, that so far as I knew, a fair and impartial trial had been had; that there may have been incompetent evidence admitted; that as they knew certain testimony had been objected to by us, which objections had been overruled by the court; that the court might be right, and we might be

wrong; that up to that time a fair trial had been had, and when the entire case was passed upon by all the courts, a result had, this would be justice; that so far as the jurors were concerned, the defendant's attorneys would be satisfied with their verdict; that is, satisfied that they were doing what they thought was just and right, whether they inflicted life imprisonment or the death penalty.

Now, this statement by the defendant's attorneys to the effect that we would be satisfied with the verdict of the jury so far as they were concerned was used as an argument by some of said jurors, that we had promised not to appeal it, and that we were under obligations not to do so. I mention this because I understand that even the above statement to the jury has been used as an argument that the failure to appeal the case was voluntary.

Will say further that it is recognized that in the above statement some of the matters stated are matters of mere opinion and not matters of fact; but such opinion has been stated because it is thought that same shows a reason why the case was not appealed, but would have been, but for the happening of the events aforesaid.

J. W. Parker."

Mr. Cunningham then stated that he had a purported transcript from the clerk of the court, in which the clerk certifies they were all the proceedings had in the trial of the case, and from which was omitted the order convening a special term of the court, and the order appointing the jury commissioners, and that they were offered for the purpose of showing that the clerk left out those orders when he made the transcript for them.

Mr. W. W. Camp testified he lived at Pecos in Reeves County, and has resided there for twenty-four years. "I left Pecos on the 23d of July and did not return until Friday. On my return I heard some remarks about lynching Martinez out on the square. They were made after sentence had been passed. I heard some one say they could hang three as well as one. Eight or ten were present when the remark was made. They were standing around the fountain in the square at Pecos. I then went to the courthouse and asked Judge Parker if he knew what feeling existed in regard to an appeal, and he said he did. I myself did not take any stock in it. In answer to the question: 'What percent of the people in the county *who knew of the crime* do you think thought he was guilty?' he answered, 'one hundred percent.' I believe one hundred percent of the people believed after the case had been tried that he was guilty. I do not think there is any doubt of anyone who has ever inquired into the facts of the case about the relator's guilt. In answer to the question: 'When the jury was drawn were the people all over Reeves County acquainted with the facts?' he said: 'Some were not; those living on the outskirts of the county had not heard of it.' Some had heard the rumor but they had to have evidence to determine his guilt, and I believe that the relator could

have received a fair and impartial trial under any condition. In answer to the question: 'Wasn't that an idle remark you heard?' he answered, 'Likely it was, but I did not so take it. They were dispersing, and made no effort to hang anyone, and it may have been the idle remark of some careless man. This was after sentence had been pronounced.'"

Mr. C. Brown testified: "I am sheriff of Reeves County, and was present at the trial. I have three deputies who were also in attendance on court. There were four rangers in Pecos. The sheriff of Midland County was also present during the trial. During the trial I did not know of any intimidation whatever on the part of the people, or any part of them against defendant or the attorneys representing him. After the trial was over, a crowd of men met in the courthouse yard, in front of the courthouse. Before that I did not notice anything whatever that would lead me to believe that either the defendant or his attorneys were in any danger or likely to be molested in any way. When the men came up in the courthouse yard after the verdict had been rendered, I heard what was said. I heard them call Judge Parker, and when they called him there was only two or three. They were not running, but walking rapidly. The county judge, John W. Leavel, came out in a few moments. Mr. H. L. McGee, pastor of the ·Christian church, was present. No one appeared to be particularly excited. After they stopped several others gathered around. Mr. F. W. Johnson is in the banking business, and one of our county commissioners, and a member of the Pecos Mercantile Company. He is a man about fifty-eight years old. Mr. Johnson is a good citizen. He is not a man calculated to provoke a breach of the peace under any circumstances, and has the reputation of being a law abiding citizen, and I do not think he would tolerate mob violence. I have known him fifteen or twenty years, and I heard most of the conversation between Mr. Johnson and Judge Parker. I did not hear Mr. Johnson tell Judge Parker that if he or Judge Estes appealed the case that they would hang the Mexican before the next morning. If he had said that I think I could have heard it. I did not hear Mr. Johnson or anyone else say the people were determined there should be no appeal. I did not hear anything said that I thought would place the prisoner or Mr. Estes or Judge Parker in danger. I did not hear anything that alarmed me in any way with reference to the security of the prisoner or his attorneys. I do not know that I can repeat the words I heard Mr. Johnson use, but the effect was that they did not want the case to be appealed. It was claimed that defendant had a fair and impartial trial, and had been convicted, and they wanted the law to stand as it was. Mr. Parker nor Mr. Estes did not call on me for any assistance. I was present, and they could see me. Nothing was said to create in my mind the impression that there was any danger. The people had been quiet and peaceable during the

entire trial, and I had been assured that nothing would be done; that they intended to let the law take its course. Mr. Johnson was talking to Judge Parker, and once in a while three or four others would say something, and some of them seemed a little excited. The way I understood it they were appealing to them not to appeal the case. The rangers had their Winchesters and arms with them. They were there to protect the prisoner if he needed protection. Mr. Johnson was walking fast and out of breath when he got up there. There may have been as many as thirty-five or forty men present during the conversation. At times several were talking at once. They talked about fifteen or twenty minutes. I do not think anybody was angry. I heard Mr. Johnson talking to Judge Parker, and heard him beg him not to appeal the case; that relator had had a fair trial and was guilty. There was one of the jurors present, but I did not hear anything he said. I did not hear anyone say they could hang three as easy as one, but I heard some one make a remark of that character. I am acquainted with the citizenship of Reeves County, and the defendant at that time could have a fair and impartial trial. The defendant made a confession, but I do not know that I had told anyone of that fact before the trial. In my opinion the citizenship of Reeves County did not have their minds made up that defendant was guilty until after the trial of the case. In my opinion the defendant received a fair trial. He confessed to me that he committed the crime about a mile or two miles from Saragosa. That was not the confession used in court. I was present in the courtroom when the prisoner was sentenced. He did not say he desired to appeal the case, nor give notice of appeal that I heard."

Mr. F. W. Johnson testified: "I am sixty years of age. I have lived in Reeves County twenty-five years. I am in the banking business, mercantile business and cow business. I was present during the trial of Leon Martinez last July. There was not anything during the trial to indicate to my mind that there was any danger of mob violence. After the trial, I consulted with Judge Parker with reference to an appeal in the case. About half an hour after the verdict had been rendered, there were five or six men who came to the bank and asked me to go and speak to Judge Parker and ask him not to appeal the case, saying that Judge Parker had stated that defendant had a fair and impartial trial, and that there were no grounds for appeal. They knew I had been associated with Mr. Parker, and he had been our lawyer for quite a while, and they wanted me to use my influence with him and get him not to appeal the case. I asked where Judge Parker and Mr. Estes were. Just as I got out of the bank I saw them going to the courthouse, and I holloed to Parker, but they did not hear me. Some one in the crowd holloed, and they stopped right at the walk that leads into the courthouse. I do not recollect all of them that were with me, but remember Honaker, Mayfield, Pink Herbert, George Landrum, Mr. Hosie and several others.

We did not run to overtake them, and when they stopped we had a conversation with them. When we walked up to the men I told judge like this: I said, judge, these gentlemen are citizens of Reeves County, and you know most all of them. I said they have come and asked me to talk to you and be spokesman for the crowd, and I said now the first question I want to ask you or say to you is this: I said, didn't you say that the Mexican boy has had a fair and impartial trial and is proven guilty? I said, didn't you say that? Didn't you say he had a fair and impartial trial? He said, yes. I said then judge they tell me you are going to appeal the case, and I want to ask you as a citizen and in behalf of these men here not to do it, not to prolong the case, but let it go on, let the boy suffer the penalty. I said it would be best for the country. I said if we don't do that it will cause mob law in the future, and I said I would not have anything like that in our county for anything, and I said as a friend I don't believe you have any ground whatever to appeal the case on, let me beg of you not to appeal the case. Judge Parker said: 'Johnson, I want you to always understand you can not scare me.' I said, judge, you know we did not come here to scare you, we are not on that mission. I said we want to keep the peace and dignity of our county up, and you know I would not come to you to bulldoze or anything like that in a case like this, just come as a neighbor, a friend and citizen to get you not to do this, for I think judge it is the best, and he talked on quite a while and finally he said, 'Well, you all go on off and it will be all right,' and that settled it. I did not say that if the case was appealed we would hang the Mexican. I nor anyone in my presence did not say that we were determined there should be no appeal. We made no threat of any kind. Judge Parker had been attorney for the bank, and I approached him as a friend. Mr. Hosie did not get on a box and make a speech. There was nothing said by anyone calculated to intimidate the attorneys. The only thing of that character said, as I recall it, after Mr. Parker had said it would be all right, to go on, I think Mr. Landrum made the remark that they had better not appeal the case—they would hang the defendant if they did, and Mr. Hosie made some remark, when I turned to Landrum and said, you would do nothing of the kind. We all left then. I was in the courthouse when Judge Isaacks passed sentence on the defendant. He asked him if he had anything to say why judgment of the law should not be pronounced against him, and he said, 'Judge, only as to my age.' I think that is all he said.

"I resided in Nolan County before going to Reeves County. I was in Pecos from the time Martinez was brought there charged with murder until the trial was over. In regard to lynching him, the only talk I heard was on Sunday night. I was called up on Sunday night when he was arrested out on the creek. A crowd of boys wanted to go out there and take the boy and lynch him, and I went down there and talked to the boys, and told them we would have a trial. That was

when they were supposed to be bringing him in. The rangers arrived Wednesday or Thursday. Judge Isaacks said he wanted to use all precaution possible, and it would be best to have the rangers there.

"I think there were fifteen or twenty present when I talked to Judge Parker and Mr. Estes. Mr. Parker is not our attorney now, and I have suggested to Mr. Parker to leave Pecos since that time. When I heard that Judge Parker had written letters down here claiming he had been intimidated, I went to him and talked to him about it, and said to him, 'Judge, you don't mean to say you had any idea that we came up there to intimidate you and scare you off from doing your duty,' and he said, 'No, Johnson, I didn't think that of you, but some remarks were made in the crowd that might lead me to believe that,' and I said, 'Judge, if that is the case you might as well fold your tent and leave here,' and he has not been our attorney since that conversation."

Mr. C. R. Moore testified: "I am a Texas ranger, and was present at the trial of Leon Martinez in Pecos, Reeves County, last July. We were ordered there by the authority of the Governor. There were four of us, and we were present during the entire trial. We were there to afford protection, if it became necessary. I did not see anything that would indicate the necessity for our presence, but we carried the defendant from the jail to the courthouse, and we stayed at the jail and in the courtroom. Nothing occurred that I heard that would indicate danger to anyone from mob violence. I was present when Judge Isaacks passed sentence on the defendant. He said something about his age, but did not say anything about wanting to appeal his case. When we got there the sergeant reported to the sheriff, and I had instructions to work under the sergeant. The judge nor sheriff did not give me any instructions. The people were orderly all the time we were there. We left on Sunday morning after the trial was concluded."

J. M. Mayfield testified: "I live at Saragosa in Reeves County, the community in which the crime was committed. I was present during the trial of Leon Martinez, being subpoened as a witness, and got to Pecos about 3 o'clock the day before the trial commenced. I did not see anything during that trial that would indicate to my mind that there was any violence contemplated on the defendant or his counsel. I do not know of any threats made against either of them. I was present during the conversation between Mr. Johnson and Judge Parker. Mr. Johnson was requesting him for the sake of the county and the good of the people not to appeal the case. Mr. Johnson made no threats, and did not talk in an angry tone of voice. I heard no threats at the time, and I heard nothing in regard to any trouble of any character. I heard no threats of any mob violence. After the sentence had been passed on the defendant, I went down town and heard some remarks in regard to what ought to be done with the defendant. Some expressed themselves that he ought to be hung, but

there was no talk of mob violence. I was present in court when sentence was pronounced against defendant, and heard Judge Isaacks ask him if he had anything to say why sentence should not be pronounced against him; he made some reply, but I did not understand all of it. I heard no notice of appeal given. I heard what Mr. Honaker said when Mr. Johnson was talking to Judge Parker. He remarked if there was any mob violence the lawyers would be responsible for it, and he asked him for the sake of the women not to appeal the case, adding, if this is done, I will move my family out of Reeves County. Mr. Honaker made no threats whatever. He never said they were going to mob Martinez if the case was appealed. Just said if the case was appealed, and there should be any mob violence, the lawyers would be responsible for it. I was at Saragosa when I learned of the death of Miss Brown. I was informed by Mr. Honaker. The body was found about three miles from Saragosa. Mr. Pink Harbert found the body. Some fifty men were present when they brought the defendant to where the body was found. The first I saw of him was at that place. I had asked some Mexican women living on the road east of Mr. Honaker's, if they had seen the defendant pass there. And they had told me they had seen him. I then asked him if he had passed where the Mexicans lived and he first answered no, and then said yes, I did. I did not threaten to shoot him, but when the boy was taken in the house, I said: 'that boy is guilty and we might as well take him while the sheriff is not here and hang him.' He then asked to be allowed to speak to his father and mother, and I told him he was not worthy of it, when he remarked, 'wait until the sheriff comes and I will tell him.' This was before he was carried to jail at Pecos. There were some forty or fifty men living in Saragosa community present when this occurred. I was not with Mr. Johnson when he went to the courthouse to talk to Judge Parker, but I heard down town they were going to appeal the case, and I went to the courthouse and heard the conversation between them. I made some remarks to Judge Parker during the conversation. I said, 'Judge Parker, you said when the case was tried that the defendant had had a fair and impartial trial, and left the impression you would be governed by the verdict of the jury, and I said for God's sake go back to your office and clean your hands of this.' I was in four or five feet of Judge Parker at the time this conversation took place. I do not remember all who may have took part in the conversation. I did not hear any talk of lynching the defendant if the case was appealed. I did not make a statement in the presence of W. W. Camp and others that I was in a crowd of eight or ten men who agreed that if an appeal was taken that we would lynch not only Martinez but also both of the lawyers. Neither did I hear anyone else make that statement. Most of these people with whom I talked believed Martinez guilty. I did not hear anyone say that they did not believe he was guilty. I talked to a great many people after the trial. I do not know whether an account of the killing was pub-

lished in the daily paper at Pecos or not. It was published in the weekly paper, but this was after the trial of the case."

John W. Leavell, county judge of Reeves County, testified by affidavit that he was present during the trial of Leon Martinez in the District Court of Reeves County, and that he received a fair and impartial trial, and at no time during said trial was there a mob present, nor was mob violence threatened.

H. L. Magee, pastor of the Christian church at Pecos, testified that he was present during the trial of Leon Martinez, and that according to his judgment, he received a fair and impartial trial; he further says that at no time during said trial was there any disturbance; nor so far as he could determine was there a mob present.

Wylie Cole, a druggist of Pecos, testified that he was present during the trial; that the trial was fair and impartial, and at no time during said trial was a mob present, nor was there mob violence threatened.

T. Y. Moorhead, city marshal of Pecos, testified that he was in Pecos during the trial; that in accordance with his judgment Martinez received a fair and impartial trial, and that at no time during the trial was there a mob present in Pecos, nor was mob violence threatened.

J. S. Long, editor of the Reeves County Record, published at Pecos, Chas. S. Monahan, jeweler, Wm. H. Moore, physician, and J. H. Heard, cattleman, all testify to the same facts as the city marshal.

The affidavit of Lester C. Majors, the Official Court Stenographer, was introduced. It reads: That the defendant's attorneys "one of whom was appointed by the court immediately on the bill of indictment being returned into court, to defend the case, Judge J. W. Parker, an eminent attorney of Pecos, who was afterwards employed by defendant and paid a fee to represent him, and the other, the Honorable George Estes, of El Paso, who was also employed to represent the defendant, were given every opportunity to secure testimony, and were granted everything that they asked. Neither the defendant nor either of his attorneys requested a private audience among the defendant and his attorneys, but his attorneys did request an audience with the defendant, and the court instructed a Texas ranger present to remove the defendant into a private room where his attorneys might consult with him, which was done, and no objection was made by either the defendant or his attorneys to said ranger being present during the interview. The defendant was given all the time that he asked to prepare for trial. No request was made for a postponement of the trial of the cause, either before announcement of ready or during the pendency of the case; neither was a change of venue asked for by the defendant or his counsel. All the time that was asked by the attorneys was given for the argument of the case.

"Judge J. W. Parker, of Pecos, in discussing the case before the jury, used to the jury, in substance, the following language:

" 'Gentlemen of the jury: The defendant has had a fair and im-

partial trial. We have nothing to complain of in the trial of the case, and when you have rendered your verdict we will be satisfied.'

"After the jury had rendered a verdict, finding the defendant guilty and assessing his punishment at death, the defendant's attorneys prepared and filed a motion for new trial, which motion for a new trial was signed by both the attorneys, Judge J. W. Parker of Pecos, and the Honorable George Estes of El Paso; and the court, after due consideration of said motion, overruled same, and in open court, in the presence of the district attorney, the official shorthand reporter, and others, asked Judge J. W. Parker, one of defendant's counsel, if he desired to give notice of appeal. The said Judge J. W. Parker, then and there, in open court, announced that there had been no error committed in the trial of the case, and that it was useless to take an appeal, and that the attorneys, meaning himself and the Honorable George Estes, had consulted about the matter and decided not to appeal the case. Afterward, while court was still in session, and the judge upon the stand, Judge J. W. Parker came to the judge's stand, and in a private conversation with the court, stated to the court that some people had approached him and the Honorable George Estes and asked them not to appeal the case, but that he wanted to state to the court that the action of said people in making said request had nothing whatever to do with the determination, of counsel for the defendant, not to appeal the case; that before he and the Honorable George Estes had been approached by said people with said request, that he and said George Estes had consulted between themselves, and had decided not to appeal the case, and that such conclusion had been arrived at before anyone had approached him and Estes with the request not to appeal said case."

The above is all the evidence introduced on the hearing before us. We do not care to write further than has already been written, but inasmuch as we do not agree with the conclusions reached by Presiding Judge Davidson, we make the following conclusions:

1. We do not agree to the conclusion that relator was transferred to jail at Midland only to prevent him from being lynched. Judge Isaacks, the only witness who testified on this point, says: "I ordered the sheriff of Reeves County to deliver him (defendant) to the sheriff of Midland County, because the jail was in an unsafe condition, from the standpoint of those confined in it and from the standpoint of probable escape therefrom. They have almost completed a new jail there." "Q. Did you have any other reason, judge, for ordering the prisoner taken to Midland? A. Absolutely none." "Q. You did not fear he might be lynched if he remained there? A. Not the slightest. I sent him there for his personal safety. I can not say that I feared he would be mobbed, but to guard against any possibility." What Judge Isaacks said about a mob: "Why I could not begin to tell you all that was said, because several people remarked to me something about a mob. The first conversation I had was with a friend of mine, Mr.

Johnson, the proprietor of the hotel. He said the people on the creek
—that is the term used expressive of the neighborhood in which the
crime was committed—when they first heard of it, were wrought up,
and he was afraid the prisoner was going to be violently dealt with for
a while, but the excitement *had subsided, and there was absolutely no
danger of mob violence."* The remainder of his testimony is pub-
lished above. We do not agree to the statement by Judge Davidson
that "the evidence of Judge Isaacks is not only corroborated as to
the mob spirit pervading that whole country, but it is evident from
the facts that this mob spirit was pervading the entire county and
violence was threatening and imminent." We think the evidence
establishes exactly the contrary, and so find as a fact.

2. We do not agree that the transcripts conflict with each other.
In the trial of the habeas corpus it was made manifest, that defend-
ant's attorneys had asked for a *transcript of the proceedings had on
the trial of the case,* and the clerk had furnished them such proceed-
ings, but had not included the orders convening a special term of
court, nor the order appointing jury commissioners. In the transcript
as introduced by the State, these were included. This made no con-
flict. As we read the record there is no justification for the conclusion
of our presiding judge in this respect.

3. The judge did not order the rangers to Pecos, but the record
discloses (see testimony of Ranger Moore) that they were ordered
there by the Governor. Judge Isaacks doubtless made the request for
rangers, which requests are frequently made by our judges when cases
are to be tried that the people of any part of a county are taking a
deep interest in, and judges so doing have not heretofore been cri-
ticised but commended.

4. We do not agree that Mr. Mayfield testified to threats of mob
violence after sentence was pronounced. His testimony shows that
when he spoke of hanging the defendant, it was before the trial, and
before he was carried to jail. No officer was present at this time, and
if the mob spirit was rampant, there was nothing to prevent them
from hanging defendant at that time. This is strong evidence that
the people intended no mob violence, for then defendant was in pos-
session of the people of Saragosa where the crime was committed, and
they delivered him to the officers on the sheriff's return. Neither does
his evidence justify the conclusion "that there was general talk about
lynching, if the case was appealed."

5. Neither do we agree that Mr. Camp testified, when asked, what
percent of the people believed appellant guilty, he replied, "one hun-
dred percent." The testimony of Mr. Camp is copied in the record.
The question asked was: "What percent of the people *who knew of the
crime* do you think thought he was guilty?" and he answered one
hundred percent. This did not relate to all the people of Pecos,
Reeves County, but only those *who knew of the crime.* This is mani-
fest by the further testimony of Mr. Camp who said in answer to the

question, "Now, when the jury was drawn were the people all over Reeves County acquainted with the facts?" Answer. "Some were not. Those living on the outskirts of the county had not heard of it," and testified that appellant could obtain a fair and impartial trial in Reeves County. The picking out of an isolated statement, that the witness himself explains, and contradicted by the entire record, as we read it, as a fact, we can not agree to. This expression is sought to be woven into the opinion of Presiding Judge Davidson in many instances, and when we take the evidence of the witness as a whole, it will be seen that the conclusion of the presiding judge is not borne out by the testimony.

6. There is nothing in the record to indicate that appellant's counsel were not granted all the time they desired to file a motion for a new trial. In fact, the testimony of Mr. Estes, attorney for relator, states they went in search of Judge Isaacks to notify him they were ready to present it, and requested the district attorney to so notify him. The record discloses they were granted all the time they desired in every respect, and the testimony of relator's counsel so state, as well as all the remainder of the testimony. No complaint is made by relator or his counsel that full and ample time was not granted him in making a full and fair presentation of the case throughout.

7. In the opinion of Judge Davidson the testimony of Mr. Estes and the affidavit of Judge Parker, together with other isolated disconnected statements, are taken as conclusively establishing that they were prevented by a mob from giving notice of appeal. If one will read the record as a whole, they will conclude that such a finding is against the great weight of the testimony on this hearing. One who has read the record will be convinced that the statement of our presiding judge. must have been copied from a statement of relator's counsel for it is a one-sided and partisan statement. However, in the beginning of this opinion we discussed the motion for new trial, and all matters assigned, and held if appeal had been perfected, it would have been of no avail.

8. It is not only the contention of the State that no notice was entered of record, but it is also contended that no *notice of appeal was given,* and no appeal taken. Our presiding judge, in taking the isolated and unsupported statement of appellant that: "I told him I wanted my case taken to the Court of Criminal Appeals, and my attorneys would do the rest," as true, ignores the testimony of Judge Isaacks, who says relator made no such request; also the testimony of the sheriff who was in attendance on court; the State ranger, Mr. Moore, who was in charge of relator and the testimony of Mr. Johnson, a banker, and all the others who testify on this point. Even Judge Parker, in his affidavit, states no notice of appeal was given, but on the contrary it was stated by his counsel publicly in open court that no notice of appeal would be given, Judge Parker stating that Judge Isaacks seemed surprised that no appeal was to be perfected, so

much so that he took the trouble to explain to him that he had become thoroughly convinced there was no error in the trial and hence declined to give notice of appeal. Not only the preponderance of the evidence, but all the evidence, other than the isolated testimony of relator, shows that no notice of appeal was given, *and we find as a fact that no notice of appeal was given.* It is not a question of others waiving the right of appeal for him, but the question is when as a fact appellant and no other person gave notice of appeal, the conditions of the right of appeal as given by law is not complied with, for the Code of Criminal Procedure provides that notice of appeal must be given in open court and entered of record and when notice is not given the appeal can not be entertained by this court. All of the lengthy reasoning of our presiding judge on this question is of no force, for when anyone reads the record as a whole, he must conclude that appellant is not supported in the statement that he gave notice of appeal by the evidence, but the record overwhelmingly convinces one that no notice of appeal was given. No person can conceive any reason why all this array of honorable men would go on the stand and testify falsely in this regard, while the greatest of incentives and motives can be attributed to appellant. In addition, it is the first instance we know of where the records of a court of record will be permitted to be impeached by the unsupported testimony of an interested witness, when all the testimony of those not interested support the record of the court.

9. The statement of our presiding judge that: "The writer does not believe that any candid reader can look through this record and not reach the conclusion, and the only conclusion to be deducible from the record, that the district judge understood and appreciated the mob spirit which surrounded his courthouse, and was prevalent in that community at the time of the trial, and at the time of overruling the motion for new trial and sentence was pronounced against the accused," we can not permit to go unchallenged, and for this reason we have copied the entire evidence in this opinion that no such stricture on one of our trial judges should be permitted to go in the books without the evidence being there also, that "each candid reader" may deduce his own conclusions therefrom. Judge Isaacks says such is not the fact; the sheriff and county judge say it is not correct; the minister in charge of the Christian church at Pecos says it is unfounded; the marshal of Pecos says such conclusion is unauthorized; the banker, the physician, the cattleman, the farmer, and all who attended the trial say such is not the fact, unless it be the attorneys for appellant, and they state no fact or circumstance that would support such finding at the beginning or during the trial of the case, but only some circumstances after the return of the verdict of the jury, that led them to believe that if they perfected an appeal there might be danger, but knowledge of this, if true, is shown not to have been known to the district judge, who states that all he knew of it was what Judge

Parker told him after the motion for new trial had been acted on, and was at that time informed that this had not influenced his, Judge Parker's, action. The great preponderance of the evidence would indicate that if counsel became alarmed at that time, it was unnecessarily so, and no real grounds for fear existed. Our apology for publishing the entire evidence is found in this and other expressions in the opinion severely reflecting on the trial judge and other officers of the court, and in our opinion it is such expressions as this that is bringing the judiciary into disrepute. We have no doubt but Judge Isaacks, and all the members of his court, acted from the purest and best of motives, and even though we had found grounds to reverse the case or set aside the judgment, there is in the record no excuse or justification for impugning their motives and attributing to them any other than the highest minded and best incentives, and a wholesome desire to enforce the law of this State, and by prompt punishment of those who commit crimes of the character that arouse the public mind render confidence in the judiciary more secure. The Legislature in its wisdom, in certain character of cases, has provided that crimes of a given character may be indicted and tried in another county in which the court in that district is then in session, and has provided for special terms of District Court under given conditions. This was not done that any innocent person might be made to suffer, but that those guilty of offenses might be brought promptly to trial. It is to be regretted, that it is in a measure true, that where mob violence occurs, it is because the human race has to some extent lost faith in the courts of the land. In this case there is not a scintilla of evidence that any juryman who sat in the case had prejudged the case, or that anyone of them before the trial had heard any of the details, through hearsay or otherwise. If it were otherwise, doubtless the able counsel who represented relator, under the latitude permitted on this hearing, would have presented the evidence, or some evidence of such condition, and in the absence of any evidence to the contrary, we must and do conclude, that the trial judge was fair and impartial, and tried the case in accordance with the laws of this State, and his action is not subject to the severe criticism contained in the opinion of the presiding judge. The strictures in regard to change of venue are, in our opinion, unauthorized and uncalled for. Relator's counsel asked for no change of venue. There is no evidence that at the beginning of the trial they were in fear of their life, if at any time, and relator's counsel, Mr. Estes, says there was nothing in the conduct of Judge Isaacks that could and would have led him to believe that he would not give fair consideration to any motion he might have seen proper to submit; and under the evidence adduced on this hearing, we find, as a fact, that at the time of trial no sufficient grounds existed to authorize a change of venue. The question propounded by our presiding judge: "Is not this failure to enter notice of appeal strong and convincing evidence of an unfair trial?" is uncalled for. It is based on a con-

clusion drawn from the evidence of relator alone, and against the evidence of all the other witnesses, and is an unfair criticism. of the judge who testified on this trial, that relator did not give notice of appeal, and added, if relator had even intimated he desired to appeal the case, he, himself, would have given notice and entered the notice of record. The trial judge in making this statement, and his statement is certainly as worthy of as much credence as relator's, by the question asked is notified that this court believes what he said is untrue. To this we enter our most solemn protest, and especially so as the trial judge is supported by all the other witnesses, and relator supported by none.

10. As no notice of appeal was given by appellant or anyone else, a fact which we find under the evidence, and we refer to the testimony as bearing on that point, the sentence is not void, and all the lengthy argument of our presiding judge based on the conclusions of a finding that notice was given, is not applicable to the case as made by the testimony, and as our presiding judge's construction of article 5, section 5 of the Constitution, is based on the assumption that notice of appeal was given, for notice of appeal must have been given in open court to confer jurisdiction on this court, under all the decisions of this court even those cited by him, we do not care to discuss it. For, to paraphrase his language, we do not think any candid reader can read the evidence, and find any justification for this court to conclude that notice of appeal was given, in the face of the overwhelming proof to the contrary.

11. In regard to the issuance of a writ of certiorari, even under the common law, it took the action of the court to grant the writ, and certainly it could not be granted if a majority of the members of the court find that the application does not state grounds authorizing the issuance of the writ, and we find as a conclusion of fact that in law the application filed with the clerk of this court, without the consent of the court, presents no grounds which would authorize the issuance of the writ of certiorari, and we certainly, if we have the right to issue, we also have the right to order it not to issue. As said hereinbefore, we do not discuss the right of this court to issue the writ, not deeming it necessary to a decision in this case, as no grounds are stated in the application which would justify its issuance. The numerous cases cited by our presiding judge are based on article 946 of the Revised Civil Statutes, which relates solely to the Supreme Court, and, of course, can have no application in criminal cases, for that court has no criminal jurisdiction. No such provision is found in the Code of Criminal Procedure, and article 5, section 5, certainly does not confer upon this court any power to issue any writ other than the writ of habeas corpus, except such writs as are necessary to enforce our jurisdiction, and as the right of appeal by that article is given in all cases, with such exceptions and under such regulations as may be prescribed by law, and the Legislature of this State having enacted a law, that to give this

court jurisdiction of a case, notice of appeal must be given in open court, and the same must be entered of record, and that the appeal must be perfected at the term of court at which the conviction is had, raises a grave doubt in our mind of our right to grant an appeal by certiorari or otherwise after the adjournment of a term of court, where no notice of appeal was given, and the decisions quoted from other States by our presiding judge are from .courts in States having different provisions in the constitutions and laws. But we do not wish to be understood as passing on the question of our right to issue the writ for the application presents no sufficient ground for the issuance of the writ of certiorari, even though we had the power and authority to grant it.

12. No one has contended that relief could not be granted under a writ of habeas corpus if the proceedings were void. But it is as equally well settled that if not void, we could not grant relief from a judgment entered by a court of competent jurisdiction under a writ of habeas corpus. Are these proceedings or any portion thereof void? The term of court was called in accordance with the provisions of the law of this State. The Act of the Legislature authorizing special terms of the court to be called in vacation, the entry of such call to be made in the court when it convenes, has been specifically upheld by this court in Ex parte Boyd, 50 Texas Crim. Rep., 310; Ex parte Young, 49 Texas Crim. Rep., 536, and McIntosh v. State, 56 Texas Crim. Rep., 134. It is true that Judge Davidson entered a dissent at that time in those cases and the Boyd case was carried to the Supreme Court of the United States, and there dismissed for want of jurisdiction in that court. The grand jury was properly drawn and empaneled under that law; the indictment returned into open court; the case set down for hearing, and appellant served with a copy of the indictment and copy of the special venire as required by our Code. Our Code provides that he shall be served with a copy of the indictment two days before being compelled to announce for trial; that if for any good reason he should not then be ready, he may file an application to postpone or continue. There is no question that he was served with the indictment two days before being called to announce. He then filed no application asking for further delay. The petit jury was drawn and empaneled in accordance with our laws; the proceedings during the trial were regular in every respect; verdict returned, judgment entered, motion for new trial overruled, and sentence passed. Every step taken in accordance with the laws passed by our Legislature, and we hold the judgment is not void.

13. In one part of the opinion our presiding judge holds that notice of appeal was given, and then in another part holds: "Duress having prevented the giving or entry of notice of appeal, did not oust this court of jurisdiction." The two findings are contradictory in themselves. But having held that no notice of appeal was given, we also hold that there was no duress which prevented the giving of notice

of appeal. While Mr. Estes and Judge Parker in their testimony would indicate that they were put in fear, yet (at the time of the trial) in open court, after declining to give notice of appeal, Judge Parker informed the trial judge that (he was not afraid, and that) the action of the citizens had no influence with him in the premises. Shall we take the words of Judge Parker then, or now, when he is seeking to save his client? If the evidence of Mr. Estes and Judge Parker was the only evidence, we might conclude that their effort now to save their client was disinterested, and an effort to see that justice was done, but when we consider the evidence of the pastor of the Christian church, who was present on that occasion, the sheriff and county judge of the county, the evidence of Mr. Johnson, of Mr. Mayfield, and the other witnesses in the case, to find that there was "duress" is as indefensible and unjustifiable as the finding that notice of appeal was given. The evidence would justify the conclusion that an appeal was made to them not to appeal the case, but no such conduct as would justify the conclusion that there was duress. So we find, as a fact, not only that no notice of appeal was given, but also that there was no duress which prevented notice of appeal from being given, and arriving at this conclusion we do not deem it necessary to discuss the able and learned discourse of our presiding judge on duress. We also hold that had appeal been perfected, or writ of certiorari granted, no grounds exist which would authorize us to set aside the verdict and judgment.

14. The conclusion of our presiding judge, that "appellant protested his innocence, and it was suggested by Mr. Mayfield that if he did not make a confession they would hang him," has no foundation in the evidence. According to the record he has at no time *protested his innocence*. And here we might remark that it was not incumbent on him to do so. He had the legal right to remain silent, and, under his plea of not guilty, to demand and require of the State proof of his guilt beyond a reasonable doubt. Neither did he make a confession at the instance of Mr. Mayfield or to him. He made a confession to the sheriff, but this was not introduced in evidence on the trial of the case. The confession that was introduced was one made to Mr. Brady, the district attorney, after appellant had been conveyed from the scene of the crime to the jail at Pecos, and there is no evidence that it was extorted from him, but the evidence of Mr. Brady is that it was freely and voluntarily made and there is no evidence to the contrary. There was no exception reserved to the introduction of this confession, other than that the State did not introduce all of it, and that part not introduced by the State, the defendant was permitted to introduce. The severe criticisms of the sheriff and district attorney contained in this paragraph of the opinion of our presiding judge are wholly unjustifiable, in our opinion, and we here enter our protest, and as to whether the evidence justified a verdict against defendant, we refer to the statement of facts on the trial of the case

herein reproduced. The cases cited we do not deem it necessary to discuss, because the evidence does not justify a finding of fact upon which the argument and findings are based, in this case. Relator at the time of trial, in the application for a writ of habeas corpus, or in the application for writ of certiorari, did not claim that the confession was made under duress, but the attorney for relator in this court said: "The confession is strictly statutory," and the conclusion arrived at by our presiding judge is based upon his imagination of what might have taken place, and not upon any evidence in this record. We hold that there was no circumstance introduced in evidence which would render the confession inadmissible, or would require a charge of the court on duress in connection therewith.

15. That part of the opinion of our presiding judge which holds, "if a man is not legally informed of the fact that there is a case pending against him in court, a judgment against him would be a nullity," is entertaining, but has no application to the evidence in this case. Article 546 of the Code of Criminal Procedure, provides: "No arraignment shall take place until the expiration of at least two entire days after the day on which a copy of the indictment was served on the defendant." In this case it is not contended that any attempt was made to arraign the defendant until he had been served with a copy of the indictment two entire days prior thereto. Another expression of our presiding judge in this connection, "An indictment returned at a term not authorized by law, is a nullity," is but another expression of his that the Act of the Legislature authorizing special terms of District Court is unconstitutional. This has been passed on by this court in so many cases we do not deem it necessary to again discuss it. The "building of a straw man and then tearing him to pieces" is adroitly done by our presiding judge in many instances in this case, and none more flagrantly than in this instance. If for any reason at the expiration of two days, the defendant is not ready for trial, our laws provide for the filing of motions, stating the reasons, and longer time is granted if any good reason is shown. In this case no contention is made that the defendant was not then as ready for trial as he would have been at any time in the future. As illustrative of the position of our presiding judge in this case, we would refer to his opinion in the case of Ex parte Boyd, 50 Texas Crim. Rep., 309, in which he holds that the Act of the Twenty-Ninth Legislature repealed certain provisions of the statutes theretofore existing, while in this case he holds that the Act of the Twenty-Ninth Legislature does not repeal those provisions.

16. The right to challenge the array of grand jurymen is also raised by our presiding judge, not by relator, nor his counsel. However, no reason is given why any member of the grand jury that indicted relator was disqualified, and certainly the evidence before us raises none. This but illustrates the extremes to which our presiding judge is driven in an effort to sustain his opinion in this case. If for

any reason a challenge to the grand jury or any member of the petit jury existed and appellant not accorded the right at the time of its organization, it could have been raised by appellant at the time he was called on to announce ready for trial. This question has been decided in so many cases we do not deem it necessary to enter into a discussion of it.

17. In regard to that part of the opinion relating to "due process of law" it is insisted that to try a person at the same term of court at which he is indicted is improper. This has been the custom in all of our courts, and it is a matter of frequent occurrence for them to be tried the same week. In western Texas many of the terms of court last but one week, as fixed by law, and if it was not permissible to try a man the same week, then in those courts each case must be continued one term, and as there are but two terms a year, it can readily be seen what would be the result of such holding.

18. The contention of our presiding judge that the indictment is void because relator was not present in Reeves County when indicted, is too absurd to receive serious consideration. Hundreds and thousands of men are indicted for offenses they did not even know the grand jury had under investigation. In fact, its proceedings are required by law to be kept secret, and no one is supposed to know what takes place before that body when in session. If it was the law that a person must be notified that the grand jury was going to investigate a case against him, and when the investigation would begin, doubtless the defendant would be in South America or some other land before the grand jury could return the indictment. And if it is the law that the indictment is void, because it might be supposed that some members of that body had heard of the case before being empaneled on the grand jury, and because of the state of feeling in Reeves County at the time of trial, then no indictment could ever be returned in this case, for no one doubts that the facts of this case are more generally known now than at the time of this trial. Our laws make no provision for the grand jury of any other county to return an indictment in a murder case, but it must be returned by a grand jury of Reeves County, or appellant go free. Such construction of the law would be such an absurdity no one can seriously contend therefor. The indictment must be returned by a grand jury of Reeves County if a man is to be tried for a murder committed in that county, and there is nothing in the record which would show a state of facts that the grand jury as organized could not return an indictment, and the indictment is not void.

In the concluding paragraph of the opinion of our presiding judge, he expresses the appreciation he feels for the assistance rendered him by counsel in the case, and the Assistant Attorney-General, Hon. C. E. Lane, and his assistant, Hon. Shelly Grover. We only desire to say that the Assistant Attorney-General and his assistant, Mr. Grover, who are presumed to represent the State, have filed an able brief in behalf

of the relator, the major portion of which will be found in the opinion of our presiding judge in their language. No effort has been made by them to sustain the action of the District Court of Reeves County, but the brief filed is but an effort to show why the proceedings should not be sustained. However, we have received valuable assistance from the Hon. Charles Rogan, formerly Land Commissioner of this State, and who entered his appearance for the State in this case, and the district attorney, Mr. Brady, and the brief filed by them, and the authorities cited, so completely answer the contentions of relator and the opinion of our presiding judge, we append it to this opinion. It reads as follows:

"Brief filed by Charles Rogan and W. P. Brady, counsel for the State:

An enormous crime had been committed in Reeves County, Texas, in July, 1911. For the purpose of avoiding mob violence by the law's delay and in order that parties guilty of outrageous crimes against the community and the laws of the land, the Legislature of the State of Texas made special provision by which, under the Constitution of the State of Texas, special terms of the District Court in the several districts of this State might be held for the trial of persons charged with such offenses and to procure an early trial of the case while all the witnesses are in the county, are accessible, and can be had at the trial, both for the State and for the accused.

The judge of the District Court of the district in which Reeves County is situated, in pursuance to said law, called a special term of the District Court of that county. When court was convened in accordance with the law, he appointed a jury commission to select grand and petit jurors to serve at that term of court. The jury commissioners in performance of their duties and oath of office selected grand jurors for that term of court and also petit jurors. Their return was made in the manner and form prescribed by statute. Process was duly issued and the persons selected as grand and petit jurors were summoned in the mode and manner provided by law. The grand jury was legally sworn, empaneled, and charged by the court in the manner and form provided by law.

This grand jury found a bill of indictment against the accused, Leon Martinez, charging him with murder. The accused was already under arrest and in jail. The indictment was by the grand jury duly presented in open court and there received and filed in the manner provided by law.

Upon the presentation of the indictment, a copy thereof together with the copy of the special venire which had been duly charged by the court, was duly served on the accused and the court immediately appointed counsel to defend him. This attorney had the reputation of being one of the ablest at the bar. The copy of the venire and of the indictment and of the State's witnesses was served on the accused

two full days prior to the day of trial as required by law. On the day of trial another attorney appeared on the scene to represent the accused and he and the attorney appointed by the court represented the defendant at said trial. From the special venire, a jury of twelve good and lawful men were selected to try the accused for the offense charged against him.

When the case was called for trial, neither the accused nor his attorneys asked for a change of venue on the ground that the defendant could not get a fair and impartial trial in that county. Neither was a postponement or a continuance suggested except to get the testimony of the mother of the accused. The mother of the accused was then known to be at Toyah on the railroad in the same county and a short distance only from the county seat where the accused was being tried. The court overruled the motion to postpone with the understanding that the witness should be produced in court before the end of the trial. While the accused made no effort whatever to procure the evidence of his mother, the State, of its own volition, caused said witness to be duly subpoenaed and brought into court. And although the witness arrived in the county seat about half past three or four o'clock in the afternoon, she having come from Toyah to Pecos on the afternoon train, the father of the accused pretended as if she had failed to come. The testimony of all the other witnesses in the case having been heard, the court postponed further proceedings in the trial until the following day for the purpose of procuring the attendance of this witness for the accused. It subsequently transpired that she arrived in town the day before, but for some reason unknown to the State, was kept secluded by the defendant's father, and not produced in court until the State learned that she was in the town of Pecos that night, and the following morning she appeared and testified.

The jury trying the accused was regularly and duly impaneled, the counsel for the defendant had the opportunity to and did question all of them touching their qualifications as jurors to sit in that case, and when the jury was finally selected, the number of challenges to which the defendant was entitled under the law had not been exhausted.

All the witnesses, both for the State and for the defendant, being present in Reeves County at the time the crime was committed and at the time the accused was arrested, were duly subpoenaed and were present at the trial both for the State and the defendant.

The case was duly argued by counsel, the jury was duly charged by the court, it retired to consider its verdict and in open court returned a verdict of guilty against the defendant of murder in the first degree and assessed the penalty at death, the only verdict that could have been rendered under their oaths as jurors under the law and evidence taking into consideration the enormity of the crime.

The business before the court was the trial and disposition of this case. A motion for new trial was duly made, filed, heard and over-

ruled. All the time needed for all purposes was obtained and granted by the court.

In his speech to the jury Mr. Parker, of counsel for the defendant, stated that the accused had had a fair and impartial trial. After the jury had returned their verdict, and while a motion for new trial was being prepared, a report was started that the attorneys intended to appeal the case. F. W. Johnson, a banker at Pecos, was one of the leading and most influential men in the county. Judge Parker, of counsel for the defendant, had been his warm friend, his attorney and counselor. When it became rumored, some few people, knowing the relations that existed between him and Judge Parker, called to see Mr. Johnson at his bank, and called his attention to the fact that the defendant's counsel, in their argument to the jury, had stated that the defendant had had a fair and impartial trial and requested him to use his good offices with Judge Parker to not delay justice by an appeal, but to let the law take its course. He did so, he and others overtaking counsel on their way to the courthouse from an office in town where they had been to prepare a motion for a new trial. The motion at that time had not been completed. It had been dictated but had not been typewritten.

Judge Parker did not definitely promise that an appeal would not be taken, but Mr. Johnson and others construed his remarks to mean that no appeal would be taken—and all parties dispersed. Mr. Estes, of counsel for the defendant, went back to town but Judge Parker went on to the courthouse. Later the motion for a new trial was presented to the court by Judge Parker in open court and in the presence of the defendant. The motion was overruled and no notice of appeal having been given, the court inquired of defendant's counsel if he desired to give notice of appeal, and Judge Parker replied that he did not. Later Judge Parker erroneously thinking that the trial judge may have heard that some of the citizens had called on him not to appeal the case, personally explained to the court, in open session, that he did not want the court to think he failed to give notice of appeal on account of these persons having approached him, but that he gave no such notice because he thought there was no material error upon which an appeal could be predicated. There being no further business before the court, there was nothing left to be done except to pass the sentence of the law. Before sentence was passed, the accused was asked if he had anything to say why the sentence of the law should not be passed on him to which he replied that he had nothing to say except that he was not seventeen years of age. This issue, however, had been decided against him by the jury.

It is true at the habeas corpus trial the defendant swore that he told the court that he wanted his case appealed to the Court of Criminal Appeals, but in this he was contradicted by the record, and every witness on the stand who heard him, and was not corroborated by the statement of his counsel, nor by any other person.

When the citizens called on Judge Parker of counsel for the defendant to not appeal the case and to let the law take its course, Judge Parker did not seem at all frightened. He so advised F. W. Johnson at the time and he also so advised the court when giving his reasons why no notice of appeal was given. When Johnson saw that Parker was misconstruing the motives of himself and of those who accompanied him, he took particular pains to disabuse his mind on that point and gave him to understand that the people were law abiding and that their mission was only a peaceable one. Mr. Estes was certainly not very greatly alarmed at the time that a 'mob' would likely do him or his client bodily injury for he did not, at that time, give the matter sufficient thought or importance to mention it to the district judge although he and the judge both ate and slept at the same hotel.

Certainly he was beyond all danger, if he felt any, after he returned to his home at El Paso the next day. He was then free to immediately apply to this court for redress in order to get the record perfected and brought before this court for review. But did he do this? Instead he applied to the Governor for a commutation of the sentence from death to life imprisonment. Fearing this would not be granted, habeas corpus proceedings were resorted to in this court shortly before the reprieve of thirty days granted by the Governor had expired—more than two months after the adjournment of the District Court of Reeves County. Finally, on the .... day of November, the day the habeas corpus case was set for hearing, and without leave of this court being first had and obtained, the relator's attorneys filed an application for a writ of certiorari to perfect and bring up the record in this case.

From the foregoing statement of the undisputed facts in the case, what is the law applicable thereto? Has the relator been tried and convicted by due process of law? If he has, then the relief he prays for should be denied. It is submitted that from the facts contained in the record, in order to avail the relator, notice of appeal should have been given at the time the motion for a new trial was overruled. But if his counsel had reasonable grounds to fear that to do so, the relator would have suffered bodily injury at the hands of a lawless mob, then it is submitted an application to this court for a writ of certiorari to compel the completion of the record and have it properly brought before this court for review should have been made. Failure to do so gives this court no jurisdiction.

The statute authorizing the district judge to call a special term of court at which the relator was tried and convicted is constitutional.

If the relator has been tried and convicted in a trial court by due process of law, he is not entitled to an appeal as a matter of right unless the appeal is perfected in the manner pointed out by law. Andrews v. Schwartz, 156 U. S., 272; McKane v. Durston, 153 U. S., 684; Ex parte Buchanan, 158 U. S., 31; Ex parte Boardman, 169 U. S., 39; Hall v. Johnson, 186 U. S., 480; Ex parte Blackbird, 66 Fed., 541; Ex parte Durrant, 84 Fed., 317; U. S. ex rel. v. O'Neil, 10 App.

D. C., 205; Kohl v. Lehlback, 160 U. S., 293; Allen v. Georgia, 166 U. S., 138.

The right of appeal is not essential to due process of law. Reetz v. Michigan, 188 U. S., 505; Carter v. Caldwell, 200 U. S., 293; State v. Chittenden, 127 Wis., 468; Etchells v. Wainwright, 76 Conn., 534.

What is due process of law in the States is regulated by the law of the State. Walker v. Sauvinet, 92 U. S., 90; Am. Pub. Co. v. Fisher, 166 U. S., 468; Holden v. Hardy, 169 U. S., 366; Wenham v. State, 65 Neb., 394.

Due process of law within the meaning of the fourteenth constitutional amendment is secured if the laws operated on all alike, and do not subject the individual to an arbitrary exercise of the powers of judgment. Giozza v. Tiernan, 148 U. S., 657; Minneapolis R. Ry. Co. v. Herrick, 127 U. S., 210; Leeper v. Texas, 139 U. S., 462; Duncan v. Missouri, 152 U. S., 377.

"By due process" is meant a proceeding following the forms of law, appropriate to the case and just to the parties to be affected. It must be pursued in the ordinary mode prescribed by the law; it must be adapted to the end to be attained; and whenever it is necessary for the protection of the parties, it must give them an opportunity to be heard respecting the justice of judgment sought. Tirapin v. Leamon, 157 U. S., 51.

Legislation is not open to the charge of depriving one of his rights without due process of law if it is general in its operation upon the subjects to which it relates and is enforceable by usual methods adapted to the nature of the case. Dent v. West Virginia, 129 U. S., 114.

The Federal courts will not interfere by a habeas corpus within the State in the administration of its criminal laws unless fundamental rights especially secured by the Federal Constitution are invaded. Rogers v. Peck, 199 U. S., 425.

A writ of habeas corpus will seldom be held as a writ of error to review in a Federal court the proceedings of a State court. Storti v. Massachusetts, 183 U. S., 138.

Federal courts have no power to interfere by habeas corpus with the imprisonment of a person under a judgment of conviction of crime in a State court, if that court had jurisdiction to try the case, and jurisdiction over the person of the accused and did not lose such jurisdiction during the trial. Felts v. Murphy, 201 U. S., 123.

Errors committed in a criminal case by a State court of competent jurisdiction while proceeding under statutes that do not conflict with the United States Constitution can not be reached by habeas corpus. Shibuya Jugiro v. Brush, 140 U. S., 291; Wood v. Brush, 140 U. S., 278.

The insufficiency of an indictment in a State Court to charge a certain crime is not a ground for interference by a writ of habeas corpus from a Federal court. Kohl v. Lehlback, 160 U. S., 293; Howard v. Flemming, 191 U. S., 126.

It is submitted that the District Court of Reeves County had jurisdiction over the offense and person of the accused and that the writ of habeas corpus is not available.

This court has before it all the record of the court below with the exception of the bills of exception. An inspection of the record discloses that the accused had no grounds of appeal. It is true in the ex parte affidavit of Judge Parker, he states that the court did not permit the introduction in evidence of the marriage certificate of the parents of the accused. He fails to state on what grounds the court excluded it from the evidence. The statement that the certificate offered was the marriage certificate of the parents of the accused is perhaps a conclusion of his. Had he stated the names of the parties mentioned in the certificate, it is likely and doubtless would have shown names different from the names by which the father and mother were known in the community and county in which they lived at the date of the trial. Although he states that the court excluded this alleged marriage certificate, he does not state its date, nor show its materiality. But he alleges what it is as a reason for its being offered in evidence which was immaterial and irrelevant."

The relator is remanded to the custody of the sheriff at Reeves County, and the sheriff of McLennan County is ordered to deliver him to the sheriff of Reeves County, Texas.

*Relator remanded to custody.*

DAVIDSON, Presiding Judge (dissenting).—On the 23d of July, 1911, appellant was arrested for the murder of Miss Emma Brown, the homicide having occurred the day before. He was subsequently placed in the county jail at Pecos City, the county seat of Reeves County. S. J. Isaacks, the district judge of that judicial district, states under oath that he was notified of the homicide as well as of the arrest of the applicant precisely at 12 o'clock on the night of July 23, 1911. He was then at his home in Midland, about one hundred miles east of Pecos City. The train being an hour late, enabled him to catch it, which he did, and went to Pecos City, arriving there in the early hours of the morning of July 24, 1911. He went to the hotel owned by Mr. Johnson. Upon arriving at Pecos City Judge Isaacks had a conversation with this Mr. Johnson, and subsequently with Mr. Stein, Mr. Cowan, and the district attorney in regard to defendant's case, and the excited condition of the country and the threatening attitude of the citizenship thereof towards the applicant. The judge immediately ordered applicant transferred from the Pecos City jail to the jail at Midland, one hundred miles east of Pecos City, to prevent the lynching or possible lynching of applicant at the hands of a threatened mob. Judge Isaacks testified before this court upon the hearing of the writ of habeas corpus, and, among other things, he stated "he could not begin to tell all that was said, because several people remarked to me something about a mob. The first conversa-

tion I had was with a friend of mine, Mr. Johnson. He is the proprietor of the hotel." The judge also testified to having conversations with the district attorney, with Mr. Cowan and Mr. Stein. Mr. Stein was vice-president of the bank at Pecos City. It seems that Mr. Cowan is also one of the vice-presidents of the same bank. Judge Isaacks also testified it was not particularly the fear of lynching which impelled him to send defendant to Midland. "When I sent him to Midland the first time I did so for his personal safety. I could not say that I feared he would be mobbed, but to guard against any possibility of it. I thought there was a possibility of his being mobbed, yes, sir, and the unsafety of the Pecos jail." He further stated that this was the only instance during his official career in which he ever sent a prisoner from the Pecos jail to the jail of another county. He had been district judge about three years. Before applicant left the Pecos jail for Midland the district attorney went to the jail and secured from him a confession, which was subsequently used on applicant's trial before the jury. The evidence of Judge Isaacks is not only corroborated as to the mob spirit pervading that whole county, but it is made evident from the facts that this mob spirit was pervading the entire county, and the violence was threatening and imminent.

Judge Isaacks entered an order on that day, which was Monday, the 24th of July, directing that a grand jury be summoned and petit jurors drawn to try applicant. The grand jury was empaneled on Tuesday, and indictment returned the same day, and a copy was served on applicant at 7:25 p. m. the same Tuesday evening at Midland, one hundred miles distant from the court where the indictment was returned. There are several transcripts of the minutes of the court showing the different steps taken during what Judge Isaacks styles a special term of the court. The caption of these transcripts conflict with each other, especially as to the date of calling the alleged special term. One caption places the convening as of date July 25; another as of July 24. None of these orders show that any notice was given convening the special term of the court, nor that it was in any way published either in newspapers or by posting notice. In fact, the judge orally testified that the only notice he gave was to instruct the district clerk to inform the sheriff that he was going to hold court. The only matter recited in the transcript of the order entered by the judge is a recital of the fact "that a horrible murder had been committed," etc., and it was necessary that a special term of court be held for the purpose of investigating that murder and trying the person to be indicted by the grand jury. It is also recited in the same order that a special term should be called to begin at 2 o'clock p. m. on July 24 to investigate the killing of Miss Brown. This order was subsequently entered of record in the minutes of the court as certified by the clerk. This shows to have been made on July 24. Another transcript shows that the order of the judge was dated the 25th of July, 1911, calling a special term for 2 o'clock July 24. Another transcript

omits entirely the mention of anything concerning the order in regard to the special term.

The day before the organization of the grand jury this applicant had been sent out of Reeves County one hundred miles away and confined in jail at Midland in Midland County. He was, therefore, not present when the grand jury was organized and the petit jury drawn, when the indictment was returned into court, and in fact during none of the subsequent proceedings of the court until he was brought back for trial, reaching Pecos City early Friday morning. Under this condition of things he was necessarily debarred the legally accorded right under the statute of having an opportunity of challenging either the array of grand jurymen or anyone of the selected grand jurymen. After consulting with Mr. Johnson, Mr. Stein, Mr. Cowan and the district attorney, Judge Isaacks ordered the State rangers to Pecos City to protect applicant from the threatened mob violence. They reached there Wednesday or Thursday and were present during the trial to guard applicant from mob violence while he was being tried. Under the law it seems that the State rangers are placed only under the command of the Governor. In this instance the judge seemed to think the emergency was of such a character as called for his interposition, and he, therefore, ordered the rangers to Pecos City without further preliminaries or delay. This was to meet the emergencies and attendant conditions at that time and place.

Applicant is a Mexican boy under twenty-one years of age, the evidence being in conflict as to whether he was over or under seventeen years of age. Miss Brown was an American lady. The threatening mob were Americans. The facts also show, without stating the evidence in the exact language of the witnesses, including Judge Isaacks, that the conditions were such and the situation so grave that he felt it incumbent upon him to take the steps he did take to order the court in the manner in which he ordered it, and to send applicant away one hundred miles from danger and out of reach of the mob until he could get everything in readiness to put this applicant upon trial before a jury. His acts, conduct and orders seemed to have been based upon practically this conclusion, and especially was it deemed necessary to have the rangers present when the applicant was brought back to be placed on trial before the jury.

A trial was begun on Friday morning, and had to be suspended during the day for sufficient length of time to secure the presence of applicant's mother as a witness. She lived about twenty miles distant. Saturday morning the case proceeded to a conviction, which occurred sometime just after the noon hour. After the conviction applicant and his counsel were allowed something like two hours in which to prepare a motion for new trial which, at the expiration of that time, was promptly overruled by the judge, and sentence of death, which was awarded by the jury, was pronounced against the applicant. It may be stated here, and in this connection, that the statute provides the

accused shall have two full days after the return of the verdict of the jury in which to prepare a motion for new trial. After preparing the motion applicant's counsel started to the courthouse. En route they were hailed and stopped by a concourse of men, the size of which is variously estimated. This crowd came from the bank presided over by Mr. Johnson, and was headed by him as spokesman. He testified in this connection as follows: "When we started to go out the door of the bank I asked them where Mr. Parker and Mr. Estes were. Just as I got out I saw them going up the street, going to the courthouse. They were going up the street towards the courthouse as we came out of the bank, and I holloed at Parker but he did not hear me. When he got up to where he turned around a corner going across a vacant block I holloed again at him and he did not hear me, and some one in the crowd holloed or called him and he stopped right at the walk that leads into the courthouse about one hundred and fifty feet from the courthouse door." A conversation occurred between Mr. Johnson and Mr. Parker at that point. Johnson informed Parker of the mission of the crowd which he headed, and this was, he stated, to prevent applicant taking an appeal to the Court of Criminal Appeals. He testified: "I said Judge (Parker) they tell me you are going to appeal the case, and I want to ask you as a citizen and in behalf of these men here not to do it, not to prolong the case, but let it go on, let the boy suffer the penalty. I said it would be best for our country. I said if we don't do that it will cause mob law in the future, and I said I would not have anything like that in our county for anything, and I said as a friend I don't believe you have any ground whatever to appeal the case on, let me beg of you not to appeal the case. When I first commenced talking to him he said to me, Johnson, I want you to always understand you can not scare me. I said, Judge, you know we did not come here to scare you, we are not on that mission. I said we want to keep the peace and dignity of our county up, and you know I would not come to you to bulldoze or anything like that in a case like this, just come as a neighbor, a friend and citizen to get you not to do this, for I think Judge it is the best, and he talked on quite a little and finally he said, well, you all go on off and it will be all right."

Another witness testified he did not hear Johnson tell Parker if he or Estes appealed the case they would hang the Mexican before morning. He swore that the crowd was excited; sometimes four or five of them would be talking at the same time. This occurred while Johnson was talking to Parker and caused by what was said between Parker and Johnson. The sheriff and county judge were also in this crowd. "They were appealing to them to let the case stand as it was." In the crowd was one or more of the jurors who had sat on the jury and convicted the defendant.

Mayfield testified he heard threats after sentence was pronounced on defendant. These were threats of mob violence. He heard what oc-

curred between Johnson and Parker, and heard Johnson ask Parker not to take an appeal. He says Johnson told Parker if there was any mob violence the lawyers would be responsible. Another witness testified at that time, "As for myself, I will move my family out of Reeves County if this is done" (meaning if an appeal is taken). Mayfield is the witness who, when defendant was first arrested after the homicide, threatened to hang him if he did not confess to the homicide. Mayfield further said to Parker: "For God's sake go back to your office and clean your hands of this." He also states there was general talk about lynching defendant if his case was appealed.

Camp testified in regard to the conduct and talk among the crowds in and about the town in regard to this matter. This was adverse to defendant and threatening. It was remarked by these crowds that "they could hang three as easy as they could one." He saw Parker and informed him of what was being said, and the feeling of the crowd about the matter. When asked as to what percentage of the people believed appellant guilty, he replied, "one hundred percent." Parker and Estes, attorneys for defendant, testified their lives were threatened if an appeal should be taken. Estes testified orally before the court, and Parker by affidavit. Parker was appointed by the court to defend the defendant after defendant had been sent away to Midland, and he did not see defendant to have a consultation with him until his return on Friday morning. Estes, the other attorney, lived in El Paso, and was employed to defend the defendant, and came to Pecos City on the Friday morning train. After reaching the point he made arrangements with Judge Parker to assist him in the defense of the case. They were unable to have a conference with their client; at least they did not have one until he was brought into court Friday morning for the purpose of being placed on his trial before the jury. This occurred after the court was open and the "judge on the bench." They asked permission to talk with defendant. This conversation between them and defendant occurred in the presence and hearing of two State rangers. The rangers informed the attorneys that they "could not talk to him except in their presence." Estes further testified that after the verdict they were given until 3:30 p. m. by Judge Isaacks to prepare a motion for new trial. The time allowed was something like two hours. After preparing the motion he and Judge Parker started to the courthouse. En route they were hailed and turned around and "saw a great many people coming, coming rapidly." He estimated the crowd at about fifty persons. "They came all around us. The sheriff was there and to their left side. They surrounded us there, and Mr. Johnson seemed to be the spokesman. He was very much excited and out of breath, and told us we must not appeal that case. If we did they were going—I do not remember what they said exactly, said if you are going to take an appeal of this case we are going to hang this defendant tonight, or take him out and hang him, and said we can hang three as easy as we can one, or two as easy

as we can one.  And then Mr. Hosie got up on a box and made a
speech, and said they would not permit any appeal at all."   One of
the jurors who brought in the verdict and was in the crowd, stated:
"He told Judge Parker that he would not permit any appeal, because
he had said in his argument to the jury he would be satisfied with any
verdict that they might render.  Judge Parker attempted then to argue
with them and asked them if they did not think that the question of
law as to the trial of the case ought to be settled by the Court of
Criminal Appeals, and they immediately said no, they would not per-
mit it at all, it must not be done."   Estes further testified that he
could not remember anything like all these people said to Parker and
himself.   Another one of the crowd insisted on knowing what the
attorneys of the defendant were going to do, and stated they, the
crowd, did not intend leaving there until they knew what was going
to be done.  Finally Parker said: "We will comply with your request."
Estes said he then went to the hotel and remained there until he could
get out of town on the first train, and did leave on the first train.
He did not go about the courthouse and was not in the courtroom
pending any of the subsequent proceedings, and took no further part
or action in the case.  He was asked why he did not go to the court-
house and replied, "I was afraid to, afraid of mob violence."   He
further testified that for the same reasons he did not give notice of
appeal.  Several bills of exception were reserved to the rulings of Judge
Isaacks, but were not presented to him for approval for the same rea-
son, the witness saying, "because I was afraid to as I said before."
This witness had previously held the office of county attorney of
Reeves County, and had also held the office of district attorney of
the judicial district of which Reeves County was a part.  He further
testified that he believed the crowd intended mob violence towards
him had he undertaken to perfect an appeal in the case, and that was
the reason notice of appeal was not given and entered of record.
Prior to going into the trial of the case he was notified if he was "not
careful how he conducted the case he would get the Mexican hung,
and they would not stop at him."   Johnson also testified that Parker
had been exclusively his attorney for several years.  Since this trou-
ble, however, he has not been his attorney.  Subsequent to this trouble
he advised Parker to leave Pecos.  This he says he did because Judge
Parker had written some letters to Austin to the effect that he had
been intimidated in the trial.  Judge Parker made an affidavit which
was used as evidence.  In this he narrated his connection with the case
by appointment of Judge Isaacks, and subsequent employment by and
with Mr. Estes as counsel.  He also mentioned reserving bills of ex-
ception which were not presented to the court, after the action of the
crowd heretofore mentioned.  The affidavit then states:  "After the
case was tried and after we had dictated hurriedly a motion for new
trial and while the stenographer was reducing it to typewritten form
some twenty-five or thirty men on the road between my office and the

courthouse and within a few feet of the courthouse door, surrounded Mr. Estes and myself and stated "If the case was appealed the Mexican would be hung before the next morning; that they were determined no matter what the consequences were, that he should hang before morning. That many citizens might be killed if any resistance to such hanging was made. They began to plead with Estes and myself not to appeal the case; also stated, at least some of them did, that they were determined on the fact that it should not be appealed. Some of the parties made remarks to the effect that there would be three to hang if the case was appealed. They would not allow us to reason with them at all. They seemed to fear that we would convince some of the crowd that they were making a mistake, and that they might fail to accomplish what they wanted. I said to the crowd that I wanted them to understand that what I did would not be done because of fear of personal violence or injury to myself, but if it was true that they intended to hang the Mexican that evening or night because of an appeal, I would see that notice of appeal was not given; but that I would not promise what might happen later on or might not happen; that I simply would not give notice of appeal. Now the statement by me to them that I feared no personal injury to myself was not literally true. I did not fear injury to myself so much as I feared for my client, but, still, I simply did not know what they might do. I felt that if they undertook to take the Mexican from the rangers, some of them would get killed, and if they did, then they, in their rage, would be liable to turn on Estes and myself, and we could not well scrap a whole county, or what looked like a whole county to us at the time. There were a great many threats made by these people, as I understand, and very serious ones. . . . As illustrative of the extent to which these people were worked up, several days after the trial, they brought a petition signed by nearly everybody in the county and wanted me to sign it. This was a petition to the Governor to let the Mexican hang; also some days after that, in an effort to controvert the statements before the Governor to the effect that the defendant's attorneys were intimated, some of them wanted me to sign an affidavit to the effect that there was no intimidation at all in any shape, form or fashion."

There are quite a number of things that might be mentioned more or less pertinent to the matter growing out of the incident to the excited condition of the crowds and the people about the court and the town, and the closing scenes of the trial which tended to illustrate the attitude of the danger to appellant and his counsel, and their environments, but it occurs to me that what I have collated is sufficient evidence to show such conditions.

It is a conceded fact that appellant is a Mexican, born in Gallega, State of Durango, Republic of Mexico. That he is under twenty-one years of age, and that his father is still a citizen of Mexico, and his mother is a Mexican woman. There is some conflict in the evidence as

to whether the defendant is over or under seventeen years of age. The State's evidence is to the effect that the defendant, testifying in another case, stated he was seventeen years of age. Another witness stated that he had been invited to appellant's birthday entertainment. This invitation was in writing and in the Mexican language, but it had been interpreted to him as an invitation to appellant's eighteenth birthday. If appellant was in fact eighteen years of age on that birthday, it would have occurred on the 10th of June, 1911. This invitation seems to have been sent out in April or May. The evidence for the defendant is that he was born June 10, 1896. This fact was testified by himself, his mother and his father. His Mexican citizenship is not disputed.

Appellant testified that when the motion for new trial was overruled the judge asked him what he had to say why the sentence of the law should not be pronounced, and he replied, "I want to take my case to the Court of Criminal Appeals, my lawyers will do the rest." The judge says the only reply the defendant made was "nothing except as to my age." There was no entry of the notice of appeal found in the records of the trial court. This is a conceded fact. Estes, as before stated, testified he did not go back to the court for fear of the mob violence, and left town upon the first outgoing train. Judge Parker testified to a whispered conversation with the district judge in regard to an appeal, substantially notifying the judge that he would not enter notice of appeal.

It is the contention of the State under this condition of the record, that because the notice of appeal was not written into the minutes of the court, that is, that the notice of appeal was not made and entered of record, therefore, this court could under no circumstances entertain an appeal, and that without such notice being written into the minutes of the trial court the jurisdiction of this court can not attach. This position is based upon articles 882 and 883 of White's Ann. Code of Crim. Procedure. Article 882 reads: "An appeal may be taken by the defendant at any time during the term of the court at which the conviction was had." Article 883 is as follows: "An appeal is taken by giving notice thereof in open court and having the same entered of record." Quite a number of decisions are cited, and many more could be, holding that the notice of appeal in the trial court is necessary, and that it must be entered of record. There are also a great number of cases holding that the jurisdiction of this court does not attach without the giving and entry of such notice. I do not purpose reviewing these cases. As written and the connection in which they are written, they are correct; at least, such is usually the practice in this State. The manner of taking an appeal may be classed as practice or procedure, but as to its proper class I have here no concern, but the right of appeal itself is far more reaching than the simple notice or entry of such notice. It is a constitutional right of which neither the courts nor the Legislature can deprive a person accused of crime when the

occasion for exercising that right occurs. He may waive that right if he sees proper. He may accept the sentence and suffer the alloted punishment; but that right belongs to him, to be exercised or not in his discretion or at his option. Others can not waive it for him. His attorneys can not do so, nor can they waive any other right that he may have guaranteed him. An attorney can not absolutely bind his client by any act prejudicial to the legal rights of that client in contravention of the general principles of law, much less can the attorney bind his client by waiving his constitutionally guaranteed rights. The attorney can not waive the presence of his client during any part of the trial, not even when additional instructions are given. These questions are so thoroughly a part of the law of the land that they are household words in our jurisprudence. I do not care to review the cases in this State or out of it, in regard to these matters. Appellant says he gave "notice of appeal," "and his lawyers would do the rest." One of his attorneys by reason of the threats and intimidations did not and would not go to the courthouse to look after the rights of his client, testifying that he was afraid of the mob. This is not questioned by the evidence, nor disputed in the record. The other attorney refused to give notice of appeal by reason of intimidation as shown by all the witnesses for and against the State, especially by Parker's affidavit. They all agree that after the crowd surrounded Parker and Estes, Judge Parker finally told them that he would not appeal the case, and that there would be no appeal from a conviction. This is proved, if anything in this record is proved at all, by all the witnesses who testified in this regard to that phase of the trouble. There is no question and ought not to be any question in the mind of any candid man or one moved by intellectual honesty, that the undisputed facts show that the attorneys were actuated by duress not only to save their client from mob violence and lynching, but as well to save themselves from threatened danger to their persons. The object and purpose of the excited crowd which surrounded these attorneys, and their conduct on that occasion about these attorneys as the attorneys approached the courthouse to present defendant's motion for rehearing, is explainable upon no other hypothesis or reason. That the court ought to have so understood it, and that the attorneys did so understand it is hardly debatable. After surrounding them and making the threats, they extorted a promise that notice of appeal would not be given, and no appeal would be taken, and upon that assurance from Judge Parker the crowd left the attorneys. Parker went into the courthouse; Estes went away. Parker refused, or at least failed to give notice of appeal after being fresh from the influence of the mob. The writer does not believe that any candid reader can look through this record and not reach the conclusion, and the only conclusion to be deducible from the record, that the district judge understood and appreciated the mob spirit which surrounded his courthouse and was prevalent in that community at the time of the trial, and at the time of the overruling

of the motion for new trial and sentence was pronounced against the accused. He was present at the court and in the town from the time he reached there Monday morning until he left Saturday night. He saw the crowd that had actually gathered about his court. He talked with the people and informed himself of the danger, and he so testifies. He knew and witnessed the fact that the courthouse was crowded with people at the time he passed sentence upon the defendant. He understood from Judge Parker in the whispered conversation that notice of appeal would not be given, and that it was not in fact given. From the time Judge Isaacks reached Pecos City early on that Monday morning until he adjourned court Saturday evening every act and movement on his part the record shows he recognized the presence of the mob and the danger which threatened the lynching of defendant. His act and order sending the Mexican one hundred miles away from the danger point before convening his court, the rushing of the proceedings in the absence of the defendant, and without notice of the convening of the court, or calling the term of the court which he proposed to hold for the trial of the defendant; the selection and empaneling of the grand jury in the absence of the defendant, the service of the indictment on the defendant one hundred miles away the same day upon which it was returned into court, in order that the trial of the case might be rushed as rapidly as possible by giving the necessary legal two days' notice to appellants by service of such copy, the sending for the State ranger force; the absence of consultation between defendant and his counsel except in presence of rangers; and the fact that by his act and order such consultation was prevented until the morning of the trial, his bringing the defendant back just time enough to go at once into trial, the rapid disposition of the case during the trial, and the few hours allotted defendant and his counsel for the purpose of preparing and presenting motion for new trial, and its rapid disposition, it seems to be proof evident, and stronger than words of denial, that the court saw the unmistakable evidences of mob violence threatening defiance to constituted authority and the authority of his court. In order to secure a fair trial a change of venue could have been ordered by the court when defendant was at Midland, and this without, at least, immediate danger to the life of the accused, and the case placed away from the environments of the threatening situation. White's Code Criminal Procedure, article 613. The defendant was then beyond the reach of the mob, and one hundred miles distant. It is evident from this record, and it must have been evident to the trial judge, that bringing back the defendant under the environments that surrounded his court and placing him on trial before a jury where witnesses say that one hundred percent of the people of the county believed defendant guilty, is not evidence of a fair trial, nor could the judge be ignorant of the conditions, for he testifies he talked with some of those people and became sufficiently alarmed to send defendant away for personal safety. There is no reason assigned why the de-

fendant was not kept beyond the environments of an enraged and threatening population until reason could, to some extent, assert its sway, or change of venue had to a county that was not so thoroughly infested with the mob spirit.   Our law places it within the power of the district judge, and if necessary authorizes and even requires him to change the venue to a county where a fair trial can be had.   It invests him with discretion independent of motion made by either side to change the venue.   This is a wise provision of the law if fairly and justly economized and used. There are circumstances which actuated the framers of our laws, organic and statutory, in incorporating such provision.   The judge is supposed to know, reasonably at least, of the conditions which surround the county seat where he holds his court; at least he ought to know the environments of the courthouse, immediately about the courthouse and within the courtroom.   That a conviction would result in this case was not a question in the mind of anybody, so far as this record is concerned, from the opening statement of the judge that "there was on July 22, 1911, committed in Reeves County a horrible murder on Miss Emma Brown" entered July 24, 1911, until the final close of the trial and term on July 29, 1911.   Not a witness, including the judge, even expressed anywhere in this record any doubt of such a conviction.   It is equally patent and self-evident that that conviction would mean and did mean from the beginning the death penalty.   No one was more thoroughly aware of this than the judge.   It moved him to send the defendant away from the danger point; it actuated him in bringing the State rangers to the scene of the trial, and he shows it as clearly as words can write it down in the opening sentence of his order that "there was on July 22, 1911, committed in Reeves County, a horrible murder of Miss Emma Brown."   That the defendant would be convicted, that it was impossible to get a fair and impartial jury in that county is as evident from this record as is the fact that Judge Isaacks tried the case and the jury returned a verdict assessing the death penalty.   If there is a case that could demand of the court a change of venue to a county otherwise situated, more than any other, it is this case.   A rapid trial and rapid execution of the sentence was thus sought to be obtained, and to reach this the trial was hurried as part of the proceedings to avoid the lynching.   It may be useless for the judge to say "the defendant had a fair trial."   The conviction having been obtained, so far as the verdict of the jury was concerned, then the all absorbing question in the minds of the excited crowds became the avoidance of an appeal.   This must be avoided and thwarted, and the attorneys were made aware of that fact in language far more forcible than elegant or diplomatic.   The lawyers did not question the imminent and pressing necessity, and this was done almost at the steps of the courthouse. They were then en route to present a motion for rehearing under orders of the court which they were to present within the space of two or three hours, in the face of the statute which guaranteed them the legal

right to have two days in which to prepare it. It was the one single purpose that impelled the crowd which surrounded the attorneys and called forth the threats to hang their client and perhaps themselves unless appellant was denied the right of appeal.

Is not this failure to enter notice of appeal strong and convincing evidence of an unfair trial? Does it not exclude the idea of volition on the part of appellant and his counsel? If not so, it might be seriously asked what would it take to constitute duress under such circumstances. Would it be said that these men were acting of their own volition or the defendant was freely or voluntarily waiving any right of appeal when one of the attorneys says that they were threatened with duress "by the whole county or what seemed to them to be the whole county?" Under these circumstances it may be seriously asked if there was no notice of appeal given, did this failure on the part of defendant and his counsel constitute a waiver by appellant or his attorneys of his right of appeal? No witness, of course, swears in this record that the defendant ever authorized his attorneys to waive notice of appeal. If they did waive it, as they say they did, under the duress imposed upon them, this could not bind the appellant, under those circumstances even had he agreed to the terms. This was as clearly a case of duress as can be found in the history of criminal jurisprudence. The writer would certainly say and answer that the defendant has lost none of his rights under the circumstances stated, nor can he be held to have waived his right of appeal under these conditions. A duress, violence or threatened violence which leads an accused to believe his life is in danger or his body of serious bodily injury, guarantees irresponsibility for crime, or for the act committed or omitted. It is placed upon the highest ground of self-defense. "A person forced by threats or acts of violence to do an act is not liable to punishment for the same." This includes loss of life or great personal injury, etc. White's Ann. Penal Code, article 44; Paris v. State, 35 Texas Crim. Rep., 82; Stanley v. State, 16 Texas Crim. App., 392. It is unnecessary, however, to cite authorities on such proposition. The statute excuses the party acting when the act performed is an affirmative aggression, that is when he does an act otherwise criminal. Could it then be honestly, seriously or candidly contended that if a party killing under such circumstances is to be held blameless, yet if forced to save his life by reason of such threats he does not give notice of appeal, he is, therefore, to forfeit his life and be held to have waived his right? Is his life in one instance less sacred than in the other? The writer would answer these propositions emphatically in the negative.

If the defendant was prevented from appealing by duress, that is, under the circumstances shown by this record, the sentence is clearly void, as much so as if the entry of the appeal was entered of record. Had notice of appeal been entered of record, there would be no ques-

tion that the sentence following the giving of that notice of appeal would be absolutely void and beyond the jurisdiction of the court to pronounce it upon the defendant. If so, then when duress enters into the case and prevents notice of appeal, the sentence would, therefore, be equally illegal and wholly void. Under all of the authorities relief can be had by habeas corpus from a void judgment. Sentence in this case is the final judgment. The defendant was authorized to appeal, only before the passing of the sentence, and this by reason of the statute which requires or authorizes the appeal in death penalty cases prior to the sentence. Duress—threats to take life which prevent giving notice of appeal—inhibits the passing of the sentence upon the return of the verdict. Under such circumstances the jurisdiction of this court is not superseded by failing to give notice of appeal. Its jurisdiction may be exercised by any writ or process known to constitutional or statutory law in this State, and in the absence of statutory procedure or provision, then by any procedure known to the common law. White's Ann. Code of Criminal Procedure, article 26.

Article 5, section 5, of the Constitution, provides as follows: "The Court of Criminal Appeals shall have power upon affidavits or otherwise to ascertain such questions of fact as may be necessary to the exercise of its jurisdiction." It also provides: "The Court of Criminal Appeals and the judges thereof, shall have the power to issue writs of habeas corpus, and under such regulations as may be prescribed by law issue such writs as may be necessary to enforce its own jurisdiction." That it has jurisdiction in felony cases is not to be discussed. This is fixed by the Constitution and statutory law. That this jurisdiction attaches in appeal cases is also fixed by the Constitution and is coextensive with the limits of the State. This constitutes one of the essential purposes of the creation and the existence of the Court of Criminal Appeals. For these purposes it was ordained and created. That its jurisdiction attaches by the giving of notice of appeal in open court and the entry thereof of record is a statutory provision. It is a method provided by which the accused may without circumlocution and with ease and facility appeal his case from a conviction in the lower court. That the party may fail to give notice of appeal is usually considered a waiver of the right of appeal, but this, as before stated, inheres in *him.* The court or other parties can not deprive him of it. When the convicted person is, by duress, prevented from giving this notice or of taking his appeal, the jurisdiction of this court is not ousted, nor is the accused prevented from having his case reviewed and his remedy is guaranteed by some legal method. The superior force preventing him from appealing, whether the mob violence, threats to take his life or serious bodily injury, or any sufficient cause of duress, even at the hands of the trial court, can not deprive him of his right of appeal or oust the jurisdiction of this court to execute this as one of the purposes of its ordination and mission. The Constitution and legislative Acts are fully ample for the authority of this court

to perform all functions confided to it in all of its ordained authority. This can be done by "affidavit or otherwise" and authority is fully conferred both by the Constitution and legislative enactment "to issue such writs as may be necessary to enforce its own jurisdiction." Article 5, section 5 of the Constitution. In addition and to carry out the purposes of the constitutional provisions, the Legislature, in the absence of having provided some special order, has ordained generally in article 26 of the Code of Criminal Procedure, that "the rules of the common law shall be applied and govern." Therefore, if the legislative acts have not specially provided a rule of procedure, this court may and shall be governed by the common law rules of procedure. See cases cited in White's Ann. Code of Criminal Procedure, article 26 and section 29.

The writ of certiorari is one of the well known writs of procedure at common law, and perhaps equally as well known to the practice in Texas by which appeals may be carried up or defective records supplied. If notice of appeal was given, or by duress the party was prevented from giving such notice of appeal, the writ of certiorari is available to get the record before the appellate tribunal. Threats and statements made whereby the party aggrieved was prevented from perfecting an appeal bond or from doing things essential to an appeal, will excuse a failure to perfect an appeal, and the appeal may be perfected by certiorari. Melton v. Edwards, 6 Heisk. (Tenn.), 250; 5 Cyc., 764, note 3 for cases; Sanders v. State, 85 Ind., 318; Simmons v. Dowd, 76 N. C., 155. A writ of habeas corpus may always be assisted by the writ of certiorari. This proposition seems to be without contradiction, and to the effect that a judgment brought about by duress or fraud can thus be nullified.

The case of Sanders v. State, supra, is a case so conclusive of this case and the conditions of this record, that I take the liberty to reproduce it in this opinion as a part of it, as follows:

"This is an extraordinary case. The facts proved, the procedure adopted and the relief sought are strange and unusual.

"The facts stated and proved are these: In April, 1878, Josephine Sanders, the wife of the appellant, was slain by a pistol shot; at the time she was in a room alone with her husband, and he did not and could not give any account of her death; he was then, and had been for many years, addicted to the use of alcoholic liquor and opium to such an extent that he had probably become insane; he was arrested shortly after the death of his wife; his case came on for trial; his counsel and many witnesses of unquestioned veracity testify that at the time of his trial he was insane; the homicide had aroused an intense feeling in the vicinity of the county seat where the killing was done, and the case put to trial; threats were made of lynching by a mob; counsel prepared an affidavit for delay, but feared to present it lest the mob should seize and hang the accused; the sheriff of the adjoining county came to the county seat of Clay County and warned

the sheriff of that county of imminent danger from an armed mob; a jury had been empaneled and a plea of not guilty entered, but so great was the threatened danger that counsel, to save, as they believed, their client's life, withdrew the plea of not guilty, entered a plea of guilty, on which, without evidence, the jury returned a verdict of guilty, and a life sentence was immediately pronounced upon the verdict by the court; the accused was at once hurried to the train and conveyed to the State's prison. For the purpose of clearly exhibiting the situation at the time the plea of guilty was entered, we quote from the testimony of the gentlemen who were then appellant's counsel, and who are men of high character and undoubted integrity. One of them says: 'As one of his counsel I urged and demanded of him a plea of guilty, with which I pledged myself to save his life; his counsel all concurred; Sanders always denying any knowledge of the homicide; his counsel were responsible for the act of pleading guilty, believing at the time that it was the only course by which his life might be saved.' Another one of the counsel says that 'the accused was bewildered and refused, but finally seemed to consent, and at last appeared to acquiesce in letting counsel take their own course; that the court was agitated and alarmed, and recommended and advised the plea of guilty.' The turnkey of the jail, the sheriff of Clay County and the sheriff of the adjoining county concur in stating that there was great and imminent danger of mob violence; one of the jurors says that there was intense excitement among the large crowd of people present at the trial; that he was himself stationed at the door of the courthouse to signal to the jail any movement of the mob; that the judge was greatly excited and said in 'the evening, that he 'had not drawn an easy breath until he had seen the train in motion with Sanders' aboard.' There is much other evidence as to the presence of a large number of angry and excited men, and it is also shown that they uttered threats of violence and appeared determined to seize and hang the appellant unless punishment was at once imposed upon him.

"The relief prayed is that the judgment entered upon the plea of guilty may be vacated and the appellant put upon his trial in due form of law.

"There are strong reasons in support of the appellant's prayer. All men are by our laws entitled to a fair trial, in absolute freedom from restraint and entire liberty from fear of threats and violence. It is almost a mockery to call that a trial, or a judicial hearing, which condemns an accused upon a plea of guilty forced from his reluctant counsel by threats of an angry and excited mob, and interposed because they believed that to proceed with a trial upon a plea of not guilty would result in the hanging of their client by lawless men. A man who makes a promissory note because of fear is entitled to relief. A man who executes a deed under duress is entitled to judicial assistance. A will executed under the influence of fear falls before the law. These are small things when compared with life and liberty, and yet

in the eyes of the law they are null. If such things are null when procured by fear, or extorted by violence, should not a plea be so, when to have refused it would have been to put in jeopardy the life of the man arraigned upon a charge of felony? In many respects the facts of this case go far beyond that of ordinary cases of duress, for here the officers of the law, judge, sheriffs and jailers were inspired with fear of violence; counsel of age and experience, influenced by the appearances of danger which surrounded their client, secured from him a reluctant acquiescence to the plea of guilty. More than this, the accused, if not at the time absolutely insane and incapable of understanding what he did, was weak and enfeebled in mind, and, as his counsel express it, 'lost and bewildered.'

"That the case made is one entitling the appellant to some relief is clear, but whether the law vests the courts with power to grant it is by no means so clear. Unless the law, as it exists, confers this authority, then the courts do not possess it. Hard as the case may be and grievous as may be the suitor's situation, they can make no new law to fit this case. If a new law is needed it must come from the lawmaking power.

"The right to pardon is vested in the chief executive of the State, and this, it is suggested, is the source from which relief must be obtained in such cases as this. But if the courts have power to grant relief, the fact that the Governor may pardon does not abridge a party's right to appeal to the courts for assistance. The power to pardon does not exclude the right to hear and determine; both powers may concurrently exist. Nor is a pardon always adequate relief. An innocent man suffering from an illegal sentence, procured by fraud or extorted by violence, may desire a trial and an acquittal which shall remove from his character the stain of guilt, and this the exercise of the pardoning power can not do. To pardon is to exercise executive clemency; it is an act of mercy. An acquittal is the vindication of a right, the award of justice. Again, the executive may not feel warranted in turning a condemned criminal loose, and, as he can grant no new trial, this he must do or deny a pardon. The court need not discharge, but may put the accused again to trial. We can not believe that the power to pardon was meant to cover every case of an unjust conviction, where the accused had, without fault on his part, not availed himself of the right of appeal.

"If our statute provides exclusive remedies for the relief of an accused, then, of course, those remedies must be pursued, and our next enquiry is, are such remedies provided?

"There is the remedy by appeal; but this can not reach such a case as the one in hand. An appeal would have been unavailing.

"The record showed a confession; for, on the face of the record, such the plea appeared to be, and there were no objections or exceptions. It is evident that the statutory provisions concerning appeals in criminal cases can have no application to a case like this. Here

there were no errors committed in ruling on pleadings or in conduct-ing a trial. In truth, there was no trial, and in law no confession; for a confession, like any other act, extorted by violence or procured through fear, is without effect. If, then, there was in fact no trial, and in law no plea of confession, there was a condemnation without either a trial or a confession by plea. If it be correct to affirm that the plea procured by fear is of no effect, it inevitably follows that the sentence was pronounced where no hearing was had and no guilt acknowledged. It seems clear, therefore, that the statute concerning appeals is not applicable, and, if not applicable, then it can in no sense be exclusive of other remedies, if any such there are.

"There is the remedy by a new trial. That can have no application to a case where there was no trial. Again, it can not apply, because as the statute stood at the time of the appellant's sentence, the motion must have been made before judgment, and that, the record shows, would have been impossible in this case. No time intervened between the sentence and its execution. Once more, this remedy can not be meant for such a case as this, because the grounds for a new trial prescribed by the statute would not cover the wrong here committed, nor could it bring relief.

"It is obvious that a motion in arrest of judgment can not be ap-propriate, for the face of the record is fair, and in appearance all the proceedings are regular. A motion for a venire de novo is not a statu-tory remedy, but is a recognized one borrowed from the common law, and it, as is sufficiently obvious, can have no application.

"We find, then, no statute applicable, and consequently none ex-cluding other known and recognized remedies, if any such there are, not inconsistent with our constitution and laws.

"May we look to the common law? Our statute provides that, among other laws, 'The common law of England, and the statutes of the British Parliament made in aid thereof to the fourth year of the reign of James the First (except the second section of the sixth chapter of forty-third Elizabeth, the eighth chapter of thirteenth Elizabeth, and the ninth chapter of thirty-seventh Henry the Eighth) and which are of a general nature, not local to that kingdom,' and not inconsistent with the Constitution of the United States or of the State of Indiana, and not inconsistent with the national and State statutes, shall be the law of the State. It is plain that no provision of the common law which prescribes a remedy for relieving an accused, who has been forced to plead in confession by lawless violence, can be deemed in conflict with the Constitution of the State or nation; for both these instruments are explicit in their commands that all accused persons shall have a public and impartial trial, and shall only be condemned by due process of law. Nor is there any statute, as we have seen, which can be deemed inconsistent with a common law remedy which will reach a case like this.

"The common law did not authorize the granting of a new trial in

cases of felony. Rex v. Bertrand, 10 Cox C. C., 618; Harris Crim. Law, 406. The remedy of an accused in cases where the court erred as to a matter of law was a recommendation to pardon, signed by the judges, and this was granted as a matter of course. Reg. v. Murphy, Law R., 2 P. C., 535. The remedy, where there was an error of fact, was by a proceeding called a writ coram nobis. This was a very common remedy in civil actions, but was seldom resorted to in criminal cases. Although rarely used in criminal cases, we find it conceded by courts and writers to be an appropriate remedy in criminal prosecutions as well as in civil actions. Judge Cooley, in a note to Blackstone's Commentaries, says: 'In this chapter Sir W. Blackstone has considered only the modes by which a judgment may be reversed by writ of error brought in a court of appeal, and has stated that this can only be done for error in law. There is, however, a proceeding to reverse a judgment by writ of error in the same court, where the error complained of is in fact and not in law, and where of course no fault is imputed to the court in pronouncing its judgment. This writ is called the writ coram nobis, or coram vobis, according as the proceedings are in the king's bench or common pleas, because the record is stated to remain before us (the king), if in the former, and before you (the judge), if in the latter, and is not removed to another court. In this proceeding it is of course necessary to suggest a new fact upon the record from which the error in the first judgment will appear; thus, supposing the defendant, being an infant, has appeared by attorney instead of guardian, it will be necessary to suggest the fact of his infancy, of which the court was not before informed.' In the notes to Jaques v. Cesar, 2 Saunders, 100, the early English cases are cited, showing the scope, character and effect of the writ. The common law doctrine is also discussed in Bacon Abridg., title Error; Comyns' Digest, title Proceeding in Error; 2 Tidd's Practice, 1136; 7 Robinson Pr., 149; Stephen Pl., 118. It is recognized in many of the States as forming a part of the law; it is so held in Alabama, Holford v. Alexander, 12 Ala., 280; in Arkansas, Adler v. State, 35 Ark., 517; S. C., 37 Am. R., 48; in Iowa, McKinney v. Western, etc., Co., 4 Iowa, 420; in Kentucky, Meredith v. Sanders, 2 Bibb., 101; Duff v. Combs, 8 B. Mon., 386; Combs v. Carter, 1 Dana, 178; in Maryland, Hawkins v. Bowie, 9 Gill & J., 428; Kemp v. Cook, 18 Md., 130; in Michigan, Teller v. Wetherell, 6 Mich., 46; in Mississippi, Fellows v. Griffin, 9 Sm. & M., 362; Keller v. Scott, 2 Sm. & M., 82; Land v. Williams, 12 Sm. & M., 362; in Missouri, Galloway v. Nifong, 1 Mo., 223; Ex parte Toney, 11 Mo., 661; Powell v. Gott, 13 Mo., 458; in New York, Higbie v. Comstock, 1 Denio, 352; Maher v. Comstock, 1 How. Pr., 175; Smith v. Kingsley, 19 Wend., 620; in North Carolina, Roughton v. Brown, 8 Jones, 393; in Ohio, Dows v. Harper, 6 Ohio, 518 (27 Am. Dec., 270); in Pennsylvania, Wood's Ex're v. Colwell, 34 Pa. St., 92; in Tennessee, Hillman v. Chester, 12 Heiskell, 34; Patterson v. Arnold, 4 Cold., 364; Wynne v. Governor, 1 Yerger, 169 (24 Am. Dec.,

448) ; Crawford v. Williams, 1 Swan., 341; in Texas, Mills v. Alexander, 21 Texas, 154; Moke v. Brackett, 28 Texas, 443; Giddings v. State, 28 Texas, 732; and in Virginia, Reid's Adm'r v. Strider's Adm'r, 7 Grat., 76.

"It is declared to be a part of the judicial procedure of the United States, Pickett v. Legerwood, 7 Pet., 144; Strode v. Stafford, 1 Brook. (U. S. C.), 162; United States v. Plumer, 3 Clifford (U. S. C.), 1. In Pickett v. Legerwood, supra, it is said: 'The cases for error coram vobis, are enumerated without any material variation in all the books of practice, and rest on the authority of the sages and fathers of the law.' Our text writers agree in holding that the remedy exists, unless superseded or abolished by statute. Powell Appellate Proceedings, 107; Curtis Co., section 178; Freeman Judg., section 94. The author last named says: 'The writ of error coram nobis is not intended to authorize any court to review and revise its opinions; but only to enable it to recall some adjudication, made while some fact existed which, if before the court, would have prevented the rendition of the judgment, and which, without any fault or negligence of the party, was not presented to the court.'

"It is suggested in the argument of the counsel for the State that even at common law the writ coram nobis had fallen into disuse in criminal cases, and should not be regarded as part of the common law procedure. All of the cases which discuss the question treat the rule as correctly laid down in the books of practice, and they all agree in declaring it applicable to criminal as well as civil cases. In the celebrated and bitterly contested case of Regina v. O'Connell, 7 Irish Law, 261, note 357, the writ was allowed, and no question made as to the right of the accused to demand it. The case was carried by appeal to the House of Lords, where, after a stubborn fight, the judgment of the Irish court was reversed; but no doubt was intimated as to the right of Daniel O'Connell and his associates to sue out the writ. O'Connell v. Regina, 11 Clark & F., 155, opinion p. 252. In United States v. Plumer, supra, Judge Clifford examined the authorities with care, and held that the writ would lie in criminal as well as in civil cases (vide opinion, p. 59). It is true that the writ was denied in that case, not, however, because it was not a proper procedure in a court of competent jurisdiction, but because the court to which the application was made had no jurisdiction at all in criminal cases. In Adler v. State, supra, the writ was held to lie in a case in some of its features remarkably like the present. But we will not extend the discussion by commenting on the cases. A somewhat careful and full investigation has enabled us to find many cases affirming the right to the writ in both civil and criminal cases, where there is no statute abolishing or superseding it, but none denying that it exists at common law and in jurisdictions where there is no overruling statute.

"It is held in well considered cases, that, although there is a statute regulating proceedings in criminal cases, the writ is not abolished

unless the statute expressly or by implication abrogates it or supplants it by some other remedy. This is so held, with respect to writs coram nobis, by Marshall, C. J., in Strode v. Stafford, supra, and it is so held in Cooke, Petitioner, 15 Pick., 234. In speaking of the claim that the writ coram nobis can not exist under the statute, Cowen, J., said, in Smith v. Kingsley, 19 Wend., 620: 'There is no statute expressly and in terms repealing its power, nor any which does so by necessary implication. Mere silence or omission to regulate proceedings upon such a writ will not operate as a repeal. The power, therefore, remains as at common law, except as to the mere form coram nobis resident; because the fiction of the record remaining before the King himself, is gone. We therefore have lost the name of the writ, but nothing more. Camp v. Bennett, 16 Wend., 48.' This doctrine is in harmony with the well established principle that the statutory procedure blends with that of the common law. Mr. Bishop says: 'The statute must be construed by the common law and in harmony with it, and by the common law must its defects be supplied.' Statutory Crimes, section 366; Bishop Written Laws, section 142. This author also quotes with approval from our own case of Walker v. State, 23 Ind., 61, saying: 'Again, where the common law procedure has been to a greater or less extent superseded by statutes, "the old rules are," as observed in an Indiana case, "continued in force, not inconsistent with the criminal code, and so far as they may operate in aid thereof." ' There are many instances in which our court has resorted to common law methods of procedure where the statute is silent on the subject. Marcus v. State, 26 Ind., 101; Bell v. State, 42 Ind., 335; Hardin v. State, 22 Ind., 347; State v. Berdetta, 3 Ind., 185 (38 Am. R., 117); Wall v. State, 23 Ind., 150; Burk v. State, 27 Ind., 430. But it is useless to multiply citations; there are comparatively few criminal cases that do not contain some reference to common law principles. What, for instance, would be our situation upon the question of self-defense, if we could not look beyond our statute to ascertain what it is, and what the procedure is in cases where it is an essential element? In civil procedure the rule is firmly settled that there are cases where relief will be granted, although there is no specific remedy provided by statute. Bigelow Frauds, 170; 3 Whart. Crim. Law, 3222; Freeman Judg., section 99; Dobson v. Pearce, 12 N. Y., 156; Molyneux v. Huey, 81 N. C., 106; Jarman v. Saunders, 64 N. C., 367; Huggins v. King, 3 Barb., 616; Stone v. Lawman, 28 Ind., 97; Johnson's Adm'rs v. Unversaw, 30 Ind., 435; Nealis v. Dicks, 72 Ind., 374. That courts possess inherent powers not derived from any statute is undeniably true. Among these powers are the right to correct their records so as to make them speak the truth, to pass upon the constitutionality of statutes, to prevent the abuse of their authority or process, and to enforce obedience to their mandate. If it were granted that courts possess only such rights and powers as are conferred by statute, they would be mere creatures of the Legislature, and not independent departments

of the government.   They are not mere creatures of the Legislature, but are coordinate branches of the government and in their sphere not subject to legislative control.   Deutschman v. Town of Charlestown, 40 Ind., 449; Cooley Const. Lim., 114, 116; 2 Story Const., 377.

"It is our opinion that the courts have the power to issue writs *in the nature* of the writ coram nobis, but that the writ can not be so comprehensive as at common law, for remedies are given by our statute which did not exist at common law—the motion for a new trial and the right of appeal—and these very materially abridge the office and functions of the old writ.   These afford an accused ample opportunity to present for review questions of fact, arising upon or prior to the trial, as well as questions of law; while at common law the writ of error allowed him to present to the Appellate Court only questions of law.   Under our system all matters of fact reviewable by appeal, or upon motion, must be presented by motion for new trial, and can not be made the grounds of an application for the writ coram nobis. Within this rule must fall the defense of insanity as well as all other defenses existing at the time of the commission of the crime.   Within this rule, too, must fall all cases of accident and surprise, of verdicts against evidence, of newly discovered evidence, and all like matters.

"Duress not only avoids all acts, but it also relieves from responsibility for crime.   1 Archbold Crim. Pr., 52; 1 Hale P. C., 56; 1 East P. C., 70.   Necessity justifies many things as against an accused; it justifies the discharge of a jury, although the trial has been duly entered on, because of the illness of a judge or juror; it dispenses with essential averments in indictments.   1 Bishop Crim. Proc., 493; Bescher v. State, 42 Ind., 480; Mixon v. State, 28 Am. R., 695.   In Commonwealth v. Jailer, etc., 7 Watts, 366, a prisoner applied for a discharge under the provisions of a statute which entitled an accused to a trial or discharge at the second term of the court after his arrest.   He had been afflicted with smallpox, and was recovering, but as the report says, 'His aspect was so loathsome as to spread a general panic.'   The application for a discharge was refused, the court saying: 'There is no doubt that necessity, either moral or physical, may raise an invariable exception to the letter of the habeas corpus act.   A court is not bound to imperil life in an attempt to perform what was not intended to be required of it.'   If, as against an accused, the government may invoke the doctrine of necessity and compulsion, may it not be invoked by him for the purpose of relieving himself from a plea wrung from him by fear of immediate and violent death?   The assignment asked does not go to the extent of discharging without a trial, but the appeal is for relief from a plea of confession and for the award of an opportunity for trial.   The application of the appellant brings to the knowledge of the court a fact which, if known, would have prevented a conviction; and all the cases agree that where a new fact is suggested which would have prevented judgment, the accused is entitled to the writ coram nobis.   We can not conceive it possible—possible, we mean,

in a legal sense, and under legal principles—that a court, with knowledge that a plea of guilty is forced from a prisoner by fear of death, would imprison him for life without a hearing or trial.

"Duress is a species of fraud. Mr. Bishop says: 'The common law doctrine is familiar, that fraud vitiates every transaction into which it enters.' 1 Bishop Crim. Law, 1008. It is a principle of wide application, that a judgment obtained by fraud may be annulled. The fraud, however, must be as to some act in securing jurisdiction, or as to something done concerning the trial or the judicial proceedings themselves; the rule has no application to cases of fraud in the transaction, or matters connected with it, out of which the legal controversy arose. Bigelow thus states the rule: 'The fraud referred to must consist either in facts relating to the manner of obtaining jurisdiction of the cause, to the mode of conducting the trial, or to the connection of the judgment, or in facts not actually or necessarily in issue at the former trial.' Bigelow Frauds, 170. 'Fraud,' said DeGrey, C. J., in Rex v. Duchess of Kingston, 20 How. St. Trials, 355, 544, 'is an extrinsic, collateral act; which vitiates the most solemn proceedings of courts of justice. Lord Coke, says, it avoids all judicial acts, ecclesiastical or temporal.' There is, indeed, no diversity of opinion as to the effect of the fraud, for it is agreed on all sides, as stated by Mr. Freeman, in speaking of judgments, that 'Upon proof of fraud or collusion in their procurement they may be vacated at any time.' While there is entire harmony upon this point, there is some diversity of opinion as to whether a judgment can be collaterally impeached for fraud. Freeman Judg., sections 99, 132; Wiley v. Pavey, 61 Ind., 457. In his discussion of this subject Mr. Bishop says: 'In criminal cases there is no question, that, when fraud is practiced at the trial by the prosecutor, producing a conviction, a new trial will be granted on the prayer of the defendant.' 1 Bishop Crim. Law, section 1009. As against the accused the rule goes much further, for it is held that if the judgment of acquittal is obtained through his fraud it is an absolute nullity. 1 Archbold Crim. Pr., 352; cases cited in; 1 Whart. Crim. Law, section 546; 1 Bishop Crim. Law, section 1010; 3 Whart. Crim. Law, section 3222; Commonwealth v. Dascom, 111 Mass., 404; Commonwealth v. Alderman, 4 Mass., 477; Halloran v. State, 80 Ind., 586; Watkins v. State, 68 Ind., 427 (34 Am. R. 273). In the case under consideration the fraud, it is true, is not that of the prosecutor, but it is such a fraud as deprived the appellant of the constitutional right to a fair trial by an impartial jury, and surely this entitles him to some relief, and under the elementary maxim, that 'there is no right without a remedy,' there must be some power to grant relief, and some remedy by which it can be secured. The practice in cases similar to this is unsettled (we have found no case exactly like it) and we think that the rule indicated by Mr. Bishop is the correct one. 'When a proceeding,' says this author, 'is entirely fraudulent, having no sound part whatever, there is no collateral or direct effect to be given it; it

is as though it had not been; only a party to the fraud is not permitted to rely on this imperfection. But practically most frauds relate only to some particular . in the proceeding—not violating, therefore, the whole.' 1 Bishop Crim. Law, section 1011. The fraud in this case extends only to the plea and subsequent proceedings, and the appellant may, therefore, be rightfully put to trial upon the original indictment. . . .

"Judgment reversed, with instructions to vacate the judgment upon the indictment against the appellant; to permit him to withdraw the plea of guilty, and plead to the indictment; to put him upon trial in due form of law upon the indictment preferred against him, and for further proceedings in accordance with this opinion.

"The clerk will issue the proper orders for the return of the appellant."

Of course, it is not to be doubted that the writ of certiorari was a proper writ at common law. Under our statute, if there is no procedure provided, we are then relegated to the common law for rules of procedure. See White's Ann. Code of Crim. Procedure, article 26. There are other rules or matters of procedure at common law that may perhaps be as equally efficacious as the writ of certiorari such as the writs coram nobis, coram vobis, and other writs, but that does not limit this court under its jurisdictional authority to either or anyone of these writs. Its jurisdiction may be exercised under the authority granted in the Constitution and provided by article 26, supra, by resort to any writ, "affidavit or otherwise" to exercise its jurisdiction. In this case the writ of certiorari has been invoked in connection with the writ of habeas corpus. Resort to the writ of certiorari to bring up records, or to perfect records in this court, is a very usual and most common practice. This writ is continually granted for these purposes, and has been during the present term of the court in several instances. This has been the rule in Texas in its history at all times as shown by statute and decisions. It has been used in this State for the purpose of setting aside void judgments, and even for the purpose of nullifying judgments obtained for the nonobservance of fundamental rights. A case in point is Burns v. LaGrange, 17 Texas, 415. In that case Burns was tried and convicted in a municipal court without a jury for violating a city ordinance. The court held the certiorari was a proper proceeding, entertained the case, and set aside the judgment. A similar holding is found in Collan v. Wilson, 127 U. S., 540, which was a habeas corpus proceeding.

In this case the conjoining of the two writs, habeas corpus and certiorari, have been employed or sought to be employed. If this should prove ineffective, resort to any or all other writs can be and ought to be had if necessary to a proper administration of justice as known to the rules of law either constitutional or statutory. I do not purpose here to digress to a discussion of the difference between justice, that is justice in the abstract as compared with justice under a due and proper

administration of justice under the rules of the law.  Duncan v. Magette, 25 Texas at p. 245.  This distinction may be as broad as that to be observed between the actions of mobs on one hand and the procedure under the proper administration of law in all well ordered courts on the other hand.  This distinction permeates all organized governments, and is the fundamental basic principle of all constitutional and statutory law in our form of government.  The appellate jurisdiction of this court is usually exercised by giving notice of appeal in the trial court, and have notice entered of record there, but this may not be, and is not the only manner in which the jurisdiction of this court may be invoked.  The Constitution expressly otherwise provides.  This has been recognized in the history of our jurisprudence.  The accused is not legally bound to appeal his case.  He may do so if he chooses.  The matter is lodged in his discretion.  Nor can he be deprived of that right by the act of others.  It is beyond the authority of the court to prevent it.  Concert of action of those in authority can not place him where or surround him with circumstances under which he can not exercise it.  Mob violence or threats to take his life or do him personal injury can not deprive him of such right.  "Duress not only avoids all acts but it also relieves from responsibility.  1 Archbold Crim. Pr., 52; 1 Hale P. C., 56; 1 East P. C., 70."  That duress was present in this case at the time of, just before, and just after the sentence is so clearly shown it may be said to be indisputable.  Not only so at that stage of the case, but from the beginning of the court it is shown by every act, ruling and order of the court throughout the different stages of the trial.  The judge's reasons for his acts and rulings show beyond any cavil that from his first appearance at Pecos City until he sent the prisoner away to Midland, after passing sentence, manifests the dangerous presence of the mob, and the judge's conviction of the danger to the prisoner.  The facts coming from the judge by reason of these acts and orders, his own testimony, the acts and words and conduct of the crowd gathered about and around his court, and especially as it surrounded appellant's counsel when they were breathing out threats to hang appellant and his counsel if notice of appeal was given, the presence of the crowd in the courthouse at the time of the presentation of the motion for new trial and passing of sentence; the failure of counsel to give notice of appeal under facts already stated, the sending of the prisoner away as soon as possible after the sentence, all show the imminent danger and the pressing duress to and upon the prisoner, as well as to his counsel, which must have been known to and recognized by the judge.  If testimony can show danger of death and mob violence, it is in this record and practically undisputed, and if duress can be shown, it is here manifest.  He may be guilty as the crowd thought and as the judge believed, yet that is no answer as to his right to have his case reviewed on appeal.  Duress may be proved by positive evidence, as shown in this record, or it may be as well shown by circumstantial evidence.  The facts justi-

fied the prisoner and his counsel in not giving notice of appeal, if it
should be conceded that he did not ask the court to enter such notice.
The law does not require the prisoner to be hanged as a prerequisite to
exercising his right of appeal. Hanging would be a positive defeat of
the very right. The right of appeal would not then be of any prac-
tical benefit to the defendant, and worse than useless and absurd legally.
In the nature of the case the prisoner having been deprived of his right
of appeal under pain of death to himself and his counsel, either or
both, the law does not leave him without remedy. The ·Constitution
and the Legislature confer authority upon this court to resort to any
and all writs known to the common law, if statutory remedies have
not been provided. The rights at common law under article 26 of the
Code of Criminal Procedure then become statutory remedies in Texas.
The writ of certiorari was and is a well known rule of procedure both
in Texas and at common law. Burns v. LaGrange, 17 Texas, 415;
Moore v. Hardison, 10 Texas, 467; Timmons v. Lacy, 30 Texas, 116.
A similar holding was had in Callan v. Wilson, 127 U. S., 540; Ex
parte Anthony, 5 Pike, 359; Hays v. Pope Co., 5 Pike, 308; Walpole
v. Ink, 3 Ohio, 143; Bob, a slave, v. State, 2 Yerg., 173; Ex parte
Tarlton, 2 Ala., 35; O'Bryan v. Dunn, 5 Texas, at page 577. The
case of Timmins v. Lacy, supra, is a well considered case, and shows
beyond any question that in this State the writ of certiorari is a
familiar procedure by which jurisdiction is exercised. See also Hail v.
Magale, 1 Texas App. Civil, 490; Sheldon v. San Antonio, 25 Texas
Sup., 178; Smithwick v. Kelly, 79 Texas, 564. It can also be used as
a direct proceeding to set aside a judgment. Linch v. Broad, 70 Texas,
92; Adoue v. Gonzales, 22 Texas App., Civ., 73, 54 S. W., 367. Sick-
ness or calamity preventing an appeal has been held a ground for re-
lief by certiorari. Ahrens v. Giesscke, 9 Texas, 432. A party need
show no merit to be relieved by certiorari against a void judgment or
one without jurisdiction. Short v. Ramsey, 18 Texas, 397. · Returns
and affidavits are proper to be considered on hearing for certiorari.
Aycock v. Williams, 18 Texas, 393; Jones v. Nold, 22 Texas, 379;
Kechring v. Schneider, 60 S. W., 277; Constitution, article 5, section 5.

Under this last statement, that is, in regard to returns and affidavits
being proper to be considered on hearing for certiorari, will say that
this is common practice in this court to perfect records or to bring up
matters that are omitted parts of the records in court below, but omit-
ted from transcripts here, and this writ of certiorari can be made
available whether the case is one on habeas corpus or on appeal, and
it is the universal practice in this State whenever it becomes necessary
to do so, to use writ of habeas corpus and writ of certiorari conjointly.
This seems to be the practice almost universally. 11 Cyc., 915 and
916; Ex parte Yearger, 8 Wall., 85 (U. S. Sup. Ct.); Armous v.
Com., 6 Serg. & Rawle., 245. Lack of rules of procedure is of small
consequence, .in fact no consequence, when it comes to exercising juris-
diction by certiorari. 11 Cyc., 801-813. Certiorari may be allowed

for the refusal to allow an appeal or a refusal to approve an appeal bond, or where an appeal is improperly dismissed, or a special appeal is overruled. 6 Cyc., 762. Certiorari is. allowed where one has lost his right of appeal through matters beyond his control. 6 Cyc., 762-763 (d), and certiorari also lies where a right has been lost through fraud, contrivance or culpable conduct of the adverse party, or in case of illness, death or calamity. 6 Cyc., 765. Certiorari is also available where a party has lost his right of appeal through the act of the judge where the defendant is guilty of no laches. 6 Cyc., 764. It is also correct that matters dehors the record are admissible for the purpose of showing the loss of the right of appeal, and other writ and affidavits may be used for this purpose. This is expressly provided by the Constitution. Article 5, section 5; Harris v. Hopson, 5 Texas, 529; 6 Cyc., 769, 790, 828, 830, 831, 827; Walton v. Pearson, 82 N. C., 464. See also 6 Cyc., 823, 819 to 822, 826, 827, 828, 830, 831. A common practice in this court is to resort to the writ of habeas corpus where there is want of jurisdiction in a lower court, or where the judgment of such court is void. This is authorized wherever the trial court was without jurisdiction of the subject matter, of the person, or has rendered a judgment on the facts which ought not to have been rendered under such state of facts. Ex parte Degener, 30 Texas Crim. App., 566; Goodfellow v. State, 53 Texas Crim. Rep., 471; Ex parte Garza, 50 Texas Crim. Rep., 106; Ogle v. State, 43 Texas Crim. Rep., 219; Ex parte Taylor, 34 Texas Crim. Rep., 591; Ex parte Kearby, 35 Texas Crim. Rep., 634; Ex parte Wilson, 39 Texas Crim. Rep., 630; Ex parte Duncan, 42 Texas Crim. Rep., 661. This rule has been followed invariably since the rendition of the Degener case, supra. The writ of certiorari is the common, usual and almost invariable procedure to bring before this court records where the jurisdiction has attached and the records are incomplete, or when it is deemed proper to bring up proceedings from the lower or trial court. This practice has been used during the present term of this court and within the last month. That the two writs—habeas corpus and certiorari—may be conjoined is evident from what has been said already under the usual practice in this State and in the Federal courts. Ex parte Yearger, 8 Wall. (U. S. Sup. Ct.), 85; 11 Cyc., 915, 916; Armous v. Com., 6 Serg. & Ralle, 245. This is expressly authorized by the Constitution of this State. Article 5, section 5.

Duress having prevented the giving or the entry of notice of appeal, did not oust the jurisdiction of this court, and its jurisdiction can be asserted by any means or rule of procedure provided by statute, and in the absence of statutory provision, then by any procedure known to common law and this is the rule under the terms of the Constitution. From this viewpoint this court is not only authorized to issue the writ of certiorari and habeas corpus, but under the facts and the record disclosed here would be recreant to the high trust conferred and high duties involved and imposed upon it by the Constitution and statutes

of the State, if it failed to do so. Again, after notice of appeal is given and entered of record, the trial court would be powerless to pass sentence of death upon the prisoner, and if done under such circumstances such sentence would be void for want of jurisdiction. See cases already cited. Notice of appeal in that instance would oust the trial court of all further jurisdiction until the Court of Criminal Appeals had disposed of the prisoner's appeal and the mandate had been sent down. Duress being sufficient to justify or excuse accused from giving notice of appeal, he stands in the same relation as his case would stand if the notice in the first instance had been given and duly entered, for duress not only voids all acts but also relieves from all responsibility for crime. The case from this attitude authorizes either writ or both writs, habeas corpus and. certiorari. The sentence being void on account of duress, authorizes and demands relief by habeas corpus, and the case would stand as if notice of appeal had been entered of record, so far as attaching the jurisdiction of this court is concerned. The sentence being void, the writ of habeas corpus was authorized, justified and required. Certiorari may and can be made effective as an original proceeding to bring the case before us on appeal when notice of appeal has been given, if record is not sent up. Duress which would prevent notice of appeal does not oust this court's appellate jurisdiction and such writ would be equally as effective to bring up the record. The refusal of judges to permit such entry, or overpowering mob influence and threats, can not vacate the jurisdiction of this court, nor can it constitute a waiver or failure to give notice on the part of the accused. So far as the law is concerned, the notice is given and will attach the appellate jurisdiction of this court, and the certiorari is the old time and familiar procedure to bring the case before the court. The citizen may not and can not be deprived of his right of appeal by the unwarranted or illegal acts of others, though the acts be those of courts, judges or mobs. Appellant, though a Mexican, and a citizen of a foreign country, is entitled to full protection of the laws of this Republic, State and Federal, as though he was a native or naturalized citizen of this State, or the Republic of the United States. This is guaranteed by our State Constitution and laws. It is vouchsafed by the treaty between the United States government and the Republic of Mexico. It is called for by the treaty of peace and comity and the rules of international law which governs the treaty between the two countries on those subjects. It is vouchsafed by the dictates of common justice, controlled by rules of law, and must be enforced under rules of fundamental justice. The law of the land, due process of law, ought to be held to be supreme in this State rather than the dictates of lawless crowds and violent mobs.

Another phase of the case from the standpoint of duress in depriving defendant of his legal rights in connection with a denial of appeal should be noticed. The application for certiorari filed November 3, 1911, and considered by this court on the trial of and in connection

with the writ of habeas corpus, alleges deprivation of the legal rights under the rulings of the trial court considered in regard to failing to obtain bills of exception and statement of facts. By being deprived of the right of appeal, he did not secure bills of exception to the admission of evidence he deemed hurtfully illegal, nor was there a statement of facts obtained and filed in the trial court. In regard to the question of duress as applicable to the question of confession to which objection was urged in the trial court, it is shown that appellant was arrested for the homicide, and was in charge of a very considerable crowd of citizens of the county, and a confession was sought to be drawn from him. He protested his innocence, and it was suggested by Mr. Mayfield, a member of the crowd, that if he did not make a confession they would hang him. He requested them to let him see his mother and father, Mayfield said, No, you are not worthy of it. When the sheriff came a confession was extorted from him while under arrest. This confession was made to the sheriff on a promise by the crowd not to hang him until the sheriff should come. This, however, was not used upon the trial except in part. The defendant was carried thence to the county jail. There he was kept until the next morning when the judge ordered him to be carried away to Midland. So far as this record is concerned, he saw no one and talked to no one except the district attorney, and it may be the jailer. The district attorney went to his cell and procured from him a confession. This was on the morning after the arrest. The body of deceased was found the day before this confession was made to the district attorney. This confession was introduced in evidence, and to the introduction of which exception was reserved. Among other things, the crowd that surrounded and threatened the lives of counsel as well as their client also denied applicant the right to have "the questions of law passed on by the Court of Criminal Appeals." This is shown by the evidence of Judge Parker, and his statement, as I understand this record, is not controverted, nor is duress denied from any source, as I understand the evidence. Under this state of facts applicant was denied, through the illegal acts of others, the right to have a statement of facts and the bills of exception reserved to admitted testimony, become a part of the record. Where this is shown the invariable rule in this State is to reverse the judgment to the end that the accused may have his case passed on by the Appellate Court in the light of the true record and correct transcript of the proceedings and rulings had upon the trial. This is done that the citizen may have such fair and legal trial as is guaranteed by our Constitution and the laws of the State and whenever and wherever the convicted party has been deprived of his legal rights by the acts of others, or by no fault or negligence on his part he is entitled to a reversal. This rule applies with especial force to such conditions as deprive him of his statement of facts and bills of exception. Trammel v. State, 1 Texas Crim. App., 121; Ruston v. State, 15 Texas Crim.

App., 336; Ruston v. State, 15 Texas Crim. App., 377; Johnson v. State, 16 Texas Crim. App., 372; Henderson v. State, 20 Texas Crim. App., 304; Sara v. State, 22 Texas Crim. App., 639; Bryans v. State, 29 Texas Crim. App., 247. The cases are so numerous sustaining this rule it is deemed unnecessary to cite others; however, I will cite the cases of Edwards v. State, and Parker v. State, decided at the present term of this court. Affidavit has always been held a proper practice proving these deprivations of rights, and constitutes one of the means of ascertaining the conditions of the record in regard to these matters. This is not exclusive, however; that it is not the fault of the appellant in regard to these matters may, however, be shown "otherwise." The objective point in all such matters is the truth, and if it is shown the appellant has been deprived of his bills of exception and statement of facts, either or both, without fault on his part, a reversal will follow. This is but one of the simplest rules of ordinary justice. This is the rule as well in the Federal court, and it applies also in those courts in a habeas corpus proceeding, and necessarily it would apply under the writ of certiorari. Ex parte Royal, 117 U. S., 241; Ex parte Virginia, 100 U. S., 339; Yick Woo v. Hopkins, 118 U. S., 356, 373 to 374; Ex parte Siebold, 100 U. S., 371; Virginia v. Rives, 100 U. S., 313; Ex parte Clarke, 100 U. S., 399; Removal Cases, 100 U. S., 457; Strauder v. West Va., 100 U. S., 303; Tenn. v. Davis, 100 U. S., 257; Callan v. Wilson, 127 U. S., 540. The denial of the evidence or bills of exception is a denial of one of the most substantial legal rights of an accused person.

The duress in this case, so far as a confession is concerned, began with the arrest of defendant. When importuned for a confession at the time he was arrested he stoutly denied his guilt. Surrounded by an excited crowd Mayfield demanded of him that he confess under threat of death penalty by hanging then and there. Defendant asked to see his father and mother. Later on the sheriff came, and under these circumstances applicant made an oral confession to him. This, however, was not admitted on the trial for the reason I suppose that it was not in writing as our statute requires. Code Criminal Procedure, article 790. The details of the surrounding circumstances, acts and statements of the enraged multitude is not thought necessary to repeat. Thence he was taken to the county jail and placed in confinement. That he had no friends is evidenced by the facts, the feeling against him being so acute that the witnesses stated that "one hundred percent of the people believed him guilty." That he had no counsel at the time of the written confession is made evident by the testimony of District Judge Isaacks, as well as by the evidence of his subsequently appointed counsel, Judge Parker. He was placed practically "incomunicado." He was in jail in charge of the sheriff, or his jailer. The sheriff is also identified as being one of the crowd present when they surrounded Parker and Estes at the time their lives were threatened, and a promise extorted from Parker that an appeal would not be

consummated. The only communication revealed by this record between appellant and anybody after he was placed in jail, and before he was carried to Midland, was had with the district attorney, and at the time the district attorney obtained the confession which was used· as evidence on the trial before the jury. From that time until he was brought back for his trial Friday morning he was beyond hope or possibility of conferring with his counsel. A distance of one hundred miles separated them, and appellant it seems was not aware of the fact that he had counsel, for counsel was not appointed until after Judge Isaacks sent him away from Pecos City. This confession may have been entirely inadmissible. Without the bill of exceptions we are unable to say what would have been the conditions surrounding its introduction, or its having been signed. Without this confession and the agreed statement of facts adduced on the trial before this court, and forming a part of this case, there is very slight evidence to show guilt, if in fact there is any that would justify a verdict. A few horse tracks, and perhaps a few human foot tracks constitute the main additional facts. The foot tracks are not shown by the evidence to have been made by defendant, and, so far as the record goes, it was not even undertaken to connect the tracks on the ground with defendant's feet. The horse tracks are not shown to have been made by an animal ridden by defendant outside of a statement by the sheriff that appellant admitted riding the horse, but this confession was made while he was under arrest, was an oral unwarranted statement, and while in charge of the sheriff. There was no attempt to show this statement was voluntarily made. Such confessions under our Code Criminal Procedure, article 810, are inadmissible.

In the case of Flagg v. People, 40 Mich., 706, the prisoner was put in jail and shackled, thence he was carried to the office of an attorney and behind bolted doors was told the best thing he could do was to confess. The confession was written out and signed by him. The court reversing the case on the ground of duress, said: "Legally and morally a more serious offense was committed in the efforts to extort a confession than the respondent was guilty of, even if his confession was true, as it was a perversion of the process of the law, a poisoning of the foundation of justice." The facts show in this case the defendant was in jail, under the circumstances heretofore stated, fresh from the threats to hang him by the crowd at the time he was arrested if he did not confess. He was placed in jail without friends or advice prior to or at the time of the confession, and what was said to him outside of the face of the written confession is not disclosed by this record, or by any witness who testified. The district attorney took the confession in the jail, but it does not show that anybody was present except himself and the prisoner. We understand, as a matter of course, that the jail doors were securely closed and bolted. The district attorney does not show the surrounding circumstances at the time or what was said and done by him, or what inducements were or were

not held out by him to induce the confession, if any. When the deprivation of appeal came, the bills of exception were not prepared, and could, therefore, not be a part of the record. There is no legal way to secure these bills under the above condition. The statement of facts was not prepared and filed in the trial court, nor were bills of exceptions. The defendant, it is evident, was under duress of body and mind from the time of his arrest until the sentence was passed on him on Saturday evening. This is not a question of doubt from this record. In addition to this, the defendant was a boy, a minor, and legally under the guardianship, care and control of the court. The rights of minors have always with our people and under all of our laws and system of jurisprudence been placed more particularly under the strictest guardianship and care of the court. The courts have been required to look more carefully to the rights of minors and to protect them from wrongs. We deem it unnecessary to cite authorities. It is so thoroughly engrafted into all of our system of jurisprudence that it is known of all intelligent men.

With reference to the confession, in Paris v. State, 35 Texas Crim. Rep., 82, this court held that if the confession was not freely and voluntarily made it could not be used, and a failure to charge that if the confession was not freely and voluntarily made and without fear or duress, constituted reversible error, without bill of exceptions or requested instructions by the accused. It was also held that when the facts were not disputed, their legal effect became a question of law, and should be determined as such question as to "due process of law" and "the law of the land." The most liberal construction for the State ever placed on article 723 of White's Code of Criminal Procedure in any opinion was by Judge Henderson. He was also the writer of the opinion in the Paris case. With all the liberality placed on that article in favor of the State, it was not sufficiently liberal to prevent the reversal in the Paris case for the reason stated. It was held that the error "was calculated to injure the rights of the defendant."

2. Another proposition is asserted and urged rather strenuously, that is, that the purported special term of court was not legal and was not in compliance with the statute. Without restating facts already mentioned in the previous portion of the opinion, it may be advisable here to state the record shows that Judge Isaacks wrote out what he termed his order calling the special term. This order was written either on July 24 or July 25. There are several transcripts brought up from the trial court showing these matters, and they are in conflict as to the two dates. None of the transcripts indicate that any notice was either ordered by the judge or given. The orders recite the fact that he called a term to meet on July 24 at 2:00 p. m. One of these orders was dated July 25 calling the term for July 24 at 2:00 o'clock p. m. One of them is dated July 24 reciting the fact that he called the court to meet on that date at 2:00 o'clock p. m. These conflicts are not explained, nor sought to be explained. In regard to the notice

given of the calling of the term, if in fact it may be called a notice of any sort, the following is shown by the oral testimony of Judge Isaacks on the trial of the habeas corpus before this court: "Q. The convening of the court was the only notice given of the special term, was it not? A. The spreading on the minutes. Q. You simply issued the order convening the court? A. Yes, sir; had the clerk spread it upon the minutes of the court and notify the sheriff that court was in session. Q. What was the purpose of the haste in convening this special term? A. Because murder had been committed and I deemed it wise to find the murderer if possible and have him punished as speedily as might be in accordance with law. Q. For what purpose did you deem it wise? A. Because I think crime should be punished as speedily as possible."

These orders make it manifest as does the entire record that the term was called only and exclusively for the purpose of indicting and trying this applicant. This is emphasized by the oral testimony of Judge Isaacks. Judge Isaacks also testified that other serious murders had been committed in that county, but this is the first instance in which he had ever ordered a special term of the court, or ordered that a prisoner should be carried away from the county for safety, or to avoid the mob, and it is the first instance of calling a special term of court for the purpose of speedily trying a murder case in the history of the 70th Judicial District over which he now presides and has presided since the creation of the district. It is apparent from this record that no notice was given by the judge of the convening of what he calls a special term of court. Our statutes, articles 1113 to 1116, inclusive, Revised Civil Statutes, require that notice shall be given of the calling of special terms of court. The Act of 1905, enacted for the purpose of amending the previous Acts, in nowise conflicts with the former statutes in regard to this question. The later Act authorizes notices to be given in vacation, whereas the former Act requires it to be given in term time. There are but three cases decided by this court undertaking to construe these Acts of the Legislature. McIntosh v. State, 56 Texas Crim. Rep., 134; Young v. State, 49 Texas Crim. Rep., 541; and Ex parte Boyd, 50 Texas Crim. Rep., 309. The question of necessity for giving notices did not arise in either of those cases, and could not have arisen for the simple reason that notice was given in each case of the convening of the court, specifying the time and place. In two of the cases the special term was held only for the purpose of pronouncing sentence upon the accused—Young's case and Boyd's case. In each case the accused had been convicted of murder. The cases had been appealed, the judgments affirmed, and the mandates had been certified to the trial court. Special terms of the court were called only for the purpose of pronouncing sentence against the parties. Under that condition of the record there was no issue to be tried by the court, save with the possibility that there might be some reason suggested why the sentence of the law should not be pronounced, but in any event notice

was given in each case, specifying the time and place at which the sentence would be pronounced. In McIntosh case the defendant was tried for and convicted of murder. Notice of special term was given by posting same at courthouse door as well as publishing in newspaper. In the instant case no notice of any sort was given.

It is universally conceded in each of the States and the Federal government, that it is essential to due process of law that a person whose life, liberty or property is to be affected must have notice that he is being proceeded against, and he must be given an opportunity to be heard.

Furthermore, if ample time to prepare defense is not given there is no due process of law and the judgment is a nullity, and also failure to allow such time is an abuse of discretion. State v. Collins, 29 So., 180; 81 American, 150; 104 La. Ann., 530; Helton v. Commonwealth, 87 S. W., 1073; Hensley v. Same, 74 S. W., 677.

Nor is it necessary that a motion for continuance be made in order for a person to claim that due process of law required that he be given reasonable time to prepare his defense (State v. Scott, 34 So., 479; 110 La. Ann., 369); when such time is not given the judgment is void.

In the Helton case, supra, twelve days was declared by the court as insufficient time to prepare a defense in a murder case. In the Hensley case, supra, five days was held to be too short a time in which to prepare defense in a murder case. Yet in the case at bar, inside of seven days after the offense was committed and inside of six days after the defendant was arrested, a special term of court had been convened and the defendant had been taken a distance of one hundred miles for safety on one day and returned that one hundred miles on another day and tried, convicted, and sentenced to death.

This is so fundamentally true that no lawyer or court would for a moment deny the proposition. If a man is not legally informed of the fact that there is a case against him pending in court, a judgment against him would be a nullity. If he had no notice whatever that a term of court was being held in which proceedings were had or to be had concerning his rights, a judgment rendered against him in such proceeding would be equally void. We have had terms of court fixed by statute since the days of Henry V. Mills v. Com., 13 Pa. St. (1 Harris), 627. Terms of court have always been fixed by the legislative department, and such terms when so fixed are called regular terms. These terms of court being created by legislative Acts, the world takes notice of them, and the courts have judicial information of them. If, therefore, a man had a case pending in court, he is held to have knowledge of the law which fixes the time when his case can or will be reached, or as is usually the case, at the next general term of the court. These general terms are, therefore, specified, and by due diligence he can ascertain when his case is to be tried, and these general terms are fixed by legislative acts. In the absence of statute, the weight of authority is that the court can not prolong its terms or hold special

terms in all of those jurisdictions where there are general laws and general terms of the court. Wightman v. Karsner, 20 Ala., 446; Flanagan v. Borg, 64 Minn., 394; Mills v. Com., 13 Pa. St. (1 Harris), 627; Atkinson v. State, 122 Ala., 95; Archer v. Ross, 2 Scammon (Ill.), 303; United States v. Melbourne, 4 Cranch C. C., 552; Commercial Bank v. Galloway, 6 Howard (Miss.), 515; Reams v. Kearns, 45 Tenn. (5 Colwell), 217; Stephens v. People, 38 Mich., 739; United States v. Cornell, Federal Cases, 14868.

An indictment returned at a term not authorized by law, and all acts at that term are nullities. Brewer v. State, 39 So., 927; Hall v. State, 30 So., 422; 130 Ala., 45. If therefore a case is filed against a party and he notified of it, whether by service of civil or criminal process, he in that case being construed to know the law, knows when proceeding will be taken in that particular case against him, i. e. the next regular term, but with a special term the rule is entirely different. Unless there is some sort of notice given showing when the particular case is to be tried, neither the party nor the general public can ascertain anything about the sitting of the court, if it be in the power of the judge to convene such term without notice. See Butcher v. Brand, 6 Iowa, 235. It is believed to be the almost universal rule of law in these States, that where a special term of court is to be held under order of the judge, that notice thereof must be given in some form of publication either by notices posted or by newspaper publications, or both. This is the rule for the reason that it would be depriving a party of his rights without due process of law if he were to have his case disposed of by the court and the court having given nothing but instantaneous notice of the holding of the term. In the case at bar the applicant was in jail at Midland when the order of Judge Isaacks was supposed to be spread upon the record in Pecos, a distance of one hundred miles. There may be some doubt, when these conflicting transcripts are compared, when this order was written and entered upon the minutes, but one thing is not uncertain, but emphatically is certain, that is, the prisoner did not have access to the court until after the indictment was found and until the day of his trial, and had no opportunity to object to any of the steps that were taken against him to his great injury prior to his being brought back Friday morning from the Midland jail. The appointment of counsel for him by the judge took place after the indictment was found, yet in this case it is apparent from the evidence that "one hundred percent of the people" of Reeves County had prejudged his case and found him guilty before the indictment was returned. The jury commissioners were appointed to select the grand and petit juries in his absence, the grand jury was empaneled in his absence, he then being, as before stated, in the Midland County jail, one hundred miles distant, and being then even without counsel. It was impossible for him to make a challenge to the array of grand jurors, or to any one of them on account of their prejudice against him. The right to challenge the en-

tire grand jury or any particular member of it in a case of this character is unquestioned, yet the defendant neither had counsel nor an opportunity to object to any or all of said grand jurors. Lack of counsel under circumstances destroys due process of law. See Miller v. U. S., 57 Pac., 836. Had he been in the Pecos County jail where the alleged court was in session, he could at least have had his request recognized by the court to be brought before the court when the grand jury was being impaneled, but Judge Isaacks had rendered this impossible by separating him a distance of one hundred miles from where he was impaneling said grand jury. This was one of the results of the calling of the special term without publication of notice. Nobody knew nor could they know that the judge was going to hold a special term at some specified time except those who perchance were told by him or who happened to be at the courthouse when the judge came in to start the special term of court. Judge Isaacks' oral testimony manifests the fact that he did not give notice. He states that he ordered the clerk to spread his order upon the minutes of the court and notify the sheriff. Just why the sheriff was notified and no one else is not explained. The court was called exclusively for the purpose of indicting and trying the applicant. He seems to have been the only interested party in the performance that was then being enacted and to be enacted, and yet the judge sent him so far away that it was a matter of impossibility that he could know or that he did know anything about it, or what was going on about the court. Many cases hold that the question of holding court out of proper time is jurisdictional, and consent can not confer jurisdiction. Mills v. Com., supra; Atkinson v. State, 122 Ala., 95; Reams v. Kearns, 45 Tenn. (5 Colwell), 217. But we deem it unnecessary to cite authorities on this proposition. The record should and must show on its face all the facts, that is, all the essential things to the holding of a special term of court, and this includes the notice. Atkinson v. State, 122 Ala., 95; Flanagan v. Borg, 64 Minn., 394. The right to a public trial by an impartial jury as guaranteed by the Constitution can not be taken away by legislation. Stephens v. People, 38 Mich., 739. This should equally apply to a prejudiced grand jury, for it is a substantial right for the defendant to be present at the time the grand jury is impaneled. The statute guarantees him the right to be present if he desires to be, and it is held, and legally correct, to deprive a person of any substantial right is illegal, and to deprive him of a substantial notice so that he and his counsel are not present or can not be present, is a violation of the due process of law and of fundamental justice.

That special terms of the court may be held, if properly organized, is justified by the terms of the Constitution under valid acts of the Legislature, but this authority is not guaranteed under the idea of its being arbitrary or autocratic, nor is such a construction to be placed on this provision of the Constitution which would authorize a judge to despotically use such authority to oppress the citizenship of the State.

The authority to hold special terms of the court must be in accordance with fundamental justice, and it must be with due deference and regard to the legal rights of our people.   To hold that a judge can hold a special term of court without any notice to the parties to be affected by it either where the case is pending, or where they are to be instituted during the special term without notice of the fact that a term will be holden, would be to inaugurate in these latter days that relic of oppression and tyranny known as the "Star Chamber."   Our Constitution and the acts of the Legislature should not receive such construction as would bring about such result.   Such construction should be placed upon constitutional provisions and statutory enactments that do not lead to injustice, wrong and oppression.   Such rules of interpretation should be adopted and enforced as will insure to our people what the Constitution and frame work of this government intended should be—fairness of trial in a public and open manner, and with due notice before their lives, liberty and property are sought to be taken.   This was clearly not done in the trial of applicant before the lower court.

3.   It is urged that this conviction is violative of the fourteenth amendment of the Constitution of the United States, which provides that no State shall deprive any person of life, liberty or property without due process of law, or deny any person equal protection of the law. It is also insisted that the conviction is violative of international law as well as contrary to and against the provisions of existing treaties between the United States and the Republic of Mexico, to wit: the treaty of March 24, 1908, article III (U. S. Document No. 5, Sixty-First Congress, Second Session, 1909-1910, volume 47, the same being volume 1, page 1205 of Treaties and Conventions), and the treaty of Guadalupe Hidalgo (id. page 1107, articles I and XXVI).   These treaties are necessarily binding obligations on the high contracting parties, and, therefore "the supreme law of the land," by explicit terms of article 6, section 2 of the Federal Constitution.   That article and section reads as follows:   "The Constitution and laws of the United States which shall be made in pursuance thereof and all treaties made or which shall be made under authority of the United States shall be the supreme law of the land, and the judges in every State shall be bound thereby, and anything in the Constitution or laws of any State to the contrary notwithstanding."   This language would seem all sufficiently explicit and mandatory to need no explanation, and require no explanation, and it would further seem to require strict observance at the hands of all courts, State and Federal, as well as all departments of the governments, State and Federal.   The judiciary, whether State or Federal, is bound in trial of cases where questions arise under treaties or international law to take cognizance of and consider such questions.   These questions must necessarily be decided in accord with and under the requirements of the provisions of existing treaties and principles of international law.   These treaties constitute a part of

the supreme law of the land, and are expressly declared to be superior
to State Constitutions and laws if there should be a conflict.   These
provisions are binding upon State courts and all departments of State
government.   It is, therefore, the duty of the judiciary of the State
to enforce the provisions of treaties and rules of international law in
accordance with the spirit of the treaties or the rules of international
law when occasion demands, and in doing so will be guided by the
interpretation thereon placed by the Supreme Court of the United
States.   It is, however, the case, and has been in our history, that these
questions have also been construed and enforced by the political de-
partments of the Federal government, usually through the medium of
diplomatic relations.   The interpretation thus placed on treaties and
international law have been regarded as binding and correct.   The
political as well as the judicial department have at all times been
controlled and actuated by strict adherence to fairness and upright-
ness in dealing with the citizenship of other nations when their rights
either of life, liberty or property have been at issue, either in courts or
other departments of our government.   This has been the idea or the
rule which has actuated and controlled departments of our government
whether the questions arose under the terms of treaties or rules of
international law.   It has at all times been insisted by our govern-
ment for her citizens that they shall have fair trials under the laws
of nations when they are being tried or their property or lives are
affected in the foreign governments, and our government in all of its
departments have conceded the same fairness to the citizens of other
nations when brought before governmental department in any matter
affecting life, liberty or property.   We have demanded this at the hands
of other nations, and with equal fairness have conceded the same to
the citizenship of other nations within our boundaries.   It has also
been maintained as violative of such law or treaty for either govern-
ment to deny the citizen justice by fair trial by any department in-
vested with authority to determine the matters at issue.   The treaties
of Mexico and the law of nations are essentially binding upon both
countries if good faith is to be the criterion for the enforcement of
those agreements.   Good faith ought to be presumed and not be re-
quired to be proved as a fact.   If bad faith is shown, or the stipulations
of the treaties or rules of international law are disregarded, this would
constitute such a breach of good faith as would constitute cause for
annulling the treaties and breaking off friendly relations.

Applicant's contention is that he has been tried with *undue haste,*
without due process of law, denied justice at the hands of the trial
court, and that the acts and rulings of that court show discrimination
against him.   He further insists that he has been denied the protection
of the provisions of the fourteenth amendment to the Federal Con-
stituion, and was denied a fair trial under the law of nations, and
under good faith guaranteed by the treaties, all of which are review-
able in his case by the Federal courts and Federal government, and

all of which demand at the hands of the trial court strict observance and fair dealing under the terms of the Constitution heretofore quoted. Under the law and the facts his contention seems legal, correct and justified. Article 3, section 2 of the Constitution of the United States provides that "the judicial power shall extend to all cases of law and equity arising under the Constitution and laws of the United States, and treaties made or which shall be made under their authority." As heretofore seen, treaties when made, "shall," like the Constitution itself, "be the supreme law of the land and the judges in every State shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding," is the unmistakable language employed in article 6, section 2 of that instrument. That the Federal courts and government of the United States has jurisdiction over cases arising under treaties and the law of nations, of course, is not debatable. This doctrine has been upheld from the inception of our national life as evidenced by the constitutional provisions above quoted, and has never been seriously questioned in our judicial history. United States v. Estrella, 4 Wheat., 298; United States v. Ortega, 11 Wheat., 467; Bylew v. United States, 111 U. S., 258; Ames v. Kansas, 111 U. S., 449; Hilton v. Guyot, 159 U. S., 113; The Paquete Habana, 175 U. S., 677; Miller v. The Resolution, 2 Sallas, 1; La Abra Silver Mining Co. v. United States, 175 U. S., 423; Tenn. v. Davis, 100 U. S., 257.

It is, therefore, apparent from what has been said that the judges and courts of the State must and will determine these Federal questions when raised before them, and in doing so are to follow and be bound by the interpretation of such treaties and laws of nations as announced by the Supreme Court of the United States. This court is called upon in this case to determine whether the terms of the treaties between the United States and Mexico have been violated in the prosecution, trial, conviction and sentence of applicant, and also whether the rules of procedure applicable to the law of nations have been set at naught in his trial. If so, then his conviction and sentence were obtained without due process of law, and this would entitle him to relief.

Undue Haste Violates Laws of Nations and Treaties: As shown by the above authorities, the conducting of a judicial trial with undue or unseemly haste, is a denial of justice which will justify international intervention under the laws of nations. The position of the United States Government as to the international law involved in this matter is very definitely set forth in the correspondence between Mr. Hamilton Fish, Secretary of State of the United States, and Mr. Cushing, our Minister to Spain, December 28, 1875. That was a communication in reference to the Virginius outrages in Cuba. In that communication, Mr. Fish said:

"This Government has not claimed that citizens of the United States, who place themselves in foreign jurisdiction, carry with them the par-

ticular immunities surrounding trial in their own country, nor has it insisted that peculiar advantages to the accused, such as trial by jury and habeas corpus, are or must be a part of the jurisdiction of foreign countries.

"But we have claimed that by *international law,* and by the usages and customs of *civilized nations,* a trial at law must be conducted *without unseemly haste,* with certain safeguards to the accused and in deference to certain recognized rights, in order to mete out justice.

"It certainly can not be said that an accused person has all the benefits of our treaty, where the defender appointed refused to read the defense provided, when the accused was not present at a considerable portion of the trial, and where no counsel was allowed or provided in the proper sense of the term, as the military officer defending him practically admitted his culpability.

"Moreover, you can not fail to remember that the prisoners of the Virginius reached Santiago de Cuba in the evening of November 1; that the next morning at 9 o'clock a council of war was convened on board the Tornado; that its labors were completed at 4 o'clock in the afternoon; that the consular officer who demanded of General Burriel permission to advise with his countrymen was in a gross manner denied access to them; that the sentences were not confirmed, and *the executions were hastened for fear that they would be stopped by superior authority.*

"In fine, if trial by military courts, as it has been practiced in Cuba, is to be continued, it is difficult to see how, in cases in which justice and moderation are most required, such forms can supply the guarantees to which, in the opinion of this Government, our citizens are entitled, and the absence of which will and must cause frequent and dangerous differences." (U. S. Digest of International Law, vol. 2, page 100, 99.)

Denial of Open and Fair Trial: Denial of an open and fair trial has always been regarded as an international offense. Where the jury system is in vogue in any country, then there must be a trial before an impartial court and jury, when dealing with a foreign citizen. An absolute denial of justice in cases arising even under municipal law is regarded as an international offense. (2 Digest International Law, p. 91, 92.)

In the trouble between the United States and England concerning the Irish persecutions, on June 2, 1881, Mr. Blaine, Secretary of State, addressed Mr. Lowell, our Minister to England, as follows:

"If American citizens while within British jurisdiction, offend against British laws, this government will not seek to shield them from the *legal* consequences of their acts, but it must insist upon the application to their cases of those *common principles of criminal jurisprudence,* which in the United States secure to every man who offends against its laws, whether he be an American citizen or a foreign subject, those incidents to a criminal prosecution which afford the best

safeguard to personal liberty and the strongest protection against oppression under the forms of law, which might otherwise be practiced through excessive zeal.

"That an accused person shall immediately upon arrest be informed of the specific crime or offense upon which he is held, and that he shall be afforded an opportunity for a speedy trial before an *impartial court and jury* are essentials to every criminal prosecution, necessary alike to the protection of the innocent and the ascertainment of guilt. (Mr. Blaine, Secretary of State, to Mr. Lowell, June 2, 1881, For Rel. 1881, 532. For the instructions of May 26, 1881, in the case of Boyton above referred to, see For. Rel., 1881, 530."

This right to a fair jury trial, of course, is confined to those countries, like England, where such trial is guaranteed in criminal cases. (See also recent U. S. Digest of International Law, vol. 4, p. 98, 99, 100.)

Unbecoming and Undue Harshness Violates Laws of Nations: Unbecoming and undue harshness in the execution of even an undoubted jurisdiction is violative of the laws of nations.

In the case of the Bluefields expulsion in 1894 of United States and British subjects by the Nicaraguan Government, our government instructed Mr. Gresham, Secretary of State, to demand immediate open trial of the accused with all *guarantees of defenses,* secured by treaty, and in default thereof, their release. (Digest International Law, vol. 4, p. 98 and 99.) In the last instance the United States admitted that Nicaragua had the right to expel citizens from its territory "provided it was exercised *in a becoming manner and without undue harshness*" and a reasonable time given to leave the territory, but our government said that the right of expulsion could not be exercised without giving to those intended to be expelled *"an open and fair trial."* In this Nicaraguan trouble, simply on account of the denial of an open and fair trial, the British Government, on April 27, 1895, occupied Corinto on the Mosquito Bay in Nicaragua, with its naval forces. (Digest of International Law, vol. 4, p. 99, 100 and 101.)

Right to Make Full Defense: To circumscribe or destroy, or unduly discriminate against the right to make defense is a denial of fundamental justice. (See last above authorities, and 2 Wharton's Digest of International Law, Senate Miscellaneous Documents, First Session, Forty-Ninth Congress, 1885-6, bottom of page 623.)

This last citation is as follows: "It has, from the very foundation of this government, been its aim that its citizens abroad should be assured of the guarantees of law; that accused persons should be apprised of the specific offense with which they might be charged; that they should have the right to be heard in their own defense, *either by themselves or such counsel as they might choose to employ to represent them;* in short, that they should have *a fair and impartial trial,* with the *presumption of innocence* surrounding them as a shield at all stages of the proceedings, until their guilt should be established by competent

and sufficient evidence." (Mr. Evarts, Secretary of State, to Aristarchi Bey, December 8, 1877, MSS. Notes, Turkey.)

"The refusal of a Chilian court, in 1852, on the trial for crime of an American citizen, to hear testimony on behalf of the defendant, would, if sustained by the Chilian Government, be considered by the United States, as 'a gross outrage to an American citizen, for which it will assuredly hold Chili responsible.'" (Mr. Conrad, Acting Secretary of State, to Mr. Peytoh, October 12, 1852. MSS. Inst.; Chili. Id., page 613.) (See also Grigsby v. Peak, 57 Texas, loc. cit., 148; Cooley on Constitutional Limitations, 4th edition, chapter 11.)

Palpable Injustice, Judicial or Otherwise: Palpable injustice in judicial or other tribunals is an offense against the laws of nations, and is ground for international intervention. This right is not weakened because the judiciary are independent of the other departments of government. (Mr. Forsyth, Secretary of State, to Mr. Semple, Feb. 12, 1839. MSS. Inst. Columbia. Wharton's Digest of International Law, pages 612, 613.)

Fraudulent Judgment or Decision: "A fraudulent decision by a foreign judge condemning an American ship, is a ground for a demand for redress by this government from the government of such judge." (Mr. Seward, Secretary of State, to Mr. Webb, December 7, 1867. MSS. Inst. Brazil. See infra section 329. Wharton's Digest of International Law, page 615.)

Unjust Discrimination Against Individuals: "It may, in general, be true that when foreigners take up their abode in a country they must expect to share the fortune of the other inhabitants, and can not expect a preference over them. While, however, a government may construe according to its pleasure its obligation to protect its *own* citizens from injury, foreign governments have a right to and it is their duty to judge whether their citizens have received the protection due to them pursuant to public law and treaties. . . . An acknowledgement of this right is not, under the circumstances, as Mr. Laftragua seems to suppose, tantamount to making unjust and invidious discriminations in favor of foreigners and against citizens. *It can not be acknowledged, as Mr. Lafragua maintains, that diplomatic interference in such cases necessarily annihilates or trenches upon the peculiar functions of a judiciary of a country. In cases of a denial of justice the right of intervention through the diplomatic channel is allowed, and justice may as much be denied when, as in this case, it would be absurd to seek it by judicial process, as if it were denied after having been sought.*"

Failure to Favorably Execute Laws for the Protection of Foreigners: "Your dispatches No. 849, of the 9th ultimo, and No. 850 of the 10th, have been read with attention. . . . *The guarantees of the treaty securing to our citizens in Mexico the protection of the laws of that country can not but be regarded as illusory and unsubstantial so long as those laws are ignored through the acts of subordinate military*

*authorities, and the judgment of the highest tribunals of the land are unheeded.* (Mr. F. W. Seward, Acting Secretary of State, to Mr. Foster, January 15, 1879. MSS. Inst., Mexico; For. Rel., 1879. As to inequality of taxation on aliens, supra section 204. Wharton's Digest of International Law, page 625.)"

International Law and not Municipal Law of the State or Country Governs: "The duties of the Haytian Government to the United States are not determined by *Haytian legislation nor by Haytian judicial decisions,* but by the laws of nations. The opinion of the court of appeals of Hayti in no respect settles the international liabilities of Hayti.

"These liabilities, so far as concerns the United States, are determined by the principles of international law, as limited by the treaty stipulations, which forms the supreme law of the land, both in Hayti and in the United States." (Mr. Baynard, Secretary of State, to Mr. Langston, March 28, 1885. MSS. Inst., Hayti; For. Rel., 1885. Wharton's Digest of International Law, 639 and 642.)

Cumulative Instances of Discrimination and Denial of Justice: "It is no defense to this statement to say that, under the laws of Hayti, he can not be otherwise treated. *That such a conflict between different laws can and does exist, is of itself* a violation of those stipulations of existing treaties which guarantee to an American citizen in Hayti (as to a Haytian citizen in the United States) the same rights and resorts in proceedings at law as to native citizens of the respective countries. To close to an alien litigant some given channel of recourse open to a native without leaving open some equivalent recourse, is a denial of justice, *and to base a persistent refusal to afford remedy upon the letter of the defective or conflicting laws is at once an admission of failure of justice,* to the injury of the alien, and an attempt to justify by the mere fact of such evident failure a *discriminatory course* toward an alien prohibited by treaty and repugnant to public law." (Mr. Bayard, Secretary of State, to Mr. Thompson, June 25, 1885. MSS. Inst., Hayti; For. Rel., 1885. Wharton's Digest of International Law, pages 642 to 643.)

It is alike the duty of the Mexican Government to see to it that any American citizen whose rights are infringed without due warrant of law, shall be protected in those rights. (Mr. Bayard, Secretary of State, to Mr. Jackson, July 31, 1885. MSS. Inst., Mexico. Wharton's Digest of International Law, page 643.)

"Oppression of a citizen of the United States by a Mexican custom officer is subject for diplomatic intervention; and the party injured is not confined to a judicial remedy." (Same to same, July 20, 1885. MSS. Inst., Mexico. Wharton's Digest of International Law, page 645.)

"That the State to which a foreigner belongs may intervene for his protection when he has been denied ordinary justice in the foreign

country, and also in case of a plain violation of the substance of natural justice, is a proposition universally recognized.

"One of the highest authorities on international law, Valin, says:

" 'To render legitimate the use of reprisals, it is not at all necessary that the ruler against whom this remedy is sought to be . employed, nor his subjects, should have used violence, nor made a seizure, nor used any other irregular attempt upon the property of the other nation or its subject; it is enough that he *has been denied justice.'*

"If the tribunals of a foreign state 'are *unable or unwilling* to entertain and adjudicate upon the grievances of a foreigner, the ground for interference is fairly laid.' (Phill. on International Law.)

"In his recent work on the Law of Nations, Sir Travers Twiss, who holds a distinguished position as a writer on public law, says:

" 'International justice may be denied in several ways: (1) by the refusal of a nation either to entertain the complaint at all, *or to allow the right to be established before its tribunals;* or (2) by studied delays and impediments, for which no good reason can be given, and which are in effect equivalent to a refusal; or (3) by an evidently unjust and partial decision.' " (Law of Nations, by Sir Travers Twiss, part 1, page 36.) (Mr. Bayard, Secretary of State, to Mr. McLane, June 23, 1886. MSS. Inst., France. Wharton's Digest of International Law, page 649.)

It is sometimes loosely said that an alien in a country when charged with crime has no greater or different rights than the citizens have when so charged. This depends entirely upon what the municipal law of the country is. If it secures, in theory, fundamental justice, and is administered without favor or discrimination, then this is true. but if the theory is despotic, or, if fundamental justice is not administered, it is an offense against the laws of nations to harm the foreign citizen thereby. Now, the foregoing contentions and citations show many specific and particular instances of violation of fundamental justice in practice, and show that they are all remediable by international intervention and the laws of nations. The government may despotically be unjust to its own citizens with impunity, so far as foreign governments are concerned; but under the laws of nations, or treaties, when it lays its hands upon the alien it must treat him with fundamental justice, and without discrimination either in general theory or in the particular acts in his individual case. Such is the laws of nations, for, the government then becomes accountable to the foreign nation. As to the United States, the fourteenth amendment secures to our citizens and all persons, what the laws of nations secure to the foreigner along the line of fundamental justice and nondiscrimination. But prior to that amendment, by virtue of the law. of nations and the treaty power, these fundamental rights were secured to the foreigner without the necessity of the amendment. See Downs v. Bidwell, 182 U. S., 244; United States v. Wong Kim Ark., 169 U. S., 649; Lem Moon Sing v. United States, 158 U. S., 538.

From the foregoing citations and contentions, it will be seen at once that the decision of this case depends upon whether or not the relator was given fundamental justice or was discriminated against. If either the negative of the first proposition, or the affirmative of the second is true, then under the laws of nations (as well as under the treaties and fourteenth amendment) he is entitled to his discharge from the judgment rendered and to be cleared of that, although it would be proper to arrest and hold him for further trial. As to due process of law and equal protection of the law as applicable to persons whether citizens or aliens, under the fourteenth amendment to the Federal Constitution, it is well to consider the combined Laws of Nations, Due Process of Law, and Equal Protection of the Law.

The fourteenth amendment: Not only does the relator claim that the laws of nations and the treaty with Mexico have been violated, but he also claims and presents at bar in argument that he has been deprived of his life without due process of law—at least so far as judgment and decree is concerned—and has been denied equal protection of the law, and that both of said denials are violative of the fourteenth amendment to the Federal Constitution, in that he has not had a fair and impartial trial, that the trial was too hasty, so hasty indeed that after nearly all of the evidence was in, the progress of the trial had to cease in order for the mother to be able to have time enough to reach the courthouse in order to give testimony as to his age; and that he was not properly represented by counsel on account of the intimidation by the mob; and that the judge had prejudged his case; and that the special term of court was without any notice and was convened only for his case, and the court appointed jury commissioners to draw a petit jury to try his case before the grand jury indicted him, and before the grand jury was even summoned, all of which, he claims, was violative of the fourteenth amendment to the Federal Constitution.

Concerning this subject, it is well to take into consideration the following holdings in Federal cases: In Yick Wo v. Hopkins, 118 U. S., 356 (affirmed in U. S. v. Arkansas, 169 U. S., 644), arbitrary power was given to commissioners as to whether or not they would grant a license to run a laundry in wooden buildings," to be exercised in reference to the circumstances of each case, with a view of the protection of the public against the damages of fire,' and this arbitrary power extended to persons who might be so licensed. "The power given them is not conferred to their discretion in the legal sense, but is granted to their mere will. It is purely arbitrary, and acknowledges neither guidance nor restraint. . . . When we consider the nature and the theory of our institutions of government, the principles upon which they are supposed to rest, and review the history of their development, we are constrained to conclude that they do not mean to leave room for the play and action of purely personal and arbitrary power. . . . But the fundamental rights to life, liberty, and pur-

suit of happiness are secured by these maxims of constitutional law of the commonwealth which are the monuments showing the virtorious progress of the race in securing to men the blessings of civilization under the reign of just and equal laws, so that . . . government of the commonwealth 'may be a government of laws and not of men.' For the very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems to be intolerable in any country where freedom prevails, as being the essence of slavery itself."

This applies with peculiar force to the special term of court law in the case at bar. The court in Wo's case continues:

"There are many illustrations that might be given of this truth, which would make manifest that it was self-evident in the light of our system of jurisprudence. The case of the political franchise of voting is one. Though not regarded strictly as a natural right, but as a privilege merely conceded by society, according to its will, under certain conditions, nevertheless, it is regarded as a *fundamental political right* because preservative of all rights. *Though the law itself be fair on its face and impartial in appearance, yet if it is applied and administered by public authority with an evil eye and an unequal hand, so as to practically make unjust and illegal discrimination between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution.*" To the same effect are the following cases: C. B. & Q. Ry. v. Chicago, 166 S. S., 226; Henderson v. Mayor, 92 U. S., 259; Chy Ling v. Freeman, 92 U. S., 275; Neal v. Delaware, 103 U. S., 370; Soon v. Crowley, 113 U. S., 703; Ex parte Abrams, loc. cit., 478.

When the fourteenth amendment forbade any State from depriving any person of life, liberty or property without due process of law, it was supposed that the intent of the people of the United States was to prevent the deprivation of any legal right in violation of the fundamental guarantees inhering as we have often said, *"apply to all the instrumentalities of the State, to its legislative, executive, and judicial authorities; and therefore it has become a settled doctrine in the constitutional jurisprudence of this country that whoever by virtue of public position under a State government deprives another of property, life or liberty without due process of law, or denies or takes away the equal protection of the law, violates the constitutional inhibition, and he acts in the name and for the State, and is clothed with the State's power, his act is that of the State.* This must be so, or as we have often said, the constitutional prohibition has no meaning, and the State has clothed one of its agents with the power to annul or evade it." C. B. & Q. Ry. v. Chicago, 166 U. S., 226, 233, 234, citing Ex parte Virginia, 100 U. S., 346, 347; Scott v. McNeal, 154 U. S., 34. The court has said: "But a State may not, *by any of its agencies,* disregard the prohibition of the fourteenth amendment. Its *judicial authorities* may keep within the letter of the prescribing forms of procedure in its

courts and give the parties interested the fullest opportunity to be heard, and yet it might be that its *final action* would be inconsistent with the amendment. In determining what is due process of law, regard must be had to substance, and not to form." Chicago, Burlington, etc., Ry. v. Chicago, 166 U. S., 226. Again, in another case, "though the law itself be fair on its face and impartial in appearance, yet if it is applied and administered by public authority with an evil eye and unequal hand . . . it is still within the prohibition of the constitution." (Yick Wo v. Hopkins, 118 U. S., 356. See also Henderson v. Mayor, 92 U. S., 259; Chy Lung v. Freeman, 92 U. S., 275; Neal v. Delaware, 103 U. S., 370; Soon Hing v. Crowley, 113 U. S., 703.)

High authority thus declares the law: "This due process of law includes, among other things, not only the right of a party to be properly brought into court, *but also the right then and there, to avail himself of the constitutional protection thrown around life, liberty, and property; the right to be heard before being condemned, and which proceeds upon inquiry, and to have judgment rendered only after trial."* (Cooley's Constitutional Lim., 4th edition, chapter XI; Grigsby v. Peak, 57 Texas, loc. cit., 148.)

Fundamental Justice and Nondiscrimination: We have seen from the contentions above, that any of the following acts are violative of the laws of nations: (1) Undue and unseemly haste in judicial trials; (2) Denial of open and fair judicial trial; (3) Denial of right to make full defense, which includes the right to be informed of the charge and given ample time to prepare for and make defense; (4) Denial of right to be heard by counsel of one's own choosing when such is within defendant's power (Virginius case); (5) Right to have a defender faithful to the defense, instead of permitting a procedure wherein "no counsel was allowed or permitted in the proper sense of the term, but where the officer defending him practically admitted his culpability" (Virginius case); (6) Where the "executions were hastened for fear they would be stopped by superior authority" (Virginius case); (7) Unbecoming and undue harshness in the exercise of even undoubted jurisdiction; (8) Fraudulent judgment or decision; (9) Unjust discrimination against individuals and failure to apply to them the same rules as are provided and usually enforced in favor of others charged with similar crimes.

As cumulative, it may be said that no procedure is either in accordance with the laws of nations or due process of law, which does not fully hear before it condemns. (From Webster's Brief in Dartmouth College Case, 4 Wharton, 518, down to date this has never been disputed by any court of high authority.) This includes the right to exhaust every avenue of procedure, whether it be appeal or otherwise, which is given to anyone charged with a similar crime. And if one has lost his right by duress or by a lawless mob, or through the fraudulent acts of the officers or by glaring failure of counsel to exhaust the

avenues of procedure which are provided, whether it be by appeal or otherwise, he is not convicted in accordance with the laws of nations nor with due process of law nor has he been shown the equal protection of the law. The right of a prisoner to be protected from a mob or lawless violence, is constitutional, is not a right that can be exercised only by a State, but also by the Federal Government. Logan v. U. S., 144 U. S., 263.

It may be claimed that the relator. is actually guilty. This seems to be the burden of some of the argument made for the upholding of the judgment. But to this claim, there are three insurmountable barriers: One is, that an *unlawful* conviction has no standing in any civilized country even though defendant be, as a matter of fact, really guilty. Another is, that if the prisoner has not been lawfully tried, how are we to ascertain, as a matter of fact that he is really guilty? For it is only after due and full and fair trial that we can, as a matter of either law or philosophy, ascertain the real fact of guilt. To assume that a defendant is guilty from what is disclosed in the evidence heard at an unfair trial in which undue haste prevented a prior preparation for defense, or denied review by appeal, is equivalent to declaring him guilty in a trial in which he is not allowed to make *any* defense, for practically speaking, an incomplete defense is no real defense at all. This, then, would be equivalent to convicting him without hearing him in his own defense. Likewise, would it be if the record upon its face appears fraudulent whether in the discrepancies in reference to when the term of court was convened some entries claiming the 24th and others claiming the 25th, and the total absence of certain entries in the first transcript that appear in the subsequent transcripts. The third insurmountable barrier, is that in this very case there is a grave doubt as to whether or not the accused is above 16 years of age, and under our laws no one under 17 years of age can be lawfully given the death penalty, and that is the penalty. assessed by verdict and judgment in this case. The defendant was born in Mexico and when tried was many hundred miles from his place of birth. It was barely possible for his mother to get to the trial, for the lack of time, to testify as to his age although she lived only twenty miles distant. There was no time in the six days between the arrest and final judgment of death to send to Mexico for the Baptismal record if there was one. There was no time for his counsel to investigate whether there was such a record. One of his counsel arrived at Pecos about midnight and the trial began the next morning. The other counsel had been appointed by the court, and had never seen the prisoner until the day that he was put on trial, and he is the counsel whom the district judge swears abandoned the idea of appeal after having been seen by the "friendly mob." In fact, the district judge had rendered it impossible for said counsel by sending the prisoner one hundred miles away.

These barriers preclude the contention that the defendant is actually guilty, and, therefore, it will be of no consequence if the State hangs

him for he will lose "no substantial right thereby," although unfairly tried and unlawfully convicted. It might be claimed that there are no bills of exception in this case, and no right to raise the question as to age. In ordinary appeals where there are no bills of exception and no statement of facts, this would be correct, but where by the procedure below the defendant was *unlawfully* deprived of his rights in these respects, the judgment would be reversible for the very lack of bills of exception and a statement of facts. See authorities cited above.

Again, this is a proceeding of habeas corpus and certiorari. These proceedings may be conjoined in one proceeding. (11 Cyc., 915-16; Ex parte Yerger, 8 Wallace, 85 (U. S. Sup. Ct.); see Armour v. Com., 6 Serg. & Ralle, 245). The validity of the judgment is being tried as to the laws of nations, due process of law, and equal protection of the law. Even if this court had no power to reverse, it certainly would have the power to nullify the judgment obtained by duress or fraud.

This is jurisdictional, for a judgment entered under duress or fraud is a nullity. When such a case comes up by certiorari and habeas corpus conjoined, the court will not be confined to the record below, but will hear all evidence necessary to determine the matter, and this would be true regardless of what might have been the evidence in the former trial. If it was procured by duress or fraud, the judgment is void, and the relator would not be confined to the evidence in the former trial. If he were so confined, then no judgment, civil or criminal, could ever be set aside for duress or fraud unless fraud were patent upon the face of the record. (See Constitution of Texas, section 5, article 5; Harris v. Hopson, 5 Texas, 529-34; 6 Cyc., 789, 790, 828, 830, 831, 837; Walton v. Pearson, 82 N. C., 464; see also 6 Cyc., 823, 819, 822, 826, 827, 828, 830, 831.)

In view of the provisions of the Federal Constitution and treaties a change of venue was necessary in order that applicant should be awarded a fair and legal trial.

The course of the district judge in the trial of this case stands at great variance with the ideas in regard to change of venue when our Constitution was formed. The idea which then prevailed was that of the English law. So strict were the English courts in securing a prisoner a fair trial that on certiorari the King's Bench would change the venue of a criminal case before trial and while pending in the court below, from one county to another. And when an application was made for such change, even a *"suspicion"* that a fair trial could not be had in the county where the cause was pending, was held sufficient grounds upon which to award the change. The King v. Hunt, 2 Chitty's Rep., 130, 5 E. C. L., 259; State v. Albee, 61 N. H., 423, 60 Amer. Rep., 325, 12 Cyc., 242 B; 4 Bl. Com., 321; 3 id., 294; 1 Chitty Cr. Law, 201; Rex v. Nottingham, 4 East, 394; Rex v. Hunt, 3 B. & Ald., 444.

In The Ping v. Hunt, 2 Chitty's Rep., 130, "the court said it was of the greatest importance that the administration of justice should not only be free from spot or blame, but that it should be, as far as human infirmity could allow it to become, as free from all suspicion. The great difficulty, and almost the only difficulty, which the court felt in granting the application, had arisen from the conduct of those by whom the application was made, the lateness of the time in which the matter was brought before the court. . . . There were circumstances somewhat extraordinary in the conduct of the parties who made the application; but as the great object of the court was to take care that the administration of justice should be free from all *suspicion* the court upon that ground had made up its mind to accede to the application. The court were not influenced by the suggestion that as fair and impartial a trial could not be had in the immensely populous county of Lancaster as any other; but as it was possible that persons connected with those who were the opponents of the defendants, in transactions which were the subject of the indictment, might be on the jury; and as that fact would be a good cause of challenge to such persons, the court were disposed to make the rule absolute subject to certain limitations." The venue was changed from Lancaster to York County.

I thought it only necessary to mention the questions discussed. The other question being incidental, will follow necessarily the decision of those treated as corollaries following the solution of the main proposition. That the opinion of the community concerted itself into the conviction that the accused was guilty, did not relieve the trial court from awarding applicant a fair legal trial. Nor will the fact that the friends or relations of an injured party demand swift vengeance based on some real or imaginary outrageous conduct by the accused authorize the court to ignore legal methods of trial. The courts are not organized to be influenced by the demands of an excited public opinion. The law demands fair trials, and this in accordance with the constituted authority under well recognized rules and principles of law, and not by the demands and cry of an excited crowd. That the crime may be such as stir up or justly excite the people, will not constitute a reason for not granting such legal and orderly trial. The law has provided how trials should be had, and any departure from the provisions of law in the conduct of trials becomes unlawful and prostitutes the courts to illegal purposes and makes of them engines of oppression rather than resorts for legal trials as contemplated in all recognized society and government.

The applicant is entitled to the relief prayed for against the trial, judgment and sentence for reasons already stated in this opinion.

Concluding I wish to express the highest appreciation of the valuable assistance rendered by counsel in the case; especially do I wish to acknowledge the painstaking and able assistance given by the Assistant Attorney-General, Hon. C. E. Lane, and his assistant in office,

Hon. Shelly Grover. At my request the questions involved were taken up and by them fully and elaborately briefed. These questions have been thoroughly elucidated in the brief filed by them. The examination of the authorities has been exhaustive, clear and remarkably forcible. While this has been largely done by Mr. Grover, yet he had the able assistance and concurrence of Mr. Lane. Too much credit can not be accorded officers of the law who manifest courage of conviction and dare to do right in upholding the law as it was intended it should be upheld. Such officers should be commended at all times for the fearless and impartial discharge of duty, and it affords great pleasure to award these gentlemen such commendation. The brief furnished by them will stand as a monument to their ability, fairness, fearless and conscientious devotion to duty, and in upholding the law and legal justice. These gentlemen in the discharge of their duty to the State have strictly adhered to the idea that they as representatives of the State should be moved by the desire only to assist the court in arriving at a correct solution of all legal questions involved in appeals as presented to this court, and this whether the disposition of the case or cases lead to an affirmance or to a reversal of the judgment. The correct conclusion of legal questions and disposition of appeals has been their official criterion of duty. This is to be fully commended, and if followed by all the trial courts and prosecuting officers of the State, the minimum of reversals might be easily and readily reached. The enforcement of law is to be arrived at only by adherence to legal requirements and principles of just and fair trials as provided by constitutional provisions, legislative enactments and well established rules of law. Our laws have been made for observance and not for evasion.

In the original opinion, or rather the first section of the opinion Judge Harper discussed the right of appeal without reference to the question of duress, which was the main proposition relied upon by applicant by which he lost his right of appeal; and also the judge discussed the international question; that is, the rights of applicant as a Mexican citizen. That clause of the first section of his opinion will so disclose. In writing what I had to say about it in my dissent I followed or sought to follow the outline of his opinion as he then presented it to me. I do not care to discuss those questions further than I have already done. I only wish to add a few remarks in regard to some expressions in the later section of Judge Harper's opinion:

1. Judge Harper handed me his opinion on January 3 last, in which he and Judge Prendergast had agreed to remand applicant under the original conviction and sentence in the trial court. I then notified my brethren that I could not agree with them and would later write out my dissent. I also informed them at the same time that they need not delay handing down the opinion in the case, and that they could hand it down at once. This they fully understood at that time. I will state further in regard to this matter they both understand

fully and have been informed invariably that whenever I reach the conclusion of dissenting, they are requested not to hold up the handing down of their opinion; that in all cases when that point has been reached, they should at once hand down the opinion, and if I saw proper to enter a written dissent I would do so without delaying the disposition of the case. There was no necessity for holding up the disposition of the case on January 3. The reason for it, I suppose, from later developments, is a want of entire satisfaction with reference to what they had written, and a desire to reply to what I might have to say. That was a matter with them about which I was not concerned. I would not make these remarks but for the expressions in Judge Harper's opinion, impliedly, if not directly, imputing the delay in the disposition of the case to me. I wish to deny that emphatically. It will be observed that the dissenting opinion had no effect upon the disposition of the case. It is decided upon the majority opinion.

2.   Judge Harper takes occasion to say my conclusion of fact from the record, as stated in what I did write, was so variant from what he and Judge Prendergast had written he felt it incumbent upon himself to include all the evidence in the addendum to his original opinion. The judge failed to insert all the evidence in his opinion. It was unnecessary to copy the evidence in the opinion as it was delivered by the witnesses and found in the certified copies of the record. This could have been included in a statement of the finding of the facts and not burden the opinion with it, but that was a matter of taste. I will state, without including the evidence in what I here state, that Judge Harper omitted from his "full" statement of the facts two transcripts by the clerk of the District Court at Pecos City to the applicant, one dated the 13th of August, and the other the 23d of September. These transcripts are in conflict with each other as to the minutes of the court, and in conflict with that introduced by the State. He also omitted certified copy of the order of Judge Isaacks convening the court. This order was not included in one of the transcripts furnished applicant. He also omitted from the statement of facts the precept issued from the District Court on July 25 to serve a copy of indictment upon applicant who was then at Midland, one hundred miles away, which shows service on the applicant the same day on which it was issued at Pecos City. He also omitted from his "full statement" of the facts copy of the special venire and the service thereon which shows service upon applicant at Midland on the 26th of July, while he was still there in jail at Midland. Both precepts show service on applicant at Midland by the sheriff of that county, one on Tuesday, July 25, and the other on Wednesday, July 26. The judge in his opinion also admitted the following: the insertion of the two transcripts furnished appellant by the clerk to show the difference in their recitals as to the time of holding the court at which applicant was convicted. The caption of one of the transcripts shows the court opened on the 25th of July. The caption of the other transcript shows

the court opened on the 24th of July. These transcripts are under
the seal of the clerk. Some of the certified copies of Judge Isaacks'
orders opening the court are also at variance with each other. These
are not all found in Judge Harper's statement of the evidence. One
of the orders written by Judge Isaacks bears date *25th of July,* calling
the court to convene on *24th of July.* The other is dated the 24th of
July, and called for court to open on the 24th of July. It might be
mentioned that other papers are not included in Judge Harper's "full
statement of the evidence," but I do not care to further pursue that
matter. Most of these were introduced by applicant on his trial before
this court under habeas corpus. These are parts of the record and
statement of facts which was before this court at the time of the sub-
mission of the case. They, of course, necessarily form a part of the
record to be considered in making up the conclusion of facts and
law. The differences between the transcript introduced by the State
and those by the applicant are marked, and entered largely into the
conclusion reached by myself in writing the opinion that I did. These
show haste, hurry and confusion at the trial, and want of accuracy in
the records even that were brought from the trial court and introduced
in evidence before this court. There was no attempt at explanation,
but the records went before the court for their face value. I do not
propose to enter further into a discussion of the legal phases of these
matters. I have done that sufficiently, I think, heretofore, and this
which I am now writing would not have been written but for some of
the statements of Judge Harper in his opinion. I do not purpose to
follow him in his sharp attacks and criticisms. I will leave those
matters to the credit of my brethren for what they may think they
are worth. I want to say this much, however, in reply to Judge
Harper's assumption that I was attacking Judge Isaacks personally,
that I do not believe what I have said in the opinion would bear the
construction Judge Harper seeks to place on same. Judge Isaacks was
essentially and necessarily a very prominent witness before this court
in the case. His acts and orders as district judge are prominent facts
involved. Judge Isaacks may have believed that he was doing what he
conceived to be his duty. With that I have no concern. But his
acts as judge as shown by the record of that court during the trial of
this case, his evidence by affidavit, and his oral testimony before this
court, the orders he entered in the minutes, necessarily form important
parts of this case. I, of course, would not and could not write of the
matters occurring at that trial and which are incident to this case
without reviewing the testimony of Judge Isaacks. Nor do I care to
review or discuss some of the discourteous statements of Judge Harper
which seem to be intended for the admiration of the people in that
immediate section who were doubtless outraged in their feelings to
the manner of the taking off of Miss Brown. This outraged feeling
on their part is natural, and with that I have no concern. I leave
to my brethren the consolation of getting whatever comfort and popu-

larity they may desire or can obtain with the people in the Pecos City section. With that I have· no concern. I have made it the rule of my judicial life, and shall continue to do so, while invested with the authority pertaining to the office I hold, to decide questions as I understand them after as careful an investigation as my capacity affords, without reference to what public opinion may be. I do and shall continue to regard the law as superior to the ebullition of outraged feeling when communities are shocked by crime. When cases arising under such circumstances have reached this court, my voice and my vote shall in the future as in the past be given for the upholding of the law, not bending it to public opinion. The stability of the institutions of this government depends upon adherence to the law as it is written and not on the fluctuating strenuosity of eruptive ebullitions of popular sentiment. If the frame work of the government and its organic and statutory law and its jurisprudence are to give way to any one of these matters of public emotions, then the government is one step nearer anarchy, and such giving way would form the predicate and precedent for another incident of the same sort. The end to this, of course, would be deplorable.

Believing applicant should be awarded another trial, I do not intend to hold that he should be discharged finally from custody. He ought to be held to be dealt with in accordance with the law of the land. I have given this case full consideration, and do not believe that he has had that character of trial which is guaranteed by the law of the land, and I do so with full realization of my duty to the State on one hand and to the accused on the other. The law is not designed to be a swift engine of oppression and vengeance, but it was and is designed to try men only after due hearing and fair trial.

I can not concur with my brethren.

[Writ of error taken May 24, 1912, to Supreme Court of the United States, the ruling of which will be noted in a subsequent volume of these reports.—Reporter.]